IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LINDA SMITH, MATTHEW SMITH, AND
NATHAN SMITH,

        Plaintiff,

vs.                                                                                    No. CIV 08-0752 JB/RLP

SEAN KENNY, JOHN FRIEDFERTIG,
CASSANDRA KUKOWSKI, CASEY
McDONNELL, KEVIN NAPOLEONE,
ANDREW VOCASEK, in their individual
capacities,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant Sandra Kukowski's Motion for

Summary Judgment, filed February 27, 2009 (Doc. 16). The Court held a hearing on May 13, 2009.

The primary issue is whether Defendant Sgt. Cassandra Kukowski enjoys qualified immunity for

the actions she took at issue in this case. Resolution of that issue turns upon two sub-issues: (i)

whether Kukowski seized Plaintiffs Matthew Smith and Linda Smith for purposes of the Fourth

Amendment to the United States Constitution when she called on her cell phone and told them to

leave the house where they were at the time of the encounter; and (ii) whether, if she conducted a

seizure, exigent circumstances justified her doing so. The Court must also decide whether Plaintiff

Nathan Smith has met his burden of putting evidence into the record to rebut Kukowski's statements

that she did not meet or interview him at any time. Because Kukowski has not shown that the

undisputed material facts demonstrate that no seizure occurred, the Court cannot say, as a matter of

law, that there was no seizure. Furthermore, while the Court would normally analyze the allegation

of exigent circumstances to determine whether, regardless of the dispute whether a seizure occurred, Kukowski might still enjoy qualified immunity, upon request of the parties, the Court will not, at this time, analyze exigent circumstances.  Given that Kukowski has not shown, as a matter of law, that no seizure occurred, and given the parties' request for the Court to refrain from deciding the exigent-circumstances issue, the Court will deny the motion for summary judgment.  The Court finds that summary judgment is not appropriate on Nathan Smith's unlawful-arrest claim against Kukowski, because there is evidence in the record that she participated in detaining and questioning him in the absence of a warrant, reasonable suspicion, or probable cause.  Nathan Smith has not, however, established a factual issue that Kukowski used, or allowed other officers to use, excessive force against him in her presence.

## FACTUAL BACKGROUND

Many of the material facts in this case are undisputed.  Moreover, the allegations relevant to this motion for summary judgment arise out of two scenarios in which Kukowski allegedly participated.  The first relevant set of allegations relates to the questioning and detainment that Nathan Smith experienced at the command center.  The second set of allegations relates to the telephone call that Kukowski made to Matthew Smith's cellular phone at approximately 2:00 a.m.

### 1.    The Twister's Event.

Kukowski is an officer for the Southeast Area Command in the Albuquerque Police Department.  See Affidavit of Cassandra Kukowski ¶ 4, at 1 (executed February 27, 2009)(Doc. 17-2)("Kukowski Aff.").  On October 22, 2007, Kukowski responded to a 311 call at the Twister's restaurant.  See id. ¶ 7, at 2.  During an interview of the Twister's employee, the employee told Kukowski that she had spotted Raymond Lollis, who was a homicide suspect.  See id. ¶ 11, at 2. The employee told Kukowski that she was "certain it was Mr. Lollis because she had just read the

newspaper where his picture was printed." Id.  Furthermore, the employee "showed [Kukowski] the newspaper that the employee had been reading that clearly showed Mr. Lollis as wanted for suspected homicide." Id.

Dispatch from the 311 call relayed the information from the Twister's employee's call to Kukowski which contained a license plate number and a description of the suspect.  See id. Kukowski traced the vehicle's license plate number to the Smiths' address on Cardenas St., where she placed a periodic watch on the address.  See id. ¶ 8-9, at 2.

After placing the watch, Kukowski interviewed the Twisters employee who made the 311 call to confirm the details.  See id. ¶ 10, at 2.  Later that evening, Kukowski saw Sean Kenny's vehicle parked in a shopping center, where he was also the commanding officer on the scene for the periodic watch issued by Kukowski.  See id. at ¶ 13, at 3.

## 2. **Kukowski's Alleged Participation in the Detention and Questioning of Nathan Smith.**

On October 23, 2009, at approximately 1:22 a.m., Defendant Officer Kevin Napoleone witnessed a white car arrive at the Smith's residence.  See Deposition of Kevin Napoleone at 6:25 (taken March 25, 2009)("Napoleone Dep.").  The driver of the car reportedly went into the home and then left at 1:30 a.m. See id. at 7:11-13.  Kenny then ordered Defendant Casey McDonnell to stop the vehicle. See Deposition of Casey McDonnell at 6:1-16 (taken March 25, 2009)("McDonnell Dep.").  McDonnell then stopped the vehicle pursuant to Kenny's command and confiscated Nathan Smith's cell phone and charger, and the keys to the car. See id. at 7:4-9; Deposition of Nathan Smith at 22:10-23:2 (taken May 27, 2009)("Nathan Smith Depo.").  McDonnell then handcuffed Nathan Smith and placed him in the back of the police vehicle.  See id. at 23:8-13; 24:17-20.

Nathan Smith was then told that he was being taken to the Sergeant so the Sergeant could

speak with him.  See id. at 30:16-20. Nathan Smith alleges that he was taken about two blocks east to a parking lot where Kenny had set up a police command center. See id. at 31:2-9.  Nathan Smith alleges seeing a "blonde, average height, female." Id. at 32:5-6.  This woman was later identified as a sergeant.  This female sergeant later questioned him about his home and about a picture of Raymond Lollis, the homicide suspect.  See id. at 32:10-24.  Smith also alleges that he saw both a sports-utility vehicle and a van at the command center where he was questioned.  See id. 34:4-2; 35:1-25.  After questioning, Smith was allowed to leave the command center area with his girlfriend. See id. at 42:23-25; 43:1-16.

Kukowski contends that she never met Nathan Smith or Matthew Smith during the night of October 22-23, 2009. See Deposition of Kukowski, at 24:1-6 (taken March 25, 2009)(Doc 45-7)("Kukowski Depo."); Kukowski Aff. ¶¶ 30-33, at 5.  Kukowski further contends that her presence was limited to the calling of Matthew Smith's cellular phone.  See Kukowski Aff. ¶¶ 20-33, at 4-5. Nevertheless, Kukowski admits she was the only female officer on sight that evening at the Cardenas address. See Deposition of Kukowski, at 27:8-12.  Furthermore, she admits driving a "Tahoe, fully marked" SUV to the command center on October 22, 2009.  Id. at 27:16-18.

### 2.    The Incident at the Smith's Residence.

On October 23, 2009, at approximately 2:30 a.m., Kukowski offered to assist Kenny in the extracting the occupants of the residence on Cardenas Street. See Kukowski Aff. ¶¶ 17-18, at 3. Kukowski proceeded by calling a phone number that Kenny had provided.  See id. ¶ 18, at 4. Kukowski states in her affidavit that she called the cellular phone at the Cardenas address and "told [Matthew Smith] he needed to come to the front door, bring any other occupants of the house with him, and make contact with the officers that were outside." Id. ¶ 18, at 3.  Kukowski alleges in her affidavit that she "advised [Matthew Smith] to bring warm clothes and shoes," and that she had

begun to give his safety instructions.  Id.  Kukowski also asserts that the phone call then became "muffled and [Kukowski] could hear that [Matthew Smith] had already gone outside." Id.  Matthew Smith terminated the phone call shortly afterward.  See id.

Matthew Smith tells a similar story.  He contends that Kukowski at approximately 2:00 a.m. "ordered both of us [Linda Smith and Matthew Smith] to exit the house" after  "identifying herself as an [Albuquerque] police officer."  Affidavit of Matthew Smith ¶ 6-7, at 1 (executed March 10, 2009)(Doc. 27-2)("M. Smith Aff.").  Matthew Smith avers that he and Linda Smith were then told to "surrender to officers waiting outside."  Id. ¶ 8, at 1.  Kukowski ordered the Linda and Matthew Smith to "leave the house with [their] hands in the air."  Id. ¶ 9, at 2.  Officer's were present with guns drawn to receive Linda and Matthew Smith when they left their home. See id. ¶¶ 10-12, at 2.  The Albuquerque Police Officers then placed Linda and Matthew Smith in handcuffs.  See id. ¶ 13, at 2.

Shortly after making the phone call, Kukowski went home.  See id. ¶ 20, at 4.  At no point did Kukowski see the house during or after the time that the extraction took place.  See id. at ¶ 20, at 4.  She did not touch or speak face-to-face with any of the residents, nor did she meet or question any of the detained individuals.  See id. ¶¶ 26-28, at 4.  Kukowski did not give orders or instructions during the events at issue in this motion.  See id. ¶ 36, at 5.

**PROCEDURAL BACKGROUND**

The Smiths brought this lawsuit in federal court pursuant to 42 U.S.C. § 1983, alleging that Kukowski violated their civil rights.  See Plaintiffs' Complaint at 1, filed August 18, 2008, (Doc. 1)("Complaint").  The Smiths allege that their rights under the Fourth and Fourteenth Amendment were violated as a result of an unlawful seizure, unlawful arrest, excessive force, and unreasonable search. See id. at 6-8. The Smiths allege that Kukowski violated their Fourth Amendment rights by

unlawfully extracting Linda and Matthew Smith from their home at approximately 2:00 a.m.  See id. ¶ 39, at 6. The Smiths also allege that the defendants violated their Fourth and Fourteenth Amendment rights by unlawfully arresting them, using excessive force, and unlawfully searching their home without probable cause or exigent circumstances by detaining the Smiths from gunpoint and searching their home without a warrant. See id. ¶¶ 42-54, at 7-9.

Kukowski filed this motion for summary judgement alleging that she is entitled to qualified immunity from the Smiths' suit.  Kukowski argues that she did not effectuate a seizure.  See Memorandum in Support of Defendant Cassandra Kukowski's Motion for Summary Judgment at 11, filed February 27, 2009, (Doc. 17)("Memo. in Support").  She also maintains that she was not physically present at the time of the physical arrest, and thus could not be held responsible for a seizure, if one occurred.  See id.  Kukowski also argues that the claim for supervisory liability must fail because she was not supervising anyone during the events at issue in this motion.  See id. at 11. Kukowski argues that, after hanging up the phone, she was no more aware of the events at the address where the extraction took place than a dispatch employee or than any other Albuquerque Police Department employee with a radio.  See id. at 11-12.  Kukowski further argues that there was no less intrusive way to conduct the extraction.  Finally, Kukowski contests that, even if she did effectuate a seizure, the law is not clearly established that her actions constituted a seizure, and that even if she committed a constitutional violation, she is still entitled to qualified immunity.  See id. at 13.

Matthew and Linda Smith argue in their response that a seizure occurred within their home without a warrant or exigent circumstances.  See Plaintiffs' Response to Defendant Cassandra Kukowski's Motion for Summary Judgement at 11, filed March 13, 2009 (Doc. 27)("Response"). Matthew and Linda Smith further contend that Kukowski ordered them, with commanding language

and tone, to come out with their "hands up," which they contend constituted a seizure inside the home.  Id. at 12.  As a result, Matthew and Linda Smith further argue, the circumstances, tone, and communications between Kukowski and Matthew Smith were of such a character that a person would not feel free to leave.  See id. at 13.

In the her reply, Kukowski argues that she did not seize any of the Smiths that evening.  See Defendant Cassandra Kukowski's Reply to Plaintiffs' Response to Defendant Kukowski's Motion for Summary Judgement at 4, filed March 27, 2009 (Doc. 32)("Reply").  Kukowski also contends that the tone, circumstances, and language surrounding the incident were not of a commanding nature.  See id. at 4-6.  Furthermore Kukowski argues, the "right to be free from police cell phone calls is not a clearly established right."  Id. at 7.

At the hearing, Kukowski conceded that "it's pretty clear that Cassandra Kukowski didn't have probable cause to arrest anybody there individually because she wasn't there physically to observe the scene whatsoever."  Transcript of Hearing at 12:5-8 (taken May 13, 2009)(Camp)("Tr.").[1]  Kukowski further conceded that though a cellular phone is not the same as a bullhorn or some other form of loudspeaker, a cellular phone is still a tool to aide in communication.  See Response at 12.  At the hearing, Ms. Minerva Camp, attorney for Kukowski, argued that, even if there was a seizure, the seizure was justified by exigent circumstances.  See id. at 12:12-15 (Camp).  The attorney for Defendants Friedfertig, McDonnell, Napoleon, and Vocasek asked the Court not to decide the exigent circumstances issue, however, because such a ruling could impact her clients, if she had not had an opportunity to brief and argue that issue.  See id. at 19:1-20:14 (Griffin).  Ms. Camp then agreed with Ms. Griffin to not address the issue of exigent

_____

[1]  The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

circumstances until further briefing was available.  See id. at 21:13-22 (Camp).  The Smiths did not

oppose the request not to address the exigent circumstances issue.  The Court thus agreed not to

decide to the exigent circumstances issue.  See id. at 22:16-23:5 (Court).

### LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

According to rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall

be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant bears

the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving

party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal

quotation marks omitted). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant

meets this burden, rule 56(e) requires the nonmoving party to designate specific facts showing that

there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir.

1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries the

burden of proof.")(internal quotation marks omitted); Otteson v. United States, 622 F.2d 516, 519

(10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the

opposing party may not rest on the allegations contained in his complaint, but must respond with

specific facts showing the existence of a genuine factual issue to be tried.'")(quoting Coleman v.

Darden, 595 F.2d 533, 536 (10th Cir. 1979)).

The party opposing a motion for summary judgment must "set forth specific facts showing

that there is a genuine issue for trial as to those dispositive matters for which it carries the burden

of proof." <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256(1986). <u>See</u> <u>Abercrombie v. City of Catoosa</u>, 896 F.2d 1228, 1231 (10th Cir. 1990).

"The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  <u>Colony Nat'l Ins. Co. v. Omer</u>, No. 07-2123, 2008 WL 2309005 at * 1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and <u>Argo v. Blue Cross and Blue Shield of Kan., Inc.</u>, 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" <u>Colony Nat'l Ins. Co. v. Omer</u>, 2008 WL 2309005 at *1 (quoting <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 250.  The mere existence of a scintilla of evidence will not avoid summary judgment.  <u>See</u> <u>Vitkus v. Beatrice Co.</u>, 11 F.3d at 1539.  There must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 251 (quoting <u>Schuylkill and Dauphin Improvement Co. v. Munson</u>, 81 U.S. 442, 448 (1871)); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely

colorable . . . or is not significantly probative, . . . summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249 (internal citations omitted). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## LAW REGARDING QUALIFIED IMMUNITY

As the Court has previously recognized in <u>Holguin v. City of Albuquerque</u>, No. CIV 05-0302 JB/RHS, 2006 U.S. Dist. LEXIS 29489 (D.N.M. March 1, 2006): "Qualified immunity recognizes the legitimate 'need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.' <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 807 (1982)(quoting <u>Butz v. Economou</u>, 438 U.S. 478, 506 (1978))." 2006 U.S. Dist. LEXIS 29489, at *15-16. Qualified immunity protects officials acting under color of state law from liability for discretionary functions, and from "the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit." <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991). To balance the interests of the complaining individual, and the burden put upon the government official in defending such cases, "courts recognize the affirmative defense of qualified immunity, which protects 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Gross v. Pirtle</u>, 245 F.3d 1151, 1155 (10th Cir. 2001)(quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

1. **Rationale for Qualified-Immunity Doctrine.**

Qualified immunity is judicially created and rooted in public policy. The fear of suit may have a chilling effect on official decision-making, seriously deterring officials from exercising judgment with the decisiveness important to their office. <u>See</u> <u>Richardson v. McKnight</u>, 521 U.S. 399, 407 (1997)(describing the purposes of qualified immunity "as protecting government's ability to perform its traditional functions by providing immunity where necessary to preserve the ability

of government officials to serve the public good or to ensure that talented candidates were not

deterred by the threat of damages suits from entering public service.")(internal quotations omitted);

Wyatt v. Cole, 504 U.S. 158, 165 (1992)(detailing the public policy basis for the qualified immunity

privilege). In  Harlow v. Fitzgerald, the Supreme Court of the United States stated:

> It cannot be disputed seriously that claims frequently run against the innocent as well
> as the guilty -- at a cost not only to the defendant officials, but to society as a whole.
> . . . [T]here is the danger that fear of being sued will dampen the ardor of all but the
> most resolute, or the most irresponsible [public officials], in the unflinching
> discharge of their duties.

457 U.S. at 814 (internal citations and quotations omitted).

The broad protection afforded by qualified immunity gives officials "a right, not merely to

avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery.'"  Holland

ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001)(quoting Behrens v. Pelletier,

516 U.S. 299, 308 (1996)).  When a defendant raises the affirmative defense of qualified immunity,

"a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial

are avoided where the defense is dispositive."  Saucier v. Katz, 533 U.S. 194, 200 (2001), overruled

in part by Pearson v. Callahan, 129 S. Ct. 808, 818-20 (2009).  The qualified immunity privilege is

"'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is

effectively lost if a case is erroneously permitted to go to trial.'"  Id. at 200-01 (quoting Mitchell v.

Forsyth, 472 U.S. 511, 526 (1985)).

### 2.    Two-Part Test for Qualified Immunity.

Courts are required to apply a two-step analysis in deciding whether a party is entitled to

qualified immunity.  Until the Supreme Court's decision in Pearson v. Callahan, the district courts

had to take the prongs in order. The courts now have the discretion to decide either prong.  Once a

defendant asserts the affirmative defense of qualified immunity, the burden then shifts to the

plaintiff to establish a violation of a constitutional or federal statutory right by the defendant, and

that the constitutional right allegedly violated was clearly established at the time of the violation.

See Gross v. Pirtle, 245 F.3d at 1155; Currier v. Doran, 242 F.3d 905, 917 (10th Cir. 2001), cert.

denied, 534 U.S. 1019 (2001); Scull v. New Mexico, 236 F.3d 588, 595 (10th Cir. 2000).

> A court required to rule upon the qualified immunity issue must consider, then, this...
> question: Taken in the light most favorable to the party asserting the injury, do the
> facts alleged show the officer's conduct violated a constitutional right? In the course
> of determining whether a constitutional right was violated on the premise alleged,
> a court might find it necessary to set forth principles which will become the basis for
> a holding that a right is clearly established. This is the process for the law's
> elaboration from case to case. . . . The law might be deprived of this explanation
> were a court simply to skip ahead to the question whether the law clearly established
> that the officer's conduct was unlawful in the circumstances of the case.

Saucier v. Katz, 533 U.S. at 201 (citations omitted). He or she must demonstrate that the right

alleged to have been violated was clearly established at the time of the defendant's allegedly

unlawful conduct. See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186; Gross v. Pirtle,

245 F.3d at 1156; Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995). If the plaintiff fails

to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity.

See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186; Gross v. Pirtle, 245 F.3d at 1156;

Albright v. Rodriguez, 51 F.3d at 1535. "In short, although we will review the evidence in the light

most favorable to the nonmoving party . . . the record must clearly demonstrate the plaintiff has

satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity."

Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (citing Medina v. Cram, 252 F.3d 1124,

1128 (10th Cir. 2001)).

### 3.    Clearly Established Law.

Qualified immunity shields state officials from liability "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have

known." Harlow v. Fitzgerald, 457 U.S. at 818.  A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned." Zweibon v. Mitchell, 720 F.2d 162, 172-173 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Strepka v. Miller, 2001 WL 1475058 at * 5 (10th Cir. 2001)(citing Currier v. Doran, 242 F.3d at 923). See Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).

The plaintiff's burden to establish that the law is clearly established "must be undertaken in light of the case's specific context, not as a broad proposition." Saucier v. Katz, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." Id. at 202. The Supreme Court has observed, however, that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Nonetheless, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 635.

In the Tenth Circuit, to carry the burden of identifying a clearly established right, the plaintiff "must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." Trotter v. Regents of the University of New Mexico, 219 F.3d 1179, 1184 (10th Cir. 2000)(quoting Hannula v. City of Lakewood, 907 F.2d 129, 131 (10th Cir. 1990), abrogated on other grounds by Dixon v. Richer, 922 F.2d 1456, 1461 (10th Cir. 1991)).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and

-13-

asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  Mimics, Inc. v. Village of Angel Fire, 394 F.3d at 842 (internal citations and quotations omitted).  If a reasonable person could have believed that the actions were lawful, "defendants are entitled to dismissal before discovery."  Workman v. Jordan, 958 F.2d 332, 336 (10th Cir. 1992).  Moreover, that an official action may be in violation of an agency's internal procedures does not, in itself, violate any clearly established constitutional right.  See Herring v. Keenan, 218 F.3d 1171, 1180-81 (10th Cir. 2000)(explaining "that the fact that an official discloses information in violation of his own internal procedures does not make the disclosure a violation of a clearly established constitutional right to privacy."), cert. denied, 534 U.S. 840 (2001); Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1251 (10th Cir. 2003)("In considering the 'objective legal reasonableness' of the state officer's actions, one relevant factor is whether the defendant relied on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question.").

### 4.    Pearson v. Callahan.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense.  In Saucier v. Katz, the Supreme Court held that the lower court need not decide the constitutional violation issue before it decides whether the violation was clearly established.  In Pearson v. Callahan, the Supreme Court held that, "while the sequence set forth [in Saucier v. Katz] is often appropriate, it should no longer be regarded as mandatory."  129 S. Ct. at 818.  Rather, lower courts "should be permitted to exercise their sound discretion in deciding which

of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." Id. The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz would often be beneficial. See Pearson v. Callahan, 129 S. Ct. at 819.

While leaving the determination whether to adhere to the Saucier v. Katz sequence in the lower courts' sound discretion, the Supreme Court mentioned various circumstances where such sequencing might be undesirable. For example, there are cases in which it is plain that a right is not clearly established, but less obvious whether such a right in fact exists. See Pearson v. Callahan, 129 S. Ct. at 819. Under such circumstances, it might be considered a waste of resources to engage in analysis under the first prong – whether a constitutional right was violated – when it is already obvious that, even if such a right existed, it was not clearly established. See id.

Another concern arises out of the fact that qualified immunity is usually raised at the pleading stage. The Supreme Court in Pearson v. Callahan observed that the "two-step" inquiry can be an uncomfortable exercise where "the answer [to] whether there was a violation may depend on a kaleidoscope of facts not yet fully developed." Id. (brackets in original)(internal quotation marks and citation omitted). Under such circumstances, it may be more advantageous to analyze whether the asserted right was clearly established rather than reaching the merits. Id.

Adherence to Saucier v. Katz also poses the potential to lead to bad decision-making. For example, in some cases that the district courts encounter, "the briefing of constitutional questions is woefully inadequate," and "constitutional questions may be prematurely and incorrectly decided in cases where they are not well presented." Pearson v. Callahan, 129 S. Ct. at 820 (internal quotation marks and citations omitted). Moreover, while a court might adhere to the formalities of Saucier v. Katz in discussing the two prongs in sequence, the court's internal processes might

-15-

involve making a decision based on whether the right was clearly established and only then turning to the more difficult question of the merits. See Pearson v. Callahan, 129 S. Ct. at 819. In some such cases, there is a risk that the district court will not devote as much care as it should to deciding the constitutional issue. See id.

"Rigid adherence to the Saucier rule may make it hard for affected parties to obtain appellate review of constitutional decisions that may have a serious prospective effect on their operations." Pearson v. Callahan, 129 S. Ct. at 820. For example, where a court holds that a constitutional violation occurred, but that the violation was not clearly established, there is an appearance of unappealability, because the defendant is the prevailing party on the issue of qualified immunity. See Pearson v. Callahan, 129 S. Ct. at 820. At the same time, the prevailing party faces the choice of changing its operations to comport with the new finding that it violated a constitutional right, or of adhering to its established practice, even though that practice has now been held to result in a violation of constitutional rights. Such a choice is difficult to take for a defendant who, in effect, has no chance to appeal the determination that a constitutional right in fact occurred. See id. at 820.

Finally, an obligation to strictly follow Saucier v. Katz runs up against the "general rule of constitutional avoidance and runs counter to the older, wiser counsel not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." Pearson v. Callahan, 129 S. Ct. at 821 (internal quotation marks and citations omitted). Furthermore, the first prong's purpose of furthering the development of constitutional law might not be meaningfully advanced in cases where the determination whether a right was violated is so fact bound that it is unlikely to provide guidance in future cases. See id. at 12.

## RELEVANT LAW REGARDING SEARCH AND SEIZURE

The Fourth Amendment protects a person's right to be secure against unreasonable search

and seizure.  The hallmark of the Fourth Amendment is reasonableness.  "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  Payton v. New York, 445 U.S. 573, 586 (1980).  The Supreme Court has stated: "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  United States v. United States District Court, 407 U.S. 297, 313 (1972).

In United States v. Reeves the Tenth Circuit established that "[o]pening the door to one's home is not voluntary if ordered to do so under color of authority."  524 F.3d 1161, 1167 (10th Cir. 2008). The Tenth Circuit has repeatedly held that absent exigent circumstances, any warrantless seizure from officials acting under the color of authority may not seize a person inside their home, or effect a seizure by ordering a person inside a home to come to the door.  See United States v. Maez, 872 F.2d 1444, 1446 (10th Cir. 1989) (holding that a seizure as a violation of the Fourth Amendment when police surrounded an individual's house for three hours planning an arrest and ordering the individual out of his home under drawn firearms believing he was a suspect in a bank robbery); United States v. Flowers, 336 F.3d 1222, 1225-27 (10th Cir. 2003) (holding that an unconstitutional seizure occurred when police officers discovered that a suspect illegally sold alcohol from his home and ordered him to open the door involuntarily to be arrested inside his home).

In United States v. Reeves, police officers suspected an individual of unlawfully carrying weapons.  See 524 F.3d at 1163.  Without an arrest or search warrant, officers had convened at the suspect's motel and made several calls from the front office to the motel room, which were unanswered. After assessing the situation, officers proceeded knocking on the suspects door and windows.  See id. at 1164.  After nearly twenty-five minutes, the suspect met the officers at the door and was promptly arrested.  See id.

-17-

The Tenth Circuit in United States v. Reeves held that the presence of police, the telephone calls, and the knocking at door constituted a seizure inside the home because the suspect would not likely have thought that he was free to ignore the officers knocking and yelling into the room.  See id. at 1168. Although it recognized that the officers in United States v. Reeves did not issue any direct commands for the suspect to open the door or come out, the Tenth Circuit reasoned:

> [T]he officers' actions were effectively a command to open the door.  The record demonstrates that three officers pounded on Reeves' door and window while yelling and loudly identifying themselves as police officers. They continued this conduct consistently for at least twenty minutes.  This encounter began between 2:30 and 3:00 in the morning, a time which must be taken into consideration when analyzing the coerciveness of the encounter.

United States v. Reeves, 524 F.3d at 1168-69.

In United States v. Reeves, the Tenth Circuit cited with approval a case from the United States Court of Appeals for the Ninth Circuit.  In United States v. Al-Azzawy, 784 F.2d 890 (9th Cir. 1985), the Ninth Circuit held that a defendant was seized inside his home for purposes of the Fourth Amendment when officers surrounded his trailer and used a bullhorn to order the suspect to exit his home and drop to his knees.  See 784 F.2d at 893.  Furthermore, in United States v. Johnson, 626 F.2d 753 (9th Cir. 1980), federal agents approached the home of a suspect  to investigate the theft of a treasury check, the Ninth Circuit held that the seizure of the suspect was unconstitutional because "it is the location of the arrested person and not the arresting agents that determines whether an arrest occurs within a home." 626 F.2d at 757.  The Ninth Circuit's reasoning was based on the notion that arresting agents should not be able to avoid an illegal search and seizure by simply directing the suspects from outside the home under the color of law to effect a seizure. See id.

The Tenth Circuit in United States v. Reeves also cited with approval United States v. Morgan, 743 F.2d 1158 (6th Cir. 1984), a case in which the United States Court of Appeals for the

Sixth Circuit held that a seizure occurred when police ordered a defendant to leave his home with his hands up.  See 743 F.2d at 1163-64.

Although "searches and seizures inside a home without a warrant are presumptively unreasonable," Payton v. New York, 445 U.S. 573, 586 (1980), exigent circumstances may, at times, justify a search or seizure without a warrant, see United States v. Najar, 451 F.3d 710, 717-18 (10th Cir. 2006).  The Tenth Circuit employs a two-pronged test to determine whether exigent circumstances exist, which examines: "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable (a modification of our former third prong.)." United States v. Najar, 451 F.3d at 717-18.  "In Payton v. New York, the Supreme Court held that, absent exigent circumstances, police officers may not enter an individual's home without consent to make a warrantless routine felony arrest even if probable cause to arrest the individual exists." United States v. Reeves, 524 F.3d at 1161 (citing Payton v. New York, 445 U.S. at 576).

The Supreme Court has found "a person has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave."  United States v. Mendenhall, 446 U.S. 544, 554 (1980).  Regarding circumstances where police officers, without warrant or exigent circumstances and acting under the color of authority, order the persons of an inhabitants to the door to be seized, the Tenth Circuit has stated:

> In situations where the individual could not or would not wish to leave, even absent the police presence, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 436 . . . (1991). Circumstances that indicate a seizure include, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might

be compelled."  [United States v.] Mendenhall, 446 U.S. [544,] 554 . . . [(1980)];
[United States v.] Maez, 872 F.2d [1444,] 1450 [(1989)].

United States v. Reeves, 524 F.3d 1161, 1167 (2008).

## LAW REGARDING DUTY TO INTERVENE

An officer who fails to intervene to prevent another officer from depriving a person of his

or her civil rights may be liable under § 1983.  See Lusby v. T.G.&Y Stores, Inc., 749 F.2d 1423,

1433 (10th Cir. 1984).  In Hall v. Burke, 12 Fed. Appx. 856 (10th Cir. 2001), the Tenth Circuit made

clear that an officer's duty to intervene applies to instances concerning excessive use of force and

illegal arrest.  The Tenth Circuit in Hall v. Burke stated:

> [W]e agree . . . that it is clearly established that all law enforcement officials have
> an affirmative duty to intervene to protect the constitutional rights of citizens from
> infringement by other law enforcement officers in their presence.  An officer who
> fails to intercede is liable for the preventable harm caused by the actions of the other
> officers where that officer observes or has reason to know: (1) that excessive force
> is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any
> constitutional violation has been committed by a law enforcement official.  In order
> for liability to attach, there must have been a realistic opportunity to intervene to
> prevent the harm from occurring.  Whether an officer had sufficient time to intercede
> or was capable of preventing the harm being caused by another officer is an issue of
> fact for the jury unless, considering all the evidence, a reasonable jury could not
> possibly conclude otherwise.

12 Fed. Appx. at 861 (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1996)).  See Lepone-

Dempsey v. Carroll County Comm'rs, 159 Fed. Appx. 916, 920 (11th Cir. 2005)(ruling that it is

clearly established that an officer may be held liable for failing to intervene to stop an unlawful

arrest); Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996)("[A] law enforcement official who

fails to intervene to prevent another law enforcement official's use of excessive force may be liable

under § 1983."); Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994)(holding that officers have a duty

to intervene where a citizen has been unjustifiably arrested); O'Neill v. Krzeminski, 839 F.2d 9, 11

(2d Cir.1988)("A law enforcement officer has an affirmative duty to intercede on the behalf of a

citizen whose constitutional rights are being violated in his presence by other officers."); Lusby v.
T.G. & Y. Stores, Inc., 749 F.2d at 1433 (ruling that officer who did not prevent fellow officer's use
of allegedly excessive force against an arrestee 'may be liable [under § 1983] if he had the
opportunity to intervene but failed to do so"); Dawkins v. Williams, 413 F. Supp. 2d 161, 172
(N.D.N.Y. 2006)(stating, with respect to illegal arrest, that "[i]t is widely recognized that all law
enforcement officials have an affirmative duty to intervene to protect the constitutional rights of
citizens from infringement by other law enforcement officers in their presence"); Kaylor v. Rankin,
356 F. Supp. 2d 839, 850-51 (N.D. Ohio 2005)(finding that the defendant officer should have
intervened to stop an unlawful arrest from happening, because he had sufficient time to intervene
and would have been able to avoid the unlawful arrest of the plaintiff).

## RELEVANT LAW REGARDING EXCESSIVE FORCE

Courts analyze Fourth-Amendment excessive force claims "under the 'objective
reasonableness' standard that governs other Fourth Amendment inquiries."  Cordova v. Aragon,
2009 WL 1707919, at *3 (10th Cir. 2009).  See Graham v. Connor, 490 U.S. 386, 395 (1989)("[A]ll
claims that law enforcement officers have used excessive force . . . in the course of an arrest,
investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth
Amendment and its 'reasonableness' standard.").  The Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which
> requires that we consider the following factors: the severity of the crime at issue,
> whether the suspect poses an immediate threat to the safety of the officers or others,
> and whether he is actively resisting arrest or attempting to evade arrest by flight.

Weigel v. Broad, 544 F.3d 1143, 1151-52 (10th Cir. 2008)(internal quotation marks and citations
omitted).  Additionally, a court must judge the reasonableness of a particular use of force from "the
perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . .

-21-

. That perspective includes an examination of the information possessed by the [officers]." Id. at 1152 (citations and internal quotation marks omitted).

Whether an officer acts unconstitutionally in handcuffing an individual depends on the objective reasonableness of the officers' actions.  See Silvan W. v. Briggs, 309 Fed.Appx. 216, 224 (10th Cir. 2009).  While the Tenth Circuit "ha[s] consistently rejected a bright-line rule requiring plaintiffs to demonstrate physical injury when bringing excessive force claims . . .[,] when an excessive force claim relies upon unduly tight handcuffing, [the Tenth Circuit has] held that the plaintiff must show some actual injury," Vondrak v. City of Las Cruces, 535 F.3d 1198, 1208 (10th Cir. 2008).

Thus, the Tenth Circuit has held that officers committed no constitutional violation when they handcuffed and detained for over an hour two individuals who were arrested for violating Utah's obstruction-of-justice statute.  See Silvan W. v. Briggs, 309 Fed.Appx. at 224.  One of the detainees alleged in his affidavit that he suffered chaffing and soreness of wrists, and extreme emotional trauma, as a result of being publicly displayed in handcuffs.  See id.  In holding that the arresting officers did not use excessive force, the Tenth Circuit reasoned:

> While Cory and Megan were not arrested for an especially severe crime and were not actively resisting arrest or attempting to flee, the officers could have been reasonably concerned for their safety, given their awareness that Cory was a peace officer and might have been armed. Further, Cory and Megan were released upon A.W.'s arrival at the home, and therefore, were not detained any longer than necessary to resolve the situation which necessitated police involvement. And because there is no evidence that Cory suffered more than a de minimis injury or that he notified the officers that his handcuffs were painful, he cannot maintain an excessive force claim based on unduly tight handcuffing . . . .  Similarly, there is no evidence that Cory suffered any injury from being denied liquids . . .  Finally, while we do not doubt that being detained in handcuffs in public view would be traumatic, not every indignity – even if it may later seem unnecessary in the peace of a judge's chambers – rises to the level of a constitutional violation.

Id. at 224-25 (citations and internal quotation marks omitted).

The Tenth Circuit has also explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it.  If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest.  If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez v. McCauley, 478 F.3d at 1127.  Moreover,

> in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

Id. at 1126.

## **ANALYSIS**

Kukowski argues that she did not participate in Nathan Smith's detention and questioning at the command center, and that she therefore is not liable for violating his constitutional rights.  Nathan Smith, however, has raised a genuine issue of material fact whether Kukowski was involved in questioning him and allowing him to remain in handcuffs at the command center.  Summary judgment is therefore not appropriate as to Nathan Smith's claims for unlawful arrest.  Because, however, Kukowski's actions do not give rise to a clearly established use of excessive force, the Court will grant summary judgment as to that claim.  Regarding the extraction at the Smith's residence, Kukowski contends that she is entitled to qualified immunity because her conduct did not result in a violation of a clearly established constitutional right.  Specifically, Kukowski maintains that her communication with Matthew Smith by cellular phone was not a seizure and that, even if her commands to Matthew Smith constituted  a seizure, exigent circumstances justified the seizure.

-23-

The Court cannot, however,  properly say, as a matter of law, that the undisputed material facts establish that no seizure occurred.  The facts, as Matthew Smith has alleged them, indicate a seizure, and  Kukowski's affidavit does not appear to differ materially from Matthew Smith's regarding how the relevant events unfolded.  Moreover, Smith has alleged evidence that Kukowski's actions violated clearly established law.  Furthermore, the Court has agreed not to decide whether there were exigent circumstances until the Defendants have had the opportunity to develop a record on that issue.  The Court will therefore deny the motion for summary judgment at this time.

**I.      KUKOWSKI IS ENTITLED SUMMARY JUDGMENT ON SOME OF THE CLAIMS THAT NATHAN SMITH HAS ASSERTED AGAINST HER.**

Nathan Smith has alleged that Kukowski participated unlawfully detaining and questioning him.  Nathan Smith has also alleged an excessive-force claim against Kukowski.  See Complaint ¶¶ 42-45, at 7-8.  Kukowski moves for summary judgment against Nathan Smith, and asserts that she did not see him at the command center or otherwise participate in his detention or questioning.  The Court finds that there are factual disputes regarding whether Kukowski participated in Nathan Smith's detention and whether she allowed him to remain handcuffed in violation of his constitutional rights.  The Court therefore believes that, based on the record before it, summary judgment on Nathan Smith's claims against Kukowski is not appropriate.

**A.      THERE IS A FACTUAL DISPUTE WHETHER KUKOWSKI PARTICIPATED IN NATHAN SMITH'S DETENTION AND QUESTIONING.**

As an initial matter, the Court notes that, in their Response, the Plaintiffs make no attempt to dispute Kukowski's factual assertions that she did not hear, observe, or experience the detention of Nathan Smith in any way, that she did not speak to or question Nathan Smith, and that she has never seen Nathan Smith.  Rather, the Smiths state in their Response that they do not dispute any

of these facts, but that the facts are not relevant to this motion.  See Response ¶¶ 35-39, at 5.  The

Tenth Circuit has held: "Without a specific reference, [the court] will not search the record in an

effort to determine whether there exists dormant evidence which might require submission of the

case to a jury."  Chavez v. New Mexico, 397 F.3d 826, 839 (10th Cir. 2005)(quotation omitted).

Accord Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1025 (10th Cir.

1992)(explaining that searching the appellate record for "dormant evidence . . . would not be fair

to either the movant or the district court"); Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1031

(9th Cir. 2001)(holding that, while a district court has discretion to consider other materials in the

record, it has no obligation to do so "where the evidence is not set forth in the opposing papers with

adequate references so that it could conveniently be found"); Barge v. Anheuser-Busch, Inc., 87 F.3d

256, 260 (8th Cir. 1996)(holding that the district court has no affirmative obligation to "plumb the

record" to procure material facts).  "The district court has discretion to go beyond the referenced

portions of these materials, but is not required to do so. If the rule were otherwise, the workload of

the district courts would be insurmountable and summary judgment would rarely be granted."  Adler

v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998) (citation omitted).  The courts "have

a limited and neutral role in the adversarial process, and [the courts should be] wary of becoming

advocates who comb through the record . . . and make a party's case for it."  Id.

       The Court notes that, for purposes of this motion, the Plaintiffs appear to have devoted

no attention to Nathan Smith's claims, giving the impression – at least, based on their failure to

dispute Kukowski's facts regarding Kukowski's contact with him – that they are conceding that

Kukowski is entitled to summary judgment on his claims.  Under normal circumstances, the Court

would believe it would be proper to take their failure to dispute material facts at face value and to

accordingly grant the motion for summary judgment as to Nathan Smith's claims.  The Court,

however, sees good reason not to do so in this case.

The Plaintiffs have filed a cross-motion for summary judgment.  See Plaintiffs' Motion for Summary Judgment, filed July 2, 2009 (Doc. 45).  In that motion, the Plaintiffs have created a factual record to support Nathan Smith's claims against Kukowski.  Thus, while Kukowski contends that she never met Nathan Smith or Matthew Smith during the night of October 22-23, 2009, see Kukowski Depo. at 24:1-6; Kukowski's Aff. ¶¶ 30-33, at 5, and further contends that her presence was limited to the calling of Matthew Smith's cellular phone, see Kukowski Aff. ¶¶ 20-33, at 4-5, Nathan Smith has raised a genuine issue of fact regarding whether Kukowski questioned Nathan Smith at the command center and allowed him to remain handcuffed.

Nathan Smith avers that he was told that he was being taken to the Sergeant so the Sergeant could speak with him.  See Nathan Smith Depo. at 30:16-20.   He alleges that he was then taken about two blocks east to a parking lot where Kenny had set up a police-command center. See id. at 31:2-9.  At the command center, he saw a "blonde, average height, female."  Id. at 32:5-6.  This woman, who was later identified as a sergeant, questioned him about his home and about a picture of Raymond Lollis, the homicide suspect.  See id. at 32:10-24.  Smith also alleges that he saw both an SUV and a van at the command center where he was questioned.  See id. 34:4-2; 35:1-25.  After questioning, Smith was allowed to leave the command center area with his girlfriend.  Id. at 42:23-25; 43:1-16.  Moreover, Nathan Smith points to deposition testimony where Kukowski admits she was the only female officer on site that evening at the Smiths' address.  See Kukowski Depo. at 27:8-12.  Furthermore, she admits driving a "Tahoe, fully marked" SUV to the command center on October 22, 2009. Id. at 27:16-18.

Thus, the record that the Plaintiffs have created in their motion for summary judgment raises a question whether Kukowski participated in the allegedly unlawful detention of Nathan Smith.  The

-26-

Court believes that, in this case, it is appropriate to rely on the evidence that the Plaintiffs raise in their motion.  There is no question that the Plaintiffs neglected the record for this motion. At the same time, Court does not wish to give the impression that it has scoured the record in an attempt to find evidence to rescue the Plaintiffs' case. The Court found the Plaintiffs' motion for summary judgment by doing no more than looking at the docket, noting the Plaintiffs' motion, and then looking at the motion's exhibits .  In the interest of good judging, the Court believes it must look at the evidence brought up in the Plaintiffs' motion to avoid potential inconsistencies.  If the Court grants summary judgment in this motion based on Kukowski's failure to dispute certain facts, that ruling would loom over the Court's later evaluation of the Plaintiffs' motion for summary judgment. Without ruling at this time whether Nathan Smith would be entitled to summary judgment on any issues related to him, the Court does not wish to be caught in a situation where the record in that motion would support summary judgment in Nathan Smith's favor, but the Court would be stuck with a previous grant of summary judgment, made on procedural grounds, in favor of Kukowski on the same issues.

Rather than allowing such a conundrum to crop up, the Court prefers to structure its rulings to best facilitate bringing out the truth.  The Court will therefore look at the evidence that the Plaintiffs have raised in their motion for summary judgment to the extent that their evidence is related to the same issues in both motion.  In light of the record, the Court finds that there is a genuine issue of fact regarding whether Kukowski participated in the questioning and detention of Nathan Smith.

**B.     IT IS CLEARLY ESTABLISHED THAT AN OFFICER WHO FAILS TO INTERVENE TO PREVENT ANOTHER OFFICER FROM DEPRIVING A PERSON OF HIS OR HER CIVIL RIGHTS MAY BE LIABLE UNDER § 1983.**

The Tenth Circuit has held:

[W]e agree . . . that it is clearly established that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.  An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official.  In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.  Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

12 Fed. Appx. at 861 (quoting <u>Anderson v. Branen</u>, 17 F.3d 552, 557 (2d Cir. 1996)).  Thus, while there are no allegations that Kukowski detained Nathan Smith or ordered other officers to detain him, her participation in questioning him and in allow him to remain in handcuffs potentially implicates her in any constitutional violations he might have suffered.  In other words, if Nathan Smith was unlawfully seized, Kukowski could be held liable for that seizure, because, although she did not effect the seizure herself, there is evidence that she allowed the detention flowing from that seizure to continue and, according to some of the evidence in the record, she personally questioned him.

**C.     THERE IS EVIDENCE THAT KUKOWSKI FAILED TO INTERVENE IN A POTENTIALLY UNLAWFUL SEIZURE.**

The evidence creates an issue of fact whether Kukowski is liable for failing to intervene in a potential unlawful seizure.  There is no contention that Nathan Smith was detained pursuant to a warrant, and Nathan Smith has provided evidence that his detention was unlawful.  For example,

there is evidence that McDonnell initially detained Nathan Smith even though McDonnell knew his identity and had no information indicating that Nathan Smith had committed a crime.  <u>See</u> McDonnell Depo. at 9:10-20.  McDonnell also allegedly confiscated Nathan Smith's cellular telephone and charger, and the keys to the car. <u>See</u> <u>id</u>. at 7:4-9; Deposition of Nathan Smith, at 22:10-23:2 (executed May 27, 2009)("Nathan Smith Dep.").  McDonnell then handcuffed Nathan Smith and placed him in the back of the police vehicle.  <u>See</u> <u>id</u>. at 23:8-13; 24:17-20.

In <u>Terry v. Ohio</u>, the Supreme Court held that a police officer can temporarily detain an individual suspected of criminal activity if the officer can point to specific, articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the intrusion.  <u>See</u> 392 U.S. at 21.  The officer's stop or seizure of a person must be based on reasonable suspicion, which can be supported by specific articulable facts, that the person was involved in wrongdoing. <u>See</u> <u>id.</u>

Officers may ask the person questions during the <u>Terry</u> stop to dispel or confirm the officers' suspicions that a law is being violated.  <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491, 498 (1983); <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 881-82 (1975).  The detainee, however, is not obliged to respond.  <u>See</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984)(stating that "the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.").  A police/citizen encounter that goes beyond the limits of a <u>Terry</u> stop is an arrest which must be supported by probable cause or consent to be valid.  <u>See</u> <u>United States v. Perdue</u>, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a <u>Terry</u> stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably

prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Id. at 29. In evaluating the validity of the stop-and-frisk, the courts must consider the totality of the circumstances. See Florida v. Bostick, 501 U.S. 429, 436 (1991).

Some of the evidence here suggests that the Defendants exceeded their authority. If an officer stops, handcuffs, and holds an individual for questioning for an hour without any information that the individual was involved in criminal activity, the law is clearly established that such activity constitutes a constitutional violation. Reasonable suspicion based on articulable facts must support an investigative detention. See Cortez v. McCauley, 478 F.3d at 1115. McDonnell's admission that he did not have information suggesting Nathan Smith was involved in a crime undermines any contention that there was reasonable suspicion.

Moreover, the length and character of the detention and questioning, if Nathan Smith's evidence is taken as true, exceeded an investigatory detention and became an arrest that required probable cause. Nathan Smith was stopped at approximately 1:30 a.m., see Napoleone Depo. at 8:1-8, and his cell phone and keys were confiscated, see McDonnell Depo. at 7:4-9. McDonnell pressed Nathan Smith against the car, held his wrists tightly and applied handcuffs behind his back. See Nathan Smith Depo. at 23:6-13. Further, Nathan Smith had to wait, handcuffed in the back of a patrol car, until he was taken to the command center to be interrogated. See id. at 23:24-25. Nathan Smith was in handcuffs the entire time he was in custody, including during the questioning period

at the command center.  See id.  Moreover, there is evidence that Nathan Smith was in custody for

at least an hour.  He was initially stopped at 1:30 a.m., and, after his questioning, he was held for

another thirty to forty-five minutes in the back of a police car with Matthew Smith – who was not

extracted from his residence until at least after 2:00 a.m.  See Nathan Smith Depo. at 41:11-15.

Being physically pressed by police, handcuffed, held, and questioned for more than an hour rises

to the level of an arrest.  See Cortez v. McCauly, 478 F.3d at 1116 (finding "no difficulty" in

holding that a plaintiff presented facts constituting an unlawful arrest where there was evidence that

officers grabbed him, at midnight, barefoot and wearing only shorts, and pulled him from the

doorway of his home, handcuffed him, advised him of his Miranda rights, placed him in the back

seat of the locked patrol car,  and questioned him while he was in the back seat of the locked patrol

car).

     Moreover, the Tenth Circuit has stated: "[T]he use of firearms, handcuffs, and other forceful

techniques generally exceed the scope of an investigative detention and enter the realm of an arrest."

Id. at 1115-16 (internal quotation and citation marks omitted).  Nathan Smith has provided facts

showing that he was physically pressed by an officer into a car and forcefully handcuffed.  Such

forceful techniques are more indicative of an arrest than of a detention.  Therefore, probable cause

was required.  Even if Kukowski did not apply the physical force and place the handcuffs, there is

evidence that she allowed Nathan Smith to remain handcuffed for an extended period and did not

intervene in any way, even knowing that no warrants had been sought or obtained.  See Kukowski

Depo. at 8:20-9:4.

     Therefore, under the totality of the circumstances, and considering that the officers believed

they were pursuing a hot lead on a murder suspect, the evidence Nathan Smith has placed in the

record – including that he was detained for an extended period, in handcuffs, even though the police

did not have information to suggest he was or had committed a crime – if taken as true, would establish that there was an arrest without probable cause.  Thus, given that there is evidence that Nathan Smith was subject to such treatment, the Court believes he has raised an issue of fact regarding whether he was unlawfully seized.  Because he has also raised a question regarding whether Kukowski participated in that questioning and detention and failed to intervene, the Court cannot properly grant summary judgment in her favor on Nathan Smith's unlawful-arrest claim.

### D.   IT IS NOT CLEARLY ESTABLISHED THAT KUKOWSKI USED OR ALLOWED EXCESSIVE FORCE TO BE USED AGAINST NATHAN SMITH DURING THE TIMES THAT SHE HAD CONTACT WITH HIM.

Although the Court finds that Nathan Smith has presented facts to support his unlawful-seizure claim against Kukowski, he has fallen short on his excessive-force claim against her.  "[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  Graham v. Connor, 490 U.S. at 395.  The Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

Weigel v. Broad, 544 F.3d at 1151-52 (internal quotation marks and citations omitted).  The Tenth Circuit has also previously found that officers did not use excessive force when they handcuffed and detained for over an hour two individuals who were arrested for violating Utah's obstruction of justice statute.  See Silvan W. v. Briggs, 309 Fed.Appx. at 224.  One of the detainees alleged in his affidavit that he suffered chaffing and soreness of wrists, and extreme emotional trauma, as a result of being publicly displayed in handcuffs.  See id.

-32-

The evidence that Nathan Smith has offered establishes that he was likely held a little over an hour. He was placed in tight handcuffs initially, though he concedes the handcuffs were loosened by the time he came to the command station where Kukowski allegedly questioned him. See Nathan Smith Depo. at 23:24-24:5. If he had been subject to a lawful arrest, it would appear, based on the Tenth Circuit's holding in Silvan W. v. Briggs, that being held for over an hour in handcuffs would not support an excessive-force claim, considering that the plaintiff in Silvan W. v. Briggs was held, in handcuffs, in a similar fashion for about the same amount of time. Moreover, considering the totality of the circumstances, Kukowski and her colleagues were pursuing a lead on a homicide suspect, whereas, the officers in Silvan W. v. Briggs were executing a warrant for obstruction of justice. If the officers were concerned that Nathan Smith might be cooperating with a homicide suspect, they might have more reason to at least place him in handcuffs for a period of time.

The primary wrinkle in the analysis is that Nathan Smith has presented facts to show that he was not subject to a lawful arrest. More precisely, there is evidence that Nathan Smith was arrested, but that the arrest was not based on probable case. The Tenth Circuit has explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it. If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest. If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez v. McCauley, 478 F.3d at 1127. Moreover,

> in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

Id. at 1126.  Thus, to determine whether Nathan Smith's evidence supports a viable excessive force claim, the Court must determine whether the force used against Nathan Smith was more than would have been necessary to effectuate a lawful arrest.  The Court does not believe that Nathan Smith's evidence shows that what the officers did, and what Kukowski allegedly failed to stop, amounted to a clearly established use of excessive force.  The Court's analogy to the facts in Silvan W. v. Briggs therefore holds, even though, according to Nathan Smith's evidence, he was arrested without probable cause.

Moreover, other Tenth Circuit case law supports the Court's conclusion that Nathan Smith has not established excessive force.  In Cortez v. McCauley, a plaintiff had been arrested at midnight, grabbed and pulled out of his house, handcuffed, and placed in the back of a patrol car.  See 478 F.3d at 1128.  Furthermore, he complained that the handcuffs were too tight and that they were hurting him.  See id.  There were no contentions that the plaintiff resisted arrest or attempted to evade capture.  See id.  Moreover, there was nothing to suggest that the plaintiff was an immediate threat to anyone's safety.  Nevertheless, the Tenth Circuit held that the officers did not use excessive force.  See id.  The Tenth Circuit explained: "[W]e have little difficulty concluding that a small amount of force, like grabbing Rick Cortez and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment."  Id.  Furthermore, the Tenth Circuit did not find the failure to loosen the handcuffs to be excessive force because there was no evidence of actual injury.  See id. at 1129.

Although the Court makes no comment regarding whether McDonnell used excessive force in effectuating the arrest, the Court believes that the record lacks evidence that Kukowski participated in, or failed to intervene in any acts that would constitute excessive force.  By the time Kukowski allegedly made contact with Nathan Smith, he was in handcuffs, but the handcuffs were

loosened.   There is no other evidence of physical force being applied to Nathan Smith in Kukowski's presence aside from the handcuffs.  The handcuffs in this situation are not, on their own, enough to support an excessive-force claim against Kukowski.  The Court will therefore grant summary judgment to Kukowski on the excessive force claim.

## II.   A SEIZURE OCCURS WHEN AN OFFICER ISSUES COMMANDS BY TELEPHONE THAT THE OCCUPANTS OF A HOME EXIT AND SURRENDER TO OFFICERS WAITING OUTSIDE.

According to United States v. Mendenhall, officers seize a person if a person does not feel free to leave or disregard the contact.  See 446 U.S. at 554.  The circumstances that may point to a seizure of an individual would include tone of voice, physical touching, presence of several officers, or display of weapons by the officers.  See id.   Conversely, if there is a lack of force or otherwise lack of a showing from the officers that may compel an individual to feel that he or she is not free to go, then a seizure has not necessarily occurred. See id.

As Matthew Smith relates the events that occurred at the Smiths' residence, which are at issue on this motion, he received a call at approximately 2:00 a.m. from Kukowski, who identified herself as a police officer and ordered him and all other occupants of the house to exit and surrender themselves to other officers waiting outside.  See M. Smith Aff. ¶¶ 4-8, at 1.  Matthew Smith also alleges in his affidavit that Kukowski ordered that he and his mother exit with their hands in the air. See id. ¶ 9, at 1-2.

The facts that Matthew Smith has alleged amount to a seizure under the Fourth Amendment. When an officer issues a command to someone to leave his or her home and to surrender himself to officers waiting outside, the individual receiving the command is not likely to feel free to decline to comply.  Moreover, according to Matthew Smith's version of events, Kukowski made him aware of the presence of other officers and ordered him to surrender to those officers with his hands in the

air.  Such a scenario suggests to a person that he is the target of an arrest on the premises of his home.

In this case, if Matthew Smith's evidence is to be believed, Kukowski directly ordered him to leave the house and to surrender himself into custody.  Furthermore, similar to United States v. Reeves, the police initiated contact with Matthew Smith at an odd hour – something that the Tenth Circuit found important to its analysis of coercion in United States v. Reeves.  The Court believes that, in light of the case law, a direct order to exit a home and surrender into police custody is a seizure because a reasonable person would not feel free to ignore the order.

The Court also sees substantial similarity between this case and United States v. Al-Azzawy, which the Tenth Circuit cited with approval in United States v. Reeves.  In United States v. Al-Azzawy, the Ninth Circuit held that a defendant was seized inside his home for purposes of the Fourth Amendment when officers surrounded his trailer and used a bullhorn to order the suspect to exit his home and drop to his knees.  See 784 F.2d at 893.  In his affidavit, Matthew Smith alleges that Kukowski ordered him and his mother out of the house with their hands up, and that they should surrender to the officers, who were waiting outside.  The essence of the facts in United States v. Al-Azzawy, as in this case, is that an officer ordered someone to leave his or her residence, and to surrender himself or herself into police custody.

The Court believes that, though mechanically different from a bullhorn, yelling into a home, or a land-line phone call, a cellular telephone is a tool to aide communication, as Kukowski has conceded.  The means of communication was not the focus of the analysis in United States v. Al-Azzawy or in United States v. Morgan.   Rather, the Sixth Circuit in United States v. Morgan outlined the principle of the Fourth Amendment's protection:

In these circumstances, it is the location of the arrested person, and not the arresting agents,

that determines whether an arrest occurs within a home.  Otherwise, arresting officers could avoid illegal "entry" into a home simply by remaining outside the doorway and controlling the movements of suspects within through the use of weapons that greatly extend the "reach" of the arresting officer.

United States v. Morgan, 743 F.2d at 1166 (quoting United States v. Johnson, 626 F.2d 753, 757 (9th Cir. 1980)). Applying the principle idea taken from United States v. Johnson, the Sixth Circuit in United States v. Morgan determined that warrantless control of a suspect inside his own home constitutes a seizure. See id.

The Tenth Circuit has similarly accepted the notion that "[o]pening the door to one's home is not voluntary if ordered to do so under color of authority." United States v. Reeves, 524 F.3d at 1167. See United States v. Flowers, 336 F.3d at 1226 (holding that, if a resident's decision to open his door to police is made involuntarily, a seizure within his home has occurred).  In his affidavit, Matthew Smith presents a scenario in which a reasonable person would not have felt free to leave. The late hour, the phone call, the order to exit with hands up, and the additional police presence are all factors that create a sense of coercive police authority which a reasonable person would not feel free to disregard.  Thus, Matthew Smith's facts, if taken as true, would constitute a seizure.

## III.  THE UNDISPUTED MATERIAL FACTS DO NOT INDICATE THAT NO SEIZURE OCCURRED.

While many of the facts related to this motion are undisputed, the briefing indicates that there is some dispute between the parties regarding the nature of the telephone call that Kukowski placed to Matthew Smith.  Because the Court has determined that, if Matthew Smith's allegations are true, a seizure occurred, the Court cannot properly find, as a matter of law, that no seizure occurred.  At a minimum, Matthew Smith has put evidence in the record that supports denial of summary judgment on the issue of whether a seizure occurred.

As the movant, Kukowski bears the initial burden of "show[ing] that there is an absence of

-37-

evidence to support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939

F.2d at 891 (internal quotation marks omitted).   Once a movant meets this burden, rule 56(e)

requires the nonmoving party to designate specific facts showing that there is a genuine issue for

trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. at

256.  In this case, Kukowski has not met her burden of showing an absence of evidence to support

Smith's case.  Rather, she is faced with his affidavit, in which Matthew Smith sets forth facts that,

taken as true, would entitle Matthew Smith and Linda Smith to a finding that they was seized.

Given that such evidence is in the record, the Court declines to find, as a matter of law, that there

was no seizure.[2]

_____

[2] Based on the evidence in the record, the Smiths might be entitled to summary judgment on the issue whether there was a seizure.  According to Kukowski's affidavit, she contacted the home on a cellular phone number that Kenny had provided.  See Kukowski Aff. ¶  18, at 3.  Kenny informed Kukowski that the number was given to the police by "someone leaving the Cardenas address [that] had been stopped."  Id. ¶ 17, at 3.  Upon receiving the number, Kukowski called the number, "introduced [herself] and told [Matthew Smith] he needed to come to the front door, bring any other occupants of the house with him, and make contact with the officers that were outside." Id.  She then overheard muffled sounds and could hear the Matthew Smith exit the house, and the call was then terminated. See id.  Although Kukowski attempts, in her briefing, to characterize the encounter in terms that would make it appear non-coercive, her affidavit suggests that, after identifying herself, she ordered Matthew Smith out of the house.  See id. ¶ 18, at 3 ("I . . . told him he needed to come to the front door, bring any other occupants of the house with him, and make contact with the officers that were waiting outside.").  Although the words are slightly different, Kukowski's affidavit appears to recognize that her statement to make contact with officers waiting outside was not an option for the Smiths, but rather that Smith "needed" to gather the occupants of the house and make contact with officers awaiting outside.  Moreover, Kukowski does not dispute the odd hour, the presence of multiple officers, or that she told Matthew Smith about the additional officers.  In other words, it is difficult to see any significant difference between what Smith and Kukowski have said regarding what happened.  Nevertheless, the Court has not yet held a hearing on the Plaintiffs' motion for summary judgment, and has not otherwise acted on it.  The Court therefore deals only with Kukowski's motion in this opinion.

**IV.     THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER THE SMITHS SUFFERED A VIOLATION OF THEIR CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS**.

Even if the Smiths have raised evidence that a constitutional violation has occurred, Kukowski may still be entitled to qualified immunity if the violation did not implicate a clearly established constitutional right. See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186; Gross v. Pirtle, 245 F.3d at 1156; Albright v. Rodriguez, 51 F.3d at 1535.

To succeed in defeating the "clearly established right" prong of the qualified immunity defense, the Tenth Circuit has required that plaintiffs "must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." Trotter v. Regents of the University of New Mexico, 219 F.3d 1179, 1184 (10th Cir. 2000)(quoting Hannula v. City of Lakewood, 907 F.2d 129, 131 (10th Cir. 1990), abrogated on other grounds by Dixon v. Richer, 922 F.2d 1456, 1461 (10th Cir. 1991)). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Anderson v. Creighton, 483 U.S. at 640.

Taking Matthew Smith's facts as true under the standard for summary judgment, Kukowski "ordered both [Linda Smith and Matthew Smith] to exit the house" after "identifying herself as an [Albuquerque] [P]olice [O]fficer." Affidavit of Matthew Smith ¶ 6-7, at 1. Matthew Smith further alleges that he and Linda Smith were told to exit the house with their hands up to surrender to officers outside. See id. ¶ 9, at 1. The Court believes that the Tenth Circuit has clearly established through precedent that "[o]pening the door to one's home is not voluntary if ordered to do so under

-39-

color of authority." <u>United States v. Reeves</u>, 524 F.3d 1161, 1167. <u>See also</u> <u>United States v.</u>
<u>Flowers</u>, 336 F.3d at 1225-27; <u>United States v. Maez</u>, 872 F.2d at 1446. A reasonable officer would
have known that ordering residents to exit their home with their hands up under the color of
authority constitutes a seizure. Furthermore, effecting a seizure through the threshold of a door
without a warrant or exigent circumstances would thus violate a clearly established right for persons
to be safe in their home from seizure. Under Tenth Circuit precedent and assuming Matthew
Smith's facts as true, and assuming that there were no exigent circumstances justifying a warrantless
seizure, the instructions that Kukowski gave to the Smiths on October 23, 2006, constituted a
violation of Matthew and Linda Smith's clearly established rights.

## V.   THE COURT WILL NOT RULE ON THE QUESTION WHETHER THERE WERE EXIGENT CIRCUMSTANCES.

In this case Kukowski concedes that there was no probable cause available for Kukowski to
assess before making the call. <u>See</u> Tr. at 12:5-8 (Camp). Although "searches and seizures inside
a home without a warrant are presumptively unreasonable," <u>Payton v. New York</u>, 445 U.S. at 586
(1980), exigent circumstances may, at times, justify a search or seizure without a warrant, <u>see</u> <u>United</u>
<u>States v. Najar</u>, 451 F.3d at 717-18. The Tenth Circuit employs a two-pronged test to determine
whether exigent circumstances exist, which examines: "whether (1) the officers have an objectively
reasonable basis to believe there is an immediate need to protect the lives or safety of themselves
or others, and (2) the manner and scope of the search is reasonable (a modification of our former
third prong.)." <u>United States v. Najar</u>, 451 F.3d at 717-18. Given that exigent circumstances can,
at times, justify a seizure such as the one that allegedly occurred in this case, Kukowski might be
entitled to qualified immunity regardless whether there was a seizure. Normally, on a motion such
as this motion for summary judgment, the Court would analyze the contention that exigent

-40-

circumstances existed to determine whether to grant or to deny the motion for summary judgment. In this case, however, the Defendants have asked the court to not rule on the matter of exigent circumstances until all Defendants have had a chance to fully brief the issue. See Tr. at 19:14-20:14 (Griffin); 21:14-22 (Camp).

Because the Defendants have asked the Court to refrain from ruling on exigent circumstances, the Court will hold off at this time. As a consequence, the Court leaves open the possibility that the Defendants might be entitled to qualified immunity at a later date if, after developing a record, they demonstrate the existence of exigent circumstances. At this point, it is sufficient to find that the Smiths have raised a genuine issue of material fact regarding whether a seizure occurred when Kukowski ordered them out of the residence. Summary judgment is therefore not appropriate on that issue at this time.

Ultimately, the Court finds that, on most of the issues raised in this motion, summary judgment is not appropriate. First, there is a genuine issue of material fact regarding whether Kukowski failed to intervene in an illegal seizure of Nathan Smith. The factual dispute that Nathan Smith's evidence has raised precludes summary judgment. Second, there is evidence that Kukowski seized Matthew and Linda Smith in violation of clearly established constitutional rights. Moreover, the Court has agreed to refrain from deciding whether exigent circumstances justified a seizure. Nevertheless, the Court believes summary judgment is appropriate with regard to any excessive-force claim that Nathan Smith might have against Kukowski.

**IT IS ORDERED** that Kukowski's Motion for Summary Judgment is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE


*Counsel*:

Mary Louise Boelcke
Law Office of Mary Louise Boelcke
Albuquerque, New Mexico

 -- and --

Joseph P. Kennedy
Shannon L. Kennedy
Kennedy Law Firm
Albuquerque, New Mexico

> *Attorneys for the Plaintiffs*

Robert M. White
Albuquerque City Attorney's Office
Albuquerque, New Mexico

-- and --

Kathryn Levy
City of Albuquerque Legal Department
Albuquerque, New Mexico

> *Attorneys for the Defendants Sean Kenny, Casey McDonnell, Kevin Napoleone,
> and Andrew Vocasek*

Minerva C. Camp
Butt Thornton & Baehr, PC
Albuquerque, New Mexico

> *Attorneys for Defendant Cassandra Kukowski*