## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LINDA SMITH, MATTHEW SMITH, AND
NATHAN SMITH,

        Plaintiff,

vs.                                  No. CIV 08-0752  JB/RLP

SEAN KENNY, JOHN FRIEDFERTIG,
CASSANDRA KUKOWSKI, CASEY
McDONNELL, KEVIN NAPOLEONE,
ANDREW VOCASEK, in their individual
capacities,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion for Summary

Judgment, filed July 2, 2009 (Doc. 45); (ii) the Defendants' Motion and Memorandum for Summary

Judgment Requesting Dismissal of Plaintiffs' Complaint, filed July 6, 2009 (Doc. 47); and (iii)

Defendant Cassandra Kukowski's Motion for Summary Judgment to Dismiss Plaintiffs Linda and

Matthew Smith's Excessive Use of Force Claims, filed September 18, 2009 (Doc. 61).  The Court

held a hearing on October 28, 2009.  The primary issues are: (i) whether Defendant Cassandra

Kukowski, a Sergeant in the Albuquerque Police Department ("APD"), unlawfully seized Plaintiffs

Matthew Smith and Linda Smith in their home when she called M. Smith's cellular telephone, and

instructed L. Smith and M. Smith to come outside; (ii) whether Defendant Andrew Vocasek, an

APD officer, unlawfully seized L. Smith and M. Smith once they exited their home at the behest of

Kukowski; (iii) whether Defendant Casey McDonnell, an APD officer, unlawfully seized Plaintiff

Nathan Smith; (iv) whether any of the Defendants used excessive force in the seizure of any of the

Smiths; (iv) whether Defendant Sean Kenny, a Sergeant in the APD, as the officer in command on the scene of these events, can be held liable for the actions of any of the other Defendants.  The Court will grant the Smiths' motion for summary judgment as to the following claims: (i) N. Smith's claims of unlawful arrest and unlawful search (Counts II and IV) against McDonnell and Kenny; and (ii) L. Smith's and M. Smith's claims of unlawful arrest (Count II) against Vocasek, Napoleone, and Kenny.  The Court will grant the Defendants' motions for summary judgment as to the following claims: (i) all of the Smiths' remaining claims for excessive use of force (Count III); (ii) N. Smith's claim of unlawful extraction (Count I) against all Defendants; (iii) L. Smith's and M. Smith's claims of unlawful extraction (Count I) against Vocasek, Napoleone, and McDonnell; (iv) N. Smith's claim of unlawful seizure and unlawful search (Counts II and IV) against Vocasek and Napoleone; (v) L. Smith's and M. Smith's claims for unlawful search (Count IV) against Kukowski and McDonnell; and (vi) N. Smith's claim of unlawful search (Count IV) against Kukowski.  The Court finds that factual issues exist as to damages on all claims, and as to liability on the following claims: (i) all of the Smiths' claims of state-law tort liability (Count V) against all Defendants; (ii) L. Smith's and M. Smith's claims of unlawful extraction (Count I) against Kukowski and Kenny; (iii) N. Smith's claim of unlawful seizure (Count II) against Kukowski; (iv) L. Smith's and M. Smith's claims of unlawful search (Count IV) against Vocasek, Napoleone, and Kenny; (v) L. Smith's and M. Smith's claims of unlawful arrest (Count II) against Kukowski; and (vi) L. Smith's and M. Smith's claims for unlawful arrest (Count II) against McDonnell.

## **FACTUAL BACKGROUND**

Many of the material facts in this case are undisputed. The Court has, however, commented on the factual disputes that appear significant to the parties' respective theories.  Notwithstanding those disputes, the Court believes it can decide many of these issues in this case as a matter of law.

1.      **The Twisters Incident.**

Kukowski is an officer in the Southeast Area Command for the APD.  See Affidavit of Cassandra Kukowski ¶ 4, at 1 (executed February 27, 2009)(Doc. 17- 2)("Kukowski Aff.").  On October 18, 2007, a warrant was issued for the arrest of Raymond Lollis.  Lollis was wanted for "Murder (Open Count)[;] Shooting at or from a Motor Vehicle (Great Bodily Harm); Aggravated Assault Deadly Weapon (Firearm Enhancement) 2 Counts."  Criminal Complaint -- Arrest Warrant Affidavit at 1 (dated October 18, 2007), filed July 6, 2009 (Doc. 47-2).

At approximately 7:00 p.m. on October 22, 2007, Kukowski received a tip from a worker at the Twisters fast-food restaurant at 425 Eubank Blvd. in Albuquerque, New Mexico.  See Kukowski Aff. ¶ 7, at 2.  The worker said that she "was positive" that she had seen Lollis.  See id. The worker described Lollis, described the vehicle in which she thought she had seen him -- a Jeep Cherokee -- and provided a license plate number.  See id.  At approximately 7:44 p.m. on October 22, 2007, based on the registration information for the license plate number, Kukowski placed a periodic watch on 1704 Cardenas Dr. NE, in Albuquerque, 87108, the address to which the vehicle was registered.  See id. ¶¶ 8, 9, at 2.  Kukowski also put a city-wide locate on the vehicle and went to the address on Cardenas to see if the vehicle was currently there.  See Kukowski Depo. at 6:9-15 (Doc. 47-3).  The vehicle was not at the Cardenas residence at that time.  The police dispatch issued the following bulletin regarding the periodic watch:

> CHECK 20 [LOCATION] FOR POSS[IBLE] 27-8 [SHOOTING] OFNDR WAS JUST SEEN @ TWISTERS EUBANK & CHICO APPROX 1900 HRS., UNK[NOWN] DOT [DIRECTION OF TRAVEL], ABOVE 20 [LOCATION] IS 26 [AUTO REGISTRATION] 20 [LOCATION] FOR LINDA & MATTHEW SMITH ON A '93 JEEP GRAND CHEROKEE NM 387NWP, 27-8 [SHOOTING] OFNDR IS RAYMOND CARL LOLLIS DOB 012185 WMA SSN [REDACTED] 5'9 130 REDDISH BLN HAI,,BLU EYES,,BAD COMPLEXION,, TATTOO DEMON LEFT ARM,, TRIBAL ON RT ARM,, HEAVY METH USER,, 48 [USE CAUTION]

Affidavit of Kevin Napoleone ¶ 4, at 1 (executed May 20, 2009), filed July 6, 2009 (Doc. 47-4)("Napoleone Aff.").

At approximately 10:00 p.m. on October 22, 2007, Kukowski returned to the Albuquerque Police Department Substation. See id. ¶ 12, at 3. The Smiths contend that Kukowski returned to the substation to brief the graveyard shift officers. See id. The Defendants dispute that Kukowski briefed graveyard shift officers. See Defendants' Response to Plaintiffs' Motion for Summary Judgment [Doc. 45] at 2, filed July 16, 2009 (Doc. 51)("Defendants' Response"). Kukowski's affidavit states: "[Kukowski] returned to the Southeast substation for the October 22, 2007 10:00 p.m. graveyard shift briefing to inform Sergeant Sean Kenny of the Twisters call and periodic watch [she] had placed on the 1704 Cardenas Dr. NE address." Kukowski Aff. ¶ 12, at 3. What Kukowski did at the briefing remains unclear, but the Court does not believe what she did at the briefing is relevant.

### 2.    The Surveillance of 1704 Cardenas.

At about 1:00 a.m., over five hours after the Kukowski placed the periodic watch on 1704 Cardenas, Napoleone, who was conducting the watch, spotted the suspect vehicle parked at the residence. See Deposition of Kevin Napoleone at 4:11-19 (taken March 25, 2009), filed July 2, 2009 (Doc. 45-3); Napoleone Aff. ¶¶ 2-6, at 1-2. After verifying that the Jeep Cherokee was the same vehicle in which Lollis had been seen, he positioned himself near 1704 Cardenas and called other officers to come to the scene and assist. See Napoleone Aff. ¶ 6, at 2. After receiving notification from Napoleone regarding the presence of the suspect Jeep Grand Cherokee at 1704 Cardenas, Kenny established a command post nearby where he assumed overall control as the incident commander. See Deposition of Sean Kenny at 6:4-16, 33:19-21(taken April 1, 2009), filed

July 2, 2009 (Doc. 45-5); Affidavit of Sean Kenny ¶ 5, at 2 (executed May 26, 2009), filed July 6, 2009 (Doc. 47-5)("Kenny Aff."); <u>id.</u> ¶ 10, at 3.

At 1:22 a.m., Napoleone witnessed a white car arrive at the residence.  The driver of the car -- an unidentified male -- entered the house for a short time, returned to the car at approximately 1:30 a.m., and left again.  <u>See</u> Napoleone Depo. at 6:25-7:5, 7:11-13.  At 1:30 a.m., Napoleone advised Kenny that the white car was leaving the residence.  <u>See</u> Napoleone Depo. at 8:1-8. Because Kenny found it suspicious that a vehicle would arrive at 1:22 a.m., remain for only eight minutes, and then leave, he ordered that the vehicle be stopped.  <u>See</u> Kenny Aff. ¶¶ 13-14, at 3. McDonnell, then posted at the corner of Cardenas and Summer, complied with Kenny's order and stopped the vehicle.  <u>See</u> Kenny Depo. at 9:2-8; Deposition of Casey McDonnell at 5:12, 6:1-16 (taken March 25, 2009), filed July 1, 1009 (Doc. 45-4).

### 3.    <u>The Alleged Detention of N. Smith and His Property</u>.

The Smiths allege that, after McDonnell stopped the white car, he confiscated N. Smith's cellular telephone, phone charger, and the keys to the car.  <u>See</u> McDonnell Depo. at 7:4-9; Deposition of Nathan Smith at 22:10-23:2 (taken May 27, 2009), filed July 2, 2009 (Doc. 45-6). McDonnell then allegedly informed N. Smith that he was taking the items to protect N. Smith's safety.  <u>See</u> N. Smith Depo. at 17:13-19.  The Defendants insist that nothing was "confiscated;" rather, either McDonnell or N. Smith placed the keys and cellular phone on the roof of the car during the encounter.  <u>See</u> McDonnell Depo. at 7:5-19.  N. Smith was eventually -- though considerably later -- allowed to depart the scene in his car.  <u>See</u> N. Smith Depo. at 44:23-45:18 (Doc. 51-3).[1]

---

[1] The Smiths state that Kenny ordered McDonnell to stop the car; the Defendants contest that fact to the extent that the record reflects only that Kenny ordered <u>someone</u> to stop the car and McDonnell was the officer that stopped it.  McDonnell's deposition seems to bear out the Defendants' version of events, but it is ambiguous: "While I was there, Officer Napoleone advised

Kenny testified that taking N. Smith's cellular phone and detaining him was to keep N. Smith from leaving or contacting Lollis to warn him that the police were setting up a perimeter.  See Kenny Aff. ¶ 16, at 4.  Only after taking custody of these items did McDonnell identify N. Smith.  Before this point, the Defendants were not aware of who was driving the white car.  See id. at 17:20-24.

McDonnell then removed N. Smith from his car, placed him in handcuffs, placed him in the back of his police car, and transported him to the command post located at the intersection of Summer and San Pedro.  See McDonnell Depo. at 8:3-6; id. at 8:16-24.  According to the Smiths, Kenny ordered McDonnell to execute each of these acts, including handcuffing N. Smith.  See Motion at 3.  The Defendants insist that the statements cited by the Smiths show that Kenny ordered McDonnell to take N. Smith to the command post, but do not show that he ordered McDonnell to handcuff N. Smith.  See Response at 3.  McDonnell stated only that "Sergeant Kenny requested that I transport the driver of that car to the command post."  McDonnell Depo. at 8:5-6.

The Smiths assert that McDonnell falsely told N. Smith that there was something wrong with his vehicle registration to effectuate N. Smith's seizure.  See Motion at 4; N. Smith Depo. at 21:11-21.  The Defendants dispute this assertion, though they do not provide any evidence what reason or explanation McDonnell gave N. Smith for the stop.  See Response at 3; McDonnell Depo. at 10:4-8 (Doc. 47-7)("Q. Did you tell Mr. Smith why you had stopped him?  A.  I don't remember.  Q. Did you make up some lie or some excuse as to why you had stopped him?  A.  I honestly don't remember what I told him.").  The Smiths allege that McDonnell then formally detained N. Smith.  They argue that, at this time, McDonnell knew the identity of N. Smith and had no information indicating that N. Smith had committed any crime.  See McDonnell Depo. at 9:10-25.  Kenny further

---

that a white vehicle was leaving from the address that he was watching, and Sergeant Kenny requested the vehicle be stopped."  McDonnell Depo. at 6:1-4.

ordered that N. Smith's cellular phone be seized and that the car, including the trunk, be searched.

See Kenny Depo. at 9:9-14 & 10:18-23.  The car was searched ostensibly to ensure that the suspect,

Lollis, was not inside.  See id.  As part of this process, McDonnell physically took hold of N. Smith,

pressed his chest against the car, and secured his wrists behind his back with handcuffs.  See N.

Smith Depo. at 23:6-13.  N. Smith remained in handcuffs during the remainder of the encounter.

See id. at 23:24-25.[2]  Once N. Smith reached the command center, he was interrogated by a blonde,

female sergeant of average height.  See N. Smith Depo. at 31:25-32:11; id. at 33:16-18.  The

sergeant asked N. Smith to identify a photograph.  See id. at 32:30-33:3.  N. Smith informed the

officer that his brother, M. Smith, was not the individual in the photograph.  See id.  The sergeant

then attempted to locate M. Smith's cellular telephone number in the listing of N. Smith's cellular

telephone.  See id. at 31:25-32:11.[3]  Kukowski was the only female officer at the command center,

and she was a sergeant at that time.  See Kukowski Depo. at 3:22-23 (Doc. 45-7); id. at 27:8-10.

### 4.      The Extraction of M. Smith and L. Smith.

By approximately 7:40 p.m. on October 22, 2007, Kukowski had interviewed the witness

who called in the tip regarding Lollis and the license plate of the vehicle.  The witness was "very,

very sure" that Lollis was in the vehicle.  Kukowski Depo. at 5:9-13; id. at 6:4-6.  The witness

---

[2] There is some disagreement whether the handcuffs on N. Smith were tight or caused him pain.  The Smiths describe the handcuffs as being "tightly secured" and that, even though they were "soon loosened," they caused N. Smith "physical discomfort in his shoulders" from having to sit with the handcuffs on.  See Plaintiffs' Motion ¶¶ 19-20, at 4.  The Defendants, however, point to statements by N. Smith that the handcuffs were, "a little tight at first, but then [McDonnell] loosened them up," and that they were "[n]ot so tight as they were snug."  Defendants' Response at 4-5 (citing N. Smith Depo. at 23:10-23).

[3] The Defendants dispute this fact to the extent that it attempts to imply that the blonde sergeant was Kukowski, based on Kukowski's testimony that she did not contact N. Smith nor see him at the command post.  See Response at 5 (citing Deposition of Cassandra Kukowski at 19:15-18 (taken March 25, 2009), filed July 16, 2009 (Doc. 51-2)).

allegedly "knew" that the passenger in the vehicle was Lollis based on a photograph she had seen in a newspaper.  See id. at 5:12-13; id. at 8:10-16.  Nevertheless, Kukowski never sought a search warrant for the house where the reported vehicle was registered.  See id. at 8:20-9:4.  Despite the lack of a warrant, Kukowski offered to help extract the residents from 1704 Cardenas.  See Kukowski Aff. ¶ 17, at 3.  There was an exit plan in place for the residents of the home before Kukowski made contact with M. Smith.  See Kenny Depo. at 17:14-18.  As part of that plan, Kukowski was to get the telephone number for the 1704 residence, contact the occupants inside the house, and get them to leave through the front door and go to the street.  See Kenny Depo. at 15:11-18; Kenny Aff. ¶ 18-22, at 4-5.  Kukowski first tried the home telephone, but nobody answered.  See Kukowski Depo. at 11:5-7, 11:12-23.

At or near 2:00 a.m. on October 23, 2007, Kukowski was given the cellular telephone number of a male resident of 1704 Cardenas and then placed a telephone call to that number.  See Kukowski Aff. ¶ 18, at 3; Deposition of Matthew Smith at 25:8-14 (taken May 27, 2009), filed July 2, 2009 (Doc. 45-10).  At about that time, a telephone call to his cellular telephone awakened M. Smith.  See Affidavit of Matthew Smith ¶ 4, at 1 (executed May 10, 2009), filed July 2, 2009 (Doc. 45-8)("M. Smith Aff.");  M. Smith Depo. at 25:8-14.  Kukowski then engaged M. Smith in an approximately eight-minute telephone call.  See Kukowski Depo. at 16:13-17 (Doc. 45-7); M. Smith Depo. at 26:17-19 & 29:8-18.[4]   During the conversation, Kukowski allegedly identified herself as an Albuquerque Police Officer, asked M. Smith who else was in the house with him, and instructed him to go outside.  See Defendant Cassandra Kukowski's Answer to Plaintiffs' Complaint ¶ 16, at

_____

[4] The Smiths refer to this communication as an "8 minute conversation," but the Defendants argue that the cellular telephone records establish only that M. Smith was on the telephone for eight minutes, and not that there was an eight-minute conversation.  See Defendants' Response at 6.  The Court does not believe this distinction is important to the Court's decision on this motion.

3-4, filed November 3, 2008 (Doc. 12); Kukowski Depo. at 13:2-23.  At first, M. Smith did not believe that Kukowski was a police officer, thinking she was just "some cute sounding girl."  M. Smith Depo. at 25:24-26:12.  He also initially refused to go outside, concerned that he might "walk out [his] front door to a line of gang-bangers and get shot [just] because some cute-sounding girl on [his] phone asked [him] to exit [his] house."  Id. at 26:7-12.  M. Smith testified that Kukowski never told him why his family needed to exit the house, though, when pressed, he admitted that Kukowski may have vaguely mentioned something about safety.  See M. Smith Depo. at 26:20-28:19.  M. Smith also asserted that Kukowski asked him who else was in the house with him, then told him to awaken his mother -- the only other person whom he mentioned -- and that both of them must come out and surrender themselves to the police officers waiting outside.  See Plaintiffs' Motion ¶¶ 39-41 (citing M. Smith Aff. ¶¶ 7-9, at 1-2).

Kukowski recounts this interaction differently.  According to Kukowski, she "introduced [her]self and told [M. Smith] he needed to come to the front door, bring any other occupants of the house with him, and make contact with the officers outside. [She] advised him to get warm clothes and shoes."  Kukowski Aff. ¶ 18, at 3.  She insists that she did not identify herself as a police officer; rather, she told M. Smith only that she worked for the City of Albuquerque:

> Q: . . . [Y]ou introduced yourself as Cassandra, and you worked for the City of Albuquerque, right?
>
> A: Uh-huh.
>
> Q: You didn't tell him you were a police officer?
>
> A: No.  We don't do that in negotiations because it just works a lot better if you come up with a standard intro, and that's what I used.

Kukowski Depo. at 13:24-14:6

M. Smith and his mother, L. Smith, complied, and both L. Smith and M. Smith left their

home at approximately 2:13 a.m.  See M. Smith Aff. ¶ 10; Napoleone Aff. ¶ 13, at 3.  At that time, Napoleone did not know the identity of these individuals or their relationship with Lollis, and allegedly had many concerns about their motives.  See Napoleone Aff. ¶ 14-16, at 3-4.  After exiting the home, L. Smith continued to comply with the instructions of the officers waiting outside.  See Deposition of Linda Smith at 46:19-47:25 (taken May 27, 2009), filed July 2, 2009 (Doc. 45-9). During this process, Napoleone used his gun-mounted flashlight to signal to L. Smith where she should walk.  See id. at 13:6-18.  L. Smith witnessed a line of armed police officers in a wide-legged stance, at least one of which carried a long gun, pointed in her direction.  See L. Smith Depo. at 47:19-48:21.  L. Smith was instructed to turn around, put her hands on her head, walk backwards, and then kneel down.  See id. at 48:22-49:8; Napoleone Depo. at 8:14-21, 9:9-10, 10:1-4. Napoleone then took L. Smith into custody, though he contends that he did not handcuff her or M. Smith.  See Napoleone Depo. at 8:14-21, 9:9-10, 10:1-4.  Another officer, however, handcuffed L. Smith and placed her in a police car for transport to the command center.  See id. at 49:10-14, 50:21-25.

M. Smith exited the house approximately thirty seconds after L. Smith.  A line of at least eight police officers, at least three of whom had their pistols pointed at him, confronted M. Smith. See M. Smith Depo. at 30:2-8, 30:21-31:15.  M. Smith likewise obeyed the police officer's commands by turning around, putting his hands behind his head, and submitting to a pat-down and search of his pockets.  See M. Smith Depo. at 31:23-32:13.  He was then forced to his knees and handcuffed -- though, again, allegedly by someone other than Napoleone.  See id.; Napoleone Depo. ¶ 16, at 3-4.  M. Smith stated that, as a result of the handcuffing, he may have had some reddening of his skin and tenderness, and that it may have lasted a few days.  See M. Smith Depo. at 43:6-17.

Kenny then instructed Vocasek to come to the house and pick up the Smiths.  See Vocasek

-10-

Aff. ¶ 5, at 2; Kenny Aff. ¶ 24, at 5.  Vocasek arrived shortly thereafter.  At that point, the Smiths were placed in the back of his car and transported to the mobile-command center.  See M. Smith Depo. at 34:18-25, 35:20-22; Vocasek Aff. ¶ 5, at 2.  After five or ten minutes, still handcuffed and in the back of the police car, a blonde, female officer approached and questioned M. Smith.  See id.[5] M. Smith remained handcuffed during questioning.  See id. at 36:5-7.  After questioning, M. Smith was placed in a police car with N. Smith and L. Smith.  See id. at 36:10-13.  The Smiths allege that the three of them remained in the back of the vehicle for approximately thirty to forty-five minutes. The Defendants argue that, based on the timing of other events, the Smiths were not in the back of the police car for more than eighteen minutes.  See Response at 9.[6]  The parties also disagree whether the Smiths were handcuffed during their entire stay at the command post.  See Plaintiffs' Motion at 9-10; Defendants' Response at 9-10.  The only evidence cited, however, indicates that Kenny told the officers to remove the Smiths' handcuffs once they were at the command post.  See Kenny Aff. ¶ 25, at 5.  The cited documents do not establish that any officer removed the cuffs. Because Kenny was in command at this time, however, the Court will infer that an officer followed his orders when and if appropriate to deciding these motions for summary judgment.  The Defendants allege that Kenny then explained to L. Smith that the Smiths were extracted from their

_____

[5]  The Defendants again dispute this sentence to the extent, if any, that the Smiths are attempting to imply that the blonde officer was Kukowski.  See Response at 8.

[6]  The Defendants insist that M. Smith and L. Smith arrived at the command post at approximately 2:19 a.m., see Affidavit of Andrew Vocasek ¶ 6, at 2 (executed May 19, 2009), filed July 6, 2009 (Doc. 47-8), that the officers entered the Cardenas residence at 2:37 a.m., see Affidavit of Kevin Napoleone ¶ 19, at 4 (executed May 20, 2009), filed July 6, 2009 (Doc. 47-4); Vocasek Aff. ¶ 15, at 3, and that the Smiths were standing outside the residence when the search took place at 2:37 a.m., see Vocasek Aff. ¶ 14, at 3; McDonnell Depo. at 12:20-13:4.  Further, N. Smith was released at 2:32 a.m. and permitted to leave the area.  See Affidavit of Sean Kenny ¶ 31, at 6 (executed May 26, 2009), filed July 6, 2009 (Doc. 47-5).  They assert that this chronology shows that the Smiths were detained less than 18 minutes -- from 2:19 a.m. to 2:37 a.m.  See Response at 9.

home because the police were looking for Lollis and were concerned that he may be inside her home.  See Kenny Aff. ¶ 26, at 5.  The Smiths also disagree with this allegation, asserting that they were never told why they were extracted from their home or detained.  See L. Smith Depo. at 67:19-25.

Kenny ordered that Vocasek try to obtain from L. Smith permission to search the Smith residence.  See Kenny Aff. ¶ 26, at 5.  So, after L. Smith was detained and moved to the command center, officers read her Miranda rights and presented her with permission-to-search form that would allow the officers to search the house.  See L. Smith Depo. at 55:22-25, 56:10-12, 57:25-58:2; Vocasek Depo. at 10:22-11:1; Kenny Aff. ¶ 26, at 5.  The circumstances of this encounter are strongly disputed.  The Defendants assert that the Smiths were uncuffed and that Vocasek was only advised that Kenny "would like [the Smiths] to sign a permission to search so that [the officers] [could] go in and take a look," and that Vocasek volunteered to do so.  Vocasek Depo. at 9:23-25. The Smiths assert that, when presented with the permission-to-search, L. Smith "felt . . . highly intimidat[ed], . . . with her son still handcuffed in the back of a police car," and that she "determined to do whatever the police told her to do" "[b]ecause she felt very threatened under the circumstances."  Plaintiffs' Motion at 10 (citing L. Smith Depo. at 55:22-25, 56:10-12, 57:25-60:4). The Defendants insist that L. Smith stated she understood what was being read to her and that Vocasek informed her that she could refuse to sign the form if she chose.  See L. Smith Depo. at 57:25-58:4; Vocasek Aff. ¶¶ 8-11, at 2.  L. Smith ultimately signed the permission-to-search form, and Vocasek then placed her and M. Smith in a police car -- in the back seat, such that the Smiths could not exit the vehicle -- and transported them back to a position near their home.  See L. Smith Depo. at 63:18-64:2; Vocasek Depo. at 14:22-15:5.

The permission-to-search form states that the reader "understand[s] that [he or she] may

-12-

accompany the officers during this search, and that [he or she] may rescind the Permission to Search at any time." Permission to Search at 1, filed July 6, 2009 (Doc. 47-5, p. 5). The Smiths were not allowed to accompany the officers on the search; instead, "to protect them from potential harm," Vocasek Aff. ¶ 14, at 3, they were allowed to stand "a house or two south of their house," McDonnell Depo. at 12:20-13:4, while the search took place.

Approximately six officers, including Vocasek, Napoleone, and Kenny, entered the Smiths' home. See Vocasek Depo. at 17:18-19. According to the Smiths, the search lasted ten to fifteen minutes, after which the Smiths were allowed to enter the home accompanied by another officer. See L. Smith Depo. at 66:22-67:15; Napoleone Aff. ¶ 23, at 5. Kenny was among the entering officers, but he did not move beyond the entry area or join in the search. See Napoleone Aff. ¶ 20, at 4; Kenny Aff. ¶ 28, at 6; Vocasek Aff. ¶¶ 15-17, at 3-4. The Defendants contend that the search took closer to six minutes. See Vocasek Aff. ¶ 17, at 4; Kenny Aff. ¶ 29, at 6. Following the search of the family home, the Smiths were released from police custody without any charges. In the end, the police did not locate Lollis. See Napoleone Aff. ¶ 21, at 4.

## PROCEDURAL BACKGROUND

On August 15, 2008, L. Smith, M. Smith, and N. Smith filed a five-count complaint in the United States District Court for the District of New Mexico, in which they bring civil-rights and New Mexico state-tort claims against Defendants Kenny, Friedfertig, Kukowski, McDonnell, Napoleone, and Vocasek, all of whom are officers in the Albuquerque Police Department. See Complaint at 1, filed August 15, 2008 (Doc. 1).[7] In the Complaint, Count I accuses the Defendants

---

[7] On July 2, 2009, the Plaintiffs filed a Joint Motion to Dismiss Defendant Jon Friedfertig from This Action, filed July 7, 2009 (Doc. 44). The Court granted the motion, dismissing Friedfertig as a defendant, on July 7, 2009. See Order Granting Joint Motion to Dismiss Defendant Jon Friedtertig from This Action, filed July 7, 2009 (Doc. 48).

of unlawfully extracting L. Smith and M. Smith from their home in violation of the Fourth and Fourteenth Amendments.  See Complaint ¶¶ 38-41, at 6-7.  Count II accuses the Defendants of unlawful arrest in violation of the Fourth and Fourteenth Amendments.  See id. ¶¶ 42-45, at 7-8. In Count III, the Smiths accuse the Defendants of using excessive force, also in violation of the Fourth and Fourteenth Amendments.  See id. ¶¶ 46-49, at 8.  They allege in Count IV that the Defendants engaged in an unreasonable search, also in violation of the Fourth and Fourteenth Amendments.  See id. ¶¶ 50-54, at 8-9.  Finally, Count V asserts various state-law claims, including assault, battery, false arrest and false imprisonment.  See id. ¶¶ 55-57, at 9.

On November 3, 2008, Kukowski individually answered and denied being present at 1704 Cardenas on the night in question, and further asserted five affirmative defenses.  See Defendant Cassandra Kukowski's Answer to Plaintiffs' Complaint, filed November 3, 2008 (Doc. 12). That same day, the remaining Defendants likewise answered the Smiths' Complaint, generally denying the allegations and asserted several affirmative defenses.  See Defendants' Answer to Plaintiffs' Complaint, filed November 3, 2008 (Doc. 13).  On February 27, 2009, Kukowski moved for summary judgment on grounds of qualified immunity.  See Defendant Cassandra Kukowski's Motion for Summary Judgment at 1, filed February 27, 2009 (Doc. 16).  The Court largely denied that motion on July 21, 2009, because it found that she had not established her defense of qualified immunity as a matter of law.  See Memorandum Opinion and Order at 41, filed July 21, 2009 (Doc. 52)("First, there is a genuine issue of material fact regarding whether Kukowski failed to intervene in an illegal seizure of Nathan Smith. The factual dispute that Nathan Smith's evidence has raised precludes summary judgment. Second, there is evidence that Kukowski seized Matthew and Linda Smith in violation of clearly established constitutional rights.").

The Smiths move the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, for

summary judgment as to all Defendants.[8]   See Plaintiffs' Motion at 1.   Kenny, McDonnell,

Napoleone, Vocasek, and Kukowski cross-move for summary judgment, asserting qualified

immunity and asking that the Court dismiss the Smiths' complaint.   See Defendants' Motion at 1.

Additionally, Kukowski moves for summary judgment individually on M. Smith's excessive-use-of-

force claim against her.   See Defendant Cassandra Kukowski's Motion for Summary Judgment to

Dismiss Plaintiffs Linda and Matthew Smith's Excessive Use of Force Claims at 1, filed September

18, 2009 (Doc. 61).

### A.   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT.

In their motion, the Smiths argue that Kenny and McDonnell unlawfully seized N. Smith and

his property, and that the seizure was in violation of a clearly established right.   More specifically,

they assert that, when McDonnell turned on his police lights and pulled over N. Smith, that was an

unlawful detention, and that Kenny is likewise culpable because he ordered McDonnell to pull over

N. Smith's vehicle.   See Plaintiffs' Motion at 13, 14.   They further argue that McDonnell pulling

over N. Smith interfered with N. Smith's possessory interest in his vehicle, and that McDonnell

interfered with N. Smith's possessory interest in his vehicle and telephone by taking the telephone

and keys and placing them on the top of the car, and, in taking those items, further impressed upon

N. Smith that he was not free to leave the encounter.   See id.   Furthermore, it is undisputed that

McDonnell placed N. Smith in the back of a police car and transported him to the command center.

See id. at 14.   The Smiths argue this encounter constitutes a seizure of N. Smith's person, and that

---

[8] The Smiths' Motion states that they request summary judgment based on rule 50.   See
Plaintiffs' Motion at 1.   Based on the authority cited in the Standard of Judgment section of the
Smiths' brief, however, they probably intend to move under rule 56, not rule 50.   See Plaintiffs'
Motion at 12.   Rule 50 governs motions for directed verdict after some or all of the evidence has
been heard in a jury trial.   See Fed. R. Civ. P. 50.   The Court will treat this motion as one made
pursuant to rule 56.

neither McDonnell nor Kenny, the officer who instructed McDonnell to pull over and apprehend N. Smith, had probable cause for this arrest.  See id.  They assert that this encounter violated clearly established constitutional rights of which a reasonable officer would have known.  See id.  The Defendants respond that N. Smith was seized, but that his seizure was justified as a stop based on reasonable suspicion.  See Defendants' Response at 16.  They assert that there was no "meaningful interference" with N. Smith's property rights, however, and so no seizure of his property occurred. See id.  Finally, they argue that, if the Defendants seized N. Smith's property, it was justified as a reasonable measure to ensure officer safety and secure Lollis' capture.  See id. at 16-17.

The Smiths next assert that Kukowski unlawfully seized them in their home.  See Plaintiffs' Motion at 15-19.  They argue that the officers did not have a warrant, probable cause, nor any exigent circumstances to justify the arrest.  See id.  They argue that Kukowski's use of a telephone to communicate does not change the fact that Kukowski asserted her authority as a police officer or that the Smiths submitted to that assertion of authority.  See id. at 17-18.  The Defendants argue that all Kukowski did was ask that L. Smith and M. Smith come outside, and that this request is not the kind of showing of authority that can result in a seizure.  See Defendants' Response at 14-15. They also argue that, even if Kukowski seized M. Smith, she could not have seized L. Smith because she did not speak to L. Smith.  See id. at 15.  Finally, they argue that Kukowski did not seize M. Smith by her showing of authority because M. Smith initially believed that Kukowski was just some "cute sounding girl."  Id. at 15-16.

Third, the Smiths argue that, although the force used by the police was commensurate with a reasonable arrest, the arrest was unlawful, and so the level of force used was excessive.  See Plaintiffs' Motion at 21-22.  Even if the Court finds that an investigatory detention was warranted based on what the police knew, they assert, the level of force was unreasonable for such a detention.

See id.  Both L. Smith and M. Smith were ordered to put their hands up, were physically seized, were forced to their knees, and were handcuffed.  See id. at 22.[9]  They argue that the law on these issues was clearly established when the events occurred and that a reasonable officer would have known that the level of force was unreasonable under the circumstances.  See id. at 23.  The Defendants argue that, in affecting a detention, there is no difference between the standard of reasonable force in an investigatory detention and an arrest; rather, determining whether the force used was excessive must be made based on the facts and circumstances known to the officer at the time of the detention.  See Defendants' Response at 18-20.  They assert that, in the context of attempting to apprehend a murder suspect, the amount of force used was justified to ensure officer safety and to apprehend Lollis.  See id. at 20.

Next, the Smiths argue that Vocasek and Napoleone unlawfully entered the Smiths' home, without a warrant.  See Plaintiffs' Motion at 23.  While they concede that Vocasek received a permission-to-search waiver from L. Smith, they assert that she did not voluntarily sign the waiver. See Plaintiffs' Motion at 23.  They next assert that no reasonable officer would believe that a consent form, taken under the circumstances, could give lawful permission to search.  See id. at 24. They also argue that they were further detained while the officers executed the search, and that they were not permitted to observe.  See id.  They assert that the terms of the permission-to-search form allowed them to observe and to rescind permission, but that the Defendants did not intend to comply with those terms, and so the consent could not have been intelligently and voluntarily made.  See Plaintiffs' Reply to Defendants' Response to Motion for Summary Judgment at 10, filed July 29,

---

[9] The Plaintiffs concede that any damages for their excessive-use-of-force claim will be subsumed within the damages for their unlawful-arrest claim, if they succeed on that claim.  See Plaintiffs' Motion at 22.

-17-

2009 (Doc. 58).  The Defendants argue that the search of the Smiths' home was not unreasonable under the Fourth Amendment on two bases: there were exigent circumstances and the Smiths consented to the search.  See Defendants' Motion at 23.  They contend that L. Smith's consent was valid under the circumstances.  See id. at 24.  They then assert that "officer safety issues" arose when N. Smith came and went from the Smiths' residence while the officers were setting up the perimeter, and that created the exigency permitting a warrantless entry into the Smiths' residence. See id. at 24-25.  The Defendants imply that the danger of the situation warranted barring the Smiths from joining the officers' search, notwithstanding the language of the permission-to-search form.

Finally, the Smiths argue that Kenny should be liable, as a supervisor, for all the officers' conduct.  See Plaintiffs' Motion at 25-26.  The Defendants argue that the Smiths' supervisory-liability claim against Kenny is new, and that the Court has no jurisdiction over it because it was not in the Joint Status Report.  See Defendants' Response at 23.  They insist that government officials cannot be liable under a theory of respondeat superior, and that Kenny's conduct was not unlawful in and of itself because he was acting to ensure the Smiths' safety while executing an arrest warrant for a dangerous fugitive.  See id. at 23-24.  In their Reply, the Smiths clarify that Kenny's liability is not vicarious, but direct, and that they referred to his liability as "supervisory liability" merely because Kenny was the supervising officer and yet is nevertheless liable.  Reply at 11-12.

**B.      THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.**

The Defendants' motion for summary judgment is aimed almost entirely at their assertion of the defense of qualified immunity.  See Defendants' Motion at 2.  First, they take issue with the idea that all of the Smiths' claims are asserted against all of the Defendants.  They argue that only certain of the Defendants were present at or took part in each of the events giving rise to the Smiths' claims, and that they cannot be held liable for one another's acts.  See Defendants' Motion at 12.

-18-

In response, the Smiths argue that Kukowski was affirmatively linked to each of the constitutional claims alleged in Counts I through IV of their Complaint.  See Plaintiffs' Response at 13-14.  They concede, however, that Vocasek and Napoleone played no part in the constitutional violations that N. Smith alleged, and that the Court could rightfully dismiss N. Smith's claims as against those Defendants.  See id. at 13 ("[T]he Court may rightfully deny Counts I - IV as between Plaintiff Nathan Smith and Defendant Napoleone, and as between Plaintiff Nathan Smith and Defendant Vocasek, as a matter of law.").  The Court will accept this concession, and will dismiss Counts I, II, III, and IV as between N. Smith and officers Napoleone and Vocasek.

Second, the Defendants argue that none of the Smiths were unreasonably seized.  They assert that each seizure was based on reasonable suspicion, and was for a reasonable period of time given the circumstances and the risk to the officers' safety.  See Defendants' Motion at 18-20.  They argue that handcuffing, under these circumstances, was reasonable to ensure the officers' safety.  See id. at 20-21.  Finally, they contend that the detention, based on reasonable suspicion, did not blossom into an arrest -- thereby requiring probable cause -- simply because they were for prolonged periods of time.  See id. at 21-22.  The Smiths, however, insist that the Defendants' argument essentially concedes that (i) there was no search warrant; (ii) there was no probable cause; and (iii) that each of the Plaintiffs were, at some point, "seized."  Plaintiffs' Response at 13-14.  They assert that these concessions amount to an admission that the Defendants violated M. Smith's and L. Smith's constitutional rights because a seizure within a person's home always requires probable cause.  See id. at 14 (citing Payton v. New York, 445 U.S. 573, 576 (1980)).  They also assert that, if the Court finds that N. Smith was at any time arrested -- rather than merely placed in an investigatory detention -- that will also establish a constitutional violation, because a full custodial arrest always requires probable cause.  See Defendants' Motion at 14.  The Smiths argue that N. Smith's detention

was clearly not an investigatory detention, because the detention was not brief, N. Smith was placed in handcuffs, and he was transported to another location.  See id. at 14-15.  The Smiths further attack the Defendants' assertion that the Smiths were placed in protective detention and argue that the concept of protective detention is inapplicable to the facts of this case.  See id. at 16-17.  They assert that, because the Defendants were never in any danger, because they remained in control of the situation, and because there was no arrest of the intended suspect, there was no need for a protective detention.  See id. at 16-21.

Third, the Defendants argue that the Court must dismiss the Smiths' excessive-force claim because, if the Smiths were lawfully detained, the amount of force used was reasonable, and if the Smiths were unlawfully detained, the damages from their excessive force claim will be subsumed into their claim for unlawful arrest.  See Defendants' Motion at 22-23.  They assert, therefore, that the claim will not result in damages regardless whether the detention is ultimately held to be unlawful.  See id. at 23.  The Smiths disagree, arguing that the claim should survive in case the Court finds that the officers had reasonable suspicion, though not probable cause, to detain one or more of the Smiths.  See Plaintiffs' Response at 23-24.  They argue that the amount of force used was reasonable to affect an arrest, but unreasonable to affect an investigatory detention; therefore, if the Court finds reasonable suspicion but not probable cause, the amount of force used was excessive.  See id.  The Smiths conclude by arguing that no reasonable officer would have believed that L. Smith's permission-to-search form was valid under the circumstances, nor that the arrival and departure of N. Smith from the residence created an exigency, and therefore the officers are not entitled to qualified immunity.  See id. at 24-25.

In addition, the Defendants argue that the New Mexico Tort Claims Act does not waive the officers' sovereign immunity from suit because their actions were lawful.  See Defendants' Motion

at 25-26.  To this assertion, the Smiths argue that the Court should not dismiss these claims because neither party has adequately briefed the New Mexico Tort Claims issues, and many legal and factual issues must be resolved before disposing of them.  See id. at 25.

### C.   KUKOWSKI'S MOTION FOR SUMMARY JUDGMENT.

Kukowski's motion for summary judgment asks the Court to assume, for the sake of this motion only, that an unlawful arrest of L. Smith and M. Smith occurred, and, based on that assumption and the undisputed facts in evidence, asks for the Court to grant summary judgment in favor of Kukowski on L. Smith's and M. Smith's excessive-use-of-force claims.  See Kukowski Motion at 6-8.  The Smiths attack this motion aggressively, essentially accusing Kukowski of trying to concede a fact for the purpose of this motion, where it will be beneficial to Kukowski, only to argue against that position later.  See Plaintiffs' Response to Kukowski's Motion at 3-4.  They ask the Court either to accept Kukowski's concession regarding unlawful arrest for all purposes or to allow Kukowski to withdraw her motion and sanction her under rule 11 of the Federal Rules of Civil Procedure.  See Plaintiffs' Response to Kukowski's Motion at 4-6.

### D.   THE PARTIES AGREED IN THE HEARING THAT THE COURT COULD DECIDE SOME ISSUES AS A MATTER OF LAW.

The Court held a hearing on October 28, 2009.  At the hearing, the parties largely reiterated the arguments of their brief, but most appeared to agree that many of the facts in the case are undisputed and that the Court can decide many of the issues as a matter of law.  See Transcript of Hearing at 5:17-6:23 (taken October 28, 2009)(Kennedy)("Hearing Tr."); id. at 7:2-25 (Griffin); id. at 8:25-9:6 (Griffin).  Attorney Minerva Camp argued for Kukowski and seemed to assert that the facts had changed since the Court issued its July 24, 2009 Memorandum Opinion and Order.  She thus insisted that the Court should not find as a matter of law that Kukowski seized L. Smith and

M. Smith with her October 23, 2007 telephone call, as the Court implied that it might.  See Hearing Tr. at 32:24-33:15; Memorandum Opinion and Order at 38 n.3 (Doc. 54).

The Court discussed the Defendants' argument of exigent circumstances with Stephanie Griffin, attorney for Kenny, Vocasek, McDonnell, and Napoleone.  Ms. Griffin conceded that, at the time of these events, the Defendants did not know that Lollis was in the Smiths' home.  See Hearing Tr. at 14:20-21 (Griffin).  Further, she clarified that the exigent circumstance to which the Defendants refer was the arrival and departure of N. Smith at the 1704 Cardenas house.  See id. at 44:14-20 (Griffin).  The concern was that the officers "d[id]n't know if [N. Smith] warned Raymond Lollis, they d[id]n't know if he was somehow harboring or hiding Raymond Lollis, they d[id]n't even know if Raymond Lollis at this point was in the vehicle."  Hearing Tr. at 15:21-25 (Griffin).  Paul Kennedy, attorney for the Smiths, took issue with Ms. Griffin's characterization of the situation, primarily her reference to the neighborhood and 1704 Cardenas as an "arrest scene."  See Hearing Tr. 53:6-54:6 (Kennedy).  He insisted that the Defendants cannot argue that an exigent circumstance made their conduct permissible, because the only reason there was an exigent circumstance was that the scene was designated as an "arrest" scene, but neither the search nor the arrests would be permissible in the absence of an exigency.  Id.  In other words, he insists, the Defendants argue that the exigency justifying the arrest was that the arrest was going to occur.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

According to rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving

party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal

quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant

meets this burden, rule 56(e) requires the nonmoving party to designate specific facts showing that

there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir.

1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries the

burden of proof.")(internal quotes omitted)

   The party opposing a motion for summary judgment must "set forth specific facts showing

that there is a genuine issue for trial as to those dispositive matters for which it carries the burden

of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.

1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in

its own pleadings; rather, its response must -- by affidavits or as otherwise provided in this rule --

set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  It is not enough

for the party opposing a properly supported motion for summary judgment to "rest on mere

allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256(1986).  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v.

United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary

judgment motion is made, the opposing party may not rest on the allegations contained in his

complaint, but must respond with specific facts showing the existence of a genuine factual issue to

be tried.'")(quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).  Nor can a party

"avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific

facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at * 1 (D.

Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and  Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  See Vitkus v. Beatrice Co., 11 F.3d at 1539.  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill and Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . .  summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the Court should keep in mind three principles.  First, the Court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the Court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the Court cannot decide any

issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING QUALIFIED IMMUNITY

As the Court has previously recognized in Holguin v. City of Albuquerque, No. CIV 05-0302 JB/RHS, 2006 U.S. Dist. LEXIS 29489 (D.N.M. Mar. 1, 2006):  "Qualified immunity recognizes the legitimate 'need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982)(quoting Butz v. Economou, 438 U.S. 478, 506 (1978))."  2006 U.S. Dist. LEXIS 29489, at **15-16.  Qualified immunity protects officials acting under color of state law from liability for discretionary functions, and from "the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit."  Siegert v. Gilley, 500 U.S. 226, 232 (1991).  To balance the interests of the complaining individual, and the burden put upon the government official in defending such cases, "courts recognize the affirmative defense of qualified immunity, which protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Gross v. Pirtle, 245 F.3d 1151, 1155 (10th Cir. 2001)(quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

### 1.       Rationale for Qualified-Immunity Doctrine.

Qualified immunity is judicially created and rooted in public policy.  The fear of suit may have a chilling effect on official decision-making, seriously deterring officials from exercising judgment with the decisiveness important to their office.  See Richardson v. McKnight, 521 U.S. 399, 407 (1997)(describing the purposes of qualified immunity "as protecting government's ability to perform its traditional functions by providing immunity where necessary to preserve the ability of government officials to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service.")(internal quotations omitted); Wyatt v. Cole, 504 U.S. 158, 165 (1992)(detailing the public policy basis for the qualified immunity

privilege). In  Harlow v. Fitzgerald, the Supreme Court of the United States stated:

> It cannot be disputed seriously that claims frequently run against the innocent as well as the guilty -- at a cost not only to the defendant officials, but to society as a whole. . . . [T]here is the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.

457 U.S. at 814 (internal citations and quotations omitted).

The broad protection afforded by qualified immunity gives officials "a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001)(quoting Behrens v. Pelletier, 516 U.S. 299, 308 (1996)).  When a defendant raises the affirmative defense of qualified immunity, "a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier v. Katz, 533 U.S. 194, 200 (2001), overruled in part by Pearson v. Callahan, 129 S. Ct. 808, 818-20 (2009).  The qualified immunity privilege is "'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" Id. at 200-01 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

### 2.    Two-Part Test for Qualified Immunity.

Courts are required to apply a two-step analysis in deciding whether a party is entitled to qualified immunity.  Until the Supreme Court's decision in Pearson v. Callahan, the district courts had to take the prongs in order.  Courts now have discretion to address the prongs in any order.

Once a defendant asserts the affirmative defense of qualified immunity, the burden shifts to the plaintiff to establish a violation of a constitutional or federal statutory right by the defendant, and that the constitutional right allegedly violated was clearly established at the time of the violation. See Gross v. Pirtle, 245 F.3d at 1155; Currier v. Doran, 242 F.3d 905, 917 (10th Cir. 2001); Scull

v. New Mexico, 236 F.3d 588, 595 (10th Cir. 2000).

> A court required to rule upon the qualified immunity issue must consider, then, this . . . question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  In the course of determining whether a constitutional right was violated on the premise alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established.  This is the process for the law's elaboration from case to case. . . .

Saucier v. Katz, 533 U.S. at 201 (citations omitted).  The plaintiff must demonstrate that the right alleged to have been violated was clearly established at the time of the defendant's allegedly unlawful conduct.  See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186; Gross v. Pirtle, 245 F.3d at 1156; Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995).  If the plaintiff fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity.  See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186; Gross v. Pirtle, 245 F.3d at 1156; Albright v. Rodriguez, 51 F.3d at 1535.  "In short, although we will review the evidence in the light most favorable to the nonmoving party . . . the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity."  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (citing Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001)).

**3.      Clearly Established Law.**

Qualified immunity shields state officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. at 818.  A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned."  Zweibon v. Mitchell, 720 F.2d 162, 172-173 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984).  "Ordinarily, in order for the law to be clearly established,

-27-

there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Strepka v. Miller, 2001 WL 1475058, at * 5 (10th Cir. 2001)(citing Currier v. Doran, 242 F.3d at 923). See Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).

The plaintiff's burden to establish that the law is clearly established "must be undertaken in light of the case's specific context, not as a broad proposition." Saucier v. Katz, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." Id. at 202. The Supreme Court has observed, however, that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Nonetheless, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 635.

The United States Court of Appeals for the Tenth Circuit has held that, to carry the burden of identifying a clearly established right, the plaintiff "must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." Trotter v. Regents of the University of New Mexico, 219 F.3d 1179, 1184 (10th Cir. 2000)(quoting Hannula v. City of Lakewood, 907 F.2d 129, 131 (10th Cir. 1990), abrogated on other grounds by Dixon v. Richer, 922 F.2d 1456, 1461 (10th Cir. 1991)). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "This is not to say that an official action is protected by

qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Mimics, Inc. v. Village of Angel Fire, 394 F.3d at 842 (internal citations and quotations omitted). If a reasonable person could have believed that the actions were lawful, "defendants are entitled to dismissal before discovery." Workman v. Jordan, 958 F.2d 332, 336 (10th Cir. 1992). Moreover, that an official action may be in violation of an agency's internal procedures does not, in itself, violate any clearly established constitutional right. See Herring v. Keenan, 218 F.3d 1171, 1180-81 (10th Cir. 2000)(explaining "that the fact that an official discloses information in violation of his own internal procedures does not make the disclosure a violation of a clearly established constitutional right to privacy."); Roska v. Peterson, 328 F.3d 1230, 1251 (10th Cir. 2003)("In considering the 'objective legal reasonableness' of the state officer's actions, one relevant factor is whether the defendant relied on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question.").

### 4.      Pearson v. Callahan.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense. In Saucier v. Katz, the Supreme Court held that the lower court need not decide the constitutional violation issue before it decides whether the violation was clearly established. In Pearson v. Callahan, the Supreme Court held that, "while the sequence set forth [in Saucier v. Katz] is often appropriate, it should no longer be regarded as mandatory." 129 S. Ct. at 818. Rather, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." Id. The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz would often be beneficial. See Pearson

v. Callahan, 129 S. Ct. at 819.

While leaving the determination whether to adhere to the Saucier v. Katz sequence in the lower courts' sound discretion, the Supreme Court mentioned various circumstances where such sequencing might be undesirable.  For example, there are cases in which it is plain that a right is not clearly established, but less obvious whether such a right in fact exists.  See Pearson v. Callahan, 129 S. Ct. at 819.  Under such circumstances, it might be considered a waste of resources to engage in analysis under the first prong -- whether a constitutional right was violated -- when it is already obvious that, even if such a right existed, it was not clearly established.  See id.

Another concern arises out of the fact that qualified immunity is usually raised at the pleading stage.  The Supreme Court in Pearson v. Callahan observed that the "two-step" inquiry can be an uncomfortable exercise where "the answer [to] whether there was a violation may depend on a kaleidoscope of facts not yet fully developed."  Id. (brackets in original)(internal quotation marks and citation omitted).  Under such circumstances, it may be more advantageous to analyze whether the asserted right was clearly established rather than reaching the merits.  See id.

Adherence to Saucier v. Katz also poses the potential to lead to bad decision-making.  For example, in some cases that the district courts encounter, "the briefing of constitutional questions is woefully inadequate," and "constitutional questions may be prematurely and incorrectly decided in cases where they are not well presented."  Pearson v. Callahan, 129 S. Ct. at 820 (internal quotation marks and citations omitted).  Moreover, while a court might adhere to the formalities of Saucier v. Katz in discussing the two prongs in sequence, the court's internal processes might involve making a decision based on whether the right was clearly established and only then turning to the more difficult question of the merits.  See Pearson v. Callahan, 129 S. Ct. at 819.  In some such cases, there is a risk that the district court will not devote as much care as it should to deciding

the constitutional issue.  See id.

"Rigid adherence to the Saucier rule may make it hard for affected parties to obtain appellate review of constitutional decisions that may have a serious prospective effect on their operations." Pearson v. Callahan, 129 S. Ct. at 820.  For example, where a court holds that a constitutional violation occurred, but that the right violated was not clearly established, it appears that the defendant cannot appeal, because it was the prevailing party on the issue of qualified immunity.  See Pearson v. Callahan, 129 S. Ct. at 820.  At the same time, a prevailing defendant faces a choice between changing its operations to comport with the finding that it violated a constitutional right, or adhering to its established practice, even though that practice has now been held to result in a constitutional violation.  Such a choice is difficult to take for a defendant who, in effect, has no chance to appeal the determination that the constitutional right, in fact, exists. See id. at 820.

Finally, an obligation to strictly follow Saucier v. Katz runs up against the "general rule of constitutional avoidance and runs counter to the older, wiser counsel not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."  Pearson v. Callahan, 129 S. Ct. at 821 (internal quotation marks and citations omitted).  Furthermore, the first prong's purpose of furthering the development of constitutional law might not be meaningfully advanced in cases where the determination whether a right was violated is so fact bound that it is unlikely to provide guidance in future cases.  See id. at 12.

## LAW REGARDING DUTY TO INTERVENE TO AVOID A CONSTITUTIONAL VIOLATION

An officer who fails to intervene to prevent another officer from depriving a person of his or her civil rights may be liable under § 1983.  See Lusby v. T.G.&Y. Stores, Inc., 749 F.2d 1423, 1433 (10th Cir. 1984).  In Hall v. Burke, 12 Fed. Appx. 856 (10th Cir. 2001), the Tenth Circuit made

clear that an officer's duty to intervene applies to instances concerning excessive use of force and

illegal arrest.  The Tenth Circuit in Hall v. Burke stated:

> [W]e agree . . . that it is clearly established that all law enforcement officials have
> an affirmative duty to intervene to protect the constitutional rights of citizens from
> infringement by other law enforcement officers in their presence.  An officer who
> fails to intercede is liable for the preventable harm caused by the actions of the other
> officers where that officer observes or has reason to know: (1) that excessive force
> is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any
> constitutional violation has been committed by a law enforcement official.  In order
> for liability to attach, there must have been a realistic opportunity to intervene to
> prevent the harm from occurring.  Whether an officer had sufficient time to intercede
> or was capable of preventing the harm being caused by another officer is an issue of
> fact for the jury unless, considering all the evidence, a reasonable jury could not
> possibly conclude otherwise.

12 Fed. Appx. at 861 (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1996)).  See Mick v.

Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996)("[A] law enforcement official who fails to intervene

to prevent another law enforcement official's use of excessive force may be liable under § 1983.");

Lusby v. T.G. & Y. Stores, Inc., 749 F.2d at 1433 (ruling that officer who did not prevent fellow

officer's use of allegedly excessive force against an arrestee "may be liable [under § 1983] if he had

the opportunity to intervene but failed to do so"); Lepone-Dempsey v. Carroll County Comm'rs, 159

Fed. Appx. 916, 920 (11th Cir. 2005)(ruling that it is clearly established that an officer may be held

liable for failing to intervene to stop an unlawful arrest); Yang v. Hardin, 37 F.3d 282, 285 (7th Cir.

1994)(holding that officers have a duty to intervene where a citizen has been unjustifiably arrested);

O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir.1988)("A law enforcement officer has an affirmative

duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his

presence by other officers."); Dawkins v. Williams, 413 F. Supp. 2d 161, 172 (N.D.N.Y.

2006)(stating, with respect to illegal arrest, that "[i]t is widely recognized that all law enforcement

officials have an affirmative duty to intervene to protect the constitutional rights of citizens from

infringement by other law enforcement officers in their presence"); <u>Kaylor v. Rankin</u>, 356 F. Supp.

2d 839, 850-51 (N.D. Ohio 2005)(finding that the defendant officer should have intervened to stop

an unlawful arrest from happening, because he had sufficient time to intervene and would have been

able to avoid the plaintiff's unlawful arrest).

## **RELEVANT LAW REGARDING SEARCH AND SEIZURE**

The Fourth Amendment protects a person's right to be secure against unreasonable search

and seizure:

> The right of the people to be secure in their persons, houses, papers, and effects,
> against unreasonable searches and seizures, shall not be violated, and no Warrants
> shall issue, but upon probable cause, supported by Oath or affirmation, and
> particularly describing the place to be searched, and the persons or things to be
> seized.

U.S. Const. amend. IV.  "[T]he rights of privacy and personal security protected by the Fourth

Amendment 'are to be regarded as of the very essence of constitutional liberty; and . . . the guaranty

of them is as important and as imperative as . . . the guaranties of the other fundamental rights of the

individual citizen.'" <u>Harris v. United States</u>, 331 U.S. 145, 150 (1947), <u>overruled in part by</u> <u>Chimel</u>

<u>v. California</u>, 395 U.S. 752, 768 (1969) (quoting <u>Gouled v. United States</u>, 255 U.S. 298, 304 (1921)).

The Supreme Court has stated: "[P]hysical entry of the home is the chief evil against which the

wording of the Fourth Amendment is directed."  <u>United States v. United States District Court</u>, 407

U.S. 297, 313 (1972).  The hallmark of the Fourth Amendment is reasonableness, and "[i]t is a basic

principle of Fourth Amendment law that searches and seizures inside a home without a warrant are

presumptively unreasonable." <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980).  The Supreme Court

has instructed that, when assessing the reasonableness of a warrantless search, a court must begin

"with the basic rule that 'searches conducted outside the judicial process, without prior approval by

judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few

specifically established and well-delineated exceptions.'" <u>Arizona v. Gant</u>, 129 S. Ct. 1710, 1716 (2009) (citing <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)); <u>Payton v. New York</u>, 445 U.S. at 586.

In most cases, the core requirement of Fourth Amendment reasonableness is a determination of probable cause by a neutral and detached magistrate, and a warrant "particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  It is only in very particular circumstances that a search without a warrant is deemed reasonable.  Furthermore, the police must obtain the warrant <u>before</u> the challenged search, not afterwards:

> Searches conducted without warrants have been held unlawful notwithstanding facts unquestionably showing probable cause, for the Constitution requires that the deliberate, impartial judgment of a judicial officer be interposed between the citizen and the police.  Over and again this Court has emphasized that the mandate of the Fourth Amendment requires adherence to judicial processes, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.

<u>Katz v. United States</u>, 389 U.S. at 356-57.  The Supreme Court has commented that allowing an after-the-fact analysis of the facts and circumstances to determine whether there was probable cause supporting a warrantless search or seizure "bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification for the search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment." <u>Katz v. United States</u>, 389 U.S. 347, 358 (1967)(quoting <u>Beck v. Ohio</u>, 379 U.S. 89, 96 (1964)).

### 1.    <u>Seizure Can Occur Without Physical Restraint</u>.

In <u>United States v. Reeves</u>, 524 F.3d 1161 (10th Cir. 2008), the Tenth Circuit established that "[o]pening the door to one's home is not voluntary if ordered to do so under color of authority." <u>Id.</u>

at 1167. The Tenth Circuit has repeatedly held that, absent exigent circumstances, officials acting under the color of authority and without a warrant may not seize a person inside their home, or effect a seizure by ordering a person inside a home to come to the door.  See United States v. Maez, 872 F.2d 1444, 1446 (10th Cir. 1989)(holding a seizure to have been a violation of the Fourth Amendment when police surrounded an individual's house for three hours planning an arrest and ordering the individual out of his home under drawn firearms believing he was a suspect in a bank robbery); United States v. Flowers, 336 F.3d 1222, 1225-27 (10th Cir. 2003)(holding that an unconstitutional seizure occurred when police discovered that a suspect illegally sold alcohol from his home and that ordering him to open the door to be arrested inside his home was not a voluntary act by the defendant).   In United States v. Reeves, police officers suspected an individual of unlawfully carrying weapons.  See 524 F.3d at 1163.  Without an arrest or search warrant, officers had convened at the suspect's motel and made several calls from the front office to the motel room, which were unanswered. After assessing the situation, officers proceeded knocking on the suspect's door and windows.  See id. at 1164.  After nearly twenty-five minutes, the suspect met the officers at the door and was promptly arrested.  See id.  The Tenth Circuit, in United States v. Reeves, held that the presence of police, the telephone calls, and the knocking at door constituted a seizure inside the home because the suspect would not likely have thought that he was free to ignore the officers knocking and yelling into the room.  See id. at 1168. Although it recognized that the officers in United States v. Reeves did not issue any direct commands for the suspect to open the door or come out, the Tenth Circuit reasoned:

> [T]he officers' actions were effectively a command to open the door.  The record demonstrates that three officers pounded on Reeves' door and window while yelling and loudly identifying themselves as police officers. They continued this conduct consistently for at least twenty minutes.  This encounter began between 2:30 and 3:00 in the morning, a time which must be taken into consideration when analyzing

the coerciveness of the encounter.

United States v. Reeves, 524 F.3d at 1168-69.

In United States v. Reeves, the Tenth Circuit cited with approval a case from the United States Court of Appeals for the Ninth Circuit.  In that case, United States v. Al-Azzawy, 784 F.2d 890 (9th Cir. 1985), the Ninth Circuit held that a defendant was seized inside his home for purposes of the Fourth Amendment when officers surrounded his trailer and used a bullhorn to order the suspect to exit his home and drop to his knees.  See United States v. Al-Azzawy, 784 F.2d at 893. The Ninth Circuit had found that the defendant/appellee "was not free to leave, his freedom of movement was totally restricted, and the officers' show of force and authority was overwhelming. Any reasonable person would have believed he was under arrest in these circumstances."  Id.

The Tenth Circuit in United States v. Reeves also cited with approval United States v. Morgan, 743 F.2d 1158 (6th Cir. 1984).  In  United States v. Morgan, the United States Court of Appeals for the Sixth Circuit held that a seizure occurred when police surrounded a defendant's home and demanded that he come outside:

> [T]he record provides ample proof that, as a practical matter, Morgan was under arrest as soon as the police surrounded the Morgan home, and therefore, the arrest violated Payton because no warrant had been secured. The police show of force and authority was such that a reasonable person would have believed he was not free to leave.

See 743 F.2d at 1163-64.

In United States v. Johnson, 626 F.2d 753 (9th Cir. 1980), federal agents approached the home of a suspect  to investigate the theft of a treasury check.  See 626 F.2d at 755.  The seizure of the suspect occurred when the suspect was inside the house and the officers were outside with guns drawn.  See United States v. Johnson, 626 F.2d at 757.  The Ninth Circuit held that this arrest was unconstitutional because "it is the location of the arrested person and not the arresting agents that

-36-

determines whether an arrest occurs within a home." Id.  The Ninth Circuit reasoned that to hold

otherwise would allow officers to "avoid illegal 'entry' into a home simply by remaining outside

the doorway and controlling the movements of suspects within through the use of weapons that

greatly extend the 'reach' of the arresting officers."  Id.

The Supreme Court has found "a person has been seized within the meaning of the Fourth

Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable

person would have believed he was not free to leave." United States v. Mendenhall, 446 U.S. 544,

554 (1980).  However, "in situations where the individual could not or would not want to leave, even

absent police presence, the appropriate inquiry is whether a reasonable person would feel free to

decline the officer's requests."  Florida v. Bostick, 501 U.S. 429, 436 (1991).  Regarding

circumstances where police officers, without warrant or exigent circumstances and acting under the

color of authority, order the occupants of an residence to the door to be seized, the Tenth Circuit has

stated:

> In situations where the individual could not or would not wish to leave, even absent
> the police presence, "the appropriate inquiry is whether a reasonable person would
> feel free to decline the officers' requests or otherwise terminate the encounter."
> Florida v. Bostick, 501 U.S. 429, 436 . . . (1991). Circumstances that indicate a
> seizure include, "the threatening presence of several officers, the display of a weapon
> by an officer, some physical touching of the person of the citizen, or the use of
> language or tone of voice indicating that compliance with the officer's request might
> be compelled."  [United States v.] Mendenhall, 446 U.S. [544,] 554 . . . [(1980)];
> [United States v.] Maez, 872 F.2d [1444,] 1450 [(1989)].

United States v. Reeves, 524 F.3d 1161, 1167 (2008).

## 2.    **Protective/Investigatory Detentions Versus Arrests.**

Since it decided Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court of the United States

has recognized that not all seizures are the same.   See United States v. Maddox, 388 F.3d 1356,

1361  (10th Cir. 2004)("Prior to Terry v. Ohio, 392 U.S. 1 . . . (1968), Fourth Amendment seizures

of the person were analyzed in terms of arrest, and reasonable only if supported by probable cause.")

(citing Dunaway v. New York, 442 U.S. 200, 208 (1979)).  In Terry v. Ohio, the Supreme Court

"approach[ed] the issues . . . mindful of the limitations of the judicial function in controlling the

myriad daily situations in which policemen and citizens confront each other on the street."  Terry

v. Ohio, 392 U.S. at 12.  Now, while the law still requires that a police officer have probable cause

to affect a formal arrest of an individual, certain seizures -- generally short-term seizures wherein

the citizen's rights are not significantly affected -- can be made based on reasonable suspicion alone.

See, e.g., Terry v. Ohio, 392 U.S. at 30-31; United States v. Maddox, 388 F.3d 1356, 1362 (10th Cir.

2004).

        **a.**        **The <u>Terry</u> Stop.**

       The concept of police seizures based on less than probable cause began with Terry v. Ohio,

wherein a Cleveland, Ohio police officer named Martin McFadden had been walking the beat in

downtown Cleveland when he spotted a couple of men -- Terry and Chilton -- acting suspicious.

See id. at 16.  One at a time, Terry and then Chilton would walk down the street, stop for a moment

in front of a particular store window, peer inside, continue walking a little ways farther, turn around,

begin waking back, stop in front of the same store window, peer inside again, return to where the

other man was standing, and the two would then briefly confer.  See id. at 6.  After each of the two

had walked, looked, walked, turned, walked, looked, walked, and conferred about six times, a third

man appeared from down a side street.  See id.  The three of them talked for a moment, then the

third man again departed.  See id.  Terry and Chilton resumed their apparent-reconnaissance for

another ten to twelve minutes before disappearing down the same street from which the third man

had come.  See id.

       At this point, McFadden "had become thoroughly suspicious" that the individuals he was

watching were "casing a job, a stick-up," and that one or more of the men may have a gun.  See id. So, he followed them down the street, approached the men, announced himself as a police officer, and asked them for their names.  See id. at 6-7.  The men merely mumbled in reply, at which point McFadden grabbed Terry, spun him around and patted down the outside of his clothing.  See id. at 7.  McFadden found revolvers in both Chilton's and Terry's coats, but no weapons on the third individual.  See id.

Terry and Chilton sought to have the guns suppressed because, they argued, they were discovered in an unlawful search.  See id. at 7-8.  The trial court shot down the prosecution's theory that the guns were found in a search incident to a lawful arrest, because McFadden's observations did not amount to probable cause to believe the defendants had committed any crime.  See id. at 7. The trial court nevertheless held that, based on his observations and his thirty-seven years of experience, McFadden had reasonable cause to believe that the defendants were behaving suspiciously and that they might be armed.  See id. at 8.  The intermediate appellate court affirmed the trial court's finding, and the Supreme Court of Ohio dismissed the defendants' appeal because "no 'substantial constitutional question' was involved."  Id.  The Supreme Court granted certiorari to review whether the revolvers were properly admitted into evidence.  See id.

The Supreme Court began its analysis in Terry v. Ohio with the proposition: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Id. at 9 (quoting Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251 (1891)).  Nevertheless, the Constitution does not forbid all searches and seizures, but only unreasonable searches and seizures.  See Terry v. Ohio, 392 U.S. at 9 (citing Elkins v. United States, 364 U.S. 206, 222 (1960)).   In the end, the Supreme Court upheld

McFadden's "stop-and-frisk" under a newly articulated rule: if an officer has reasonable and articulable suspicion that a person might be involved in criminal activity, the officer may briefly stop that person for the purpose of confirming or dispelling that suspicion. See Terry v. Ohio, 392 U.S. at 21-22, 30; United States v. Maddox, 388 F.3d at 1361. Similarly, if the officer has reasonable and articulable suspicion to believe that the suspect might be armed and dangerous, the officer can execute a protective frisk of the suspect's outer clothing. See Terry v. Ohio, 392 U.S. at 27, 30; United States v. Maddox, 388 F.3d at 1361.

> **b.    The Terry frisk gives rise to the protective sweep.**

In 1990, the Supreme Court expanded the Terry frisk to include a "protective sweep," a limited search that a police officer could execute based on a level of certainty less than probable cause. See Maryland v. Buie, 494 U.S. 325 (1990). In Maryland v. Buie, Buie was wanted for his participation in a two-man armed robbery of a Godfather's Pizza restaurant. See Maryland v. Buie, 494 U.S. at 328. The police entered Buie's home pursuant to a valid arrest warrant. See id. An officer found Buie in the basement and, while there, the officer briefly searched the remainder of the basement for any other occupants -- such as Buie's accomplice in the underlying crime. See id. During that brief "protective sweep," the officer found a red jumpsuit like the one that one of the robbers was allegedly wearing and, since it was in plain view, seized the jumpsuit. See id.

Buie sought to exclude admission of the red jumpsuit in evidence on the basis that the additional search that the officer executed violated the Fourth Amendment. See 494 U.S. at 228. The Maryland trial court and intermediate appellate court upheld the officer's small additional search on the basis that the officer had reasonable suspicion to believe that there might be other dangerous individuals  hiding in the basement with Buie. See id. at 328-29. The Maryland Court of Appeals reversed, holding that an officer needs probable cause to justify the kind of "protective

sweep" that the officer executed.  See id.  The Supreme Court of the United States reversed, upholding the Maryland trial court's and intermediate appellate court's decisions.

The Supreme Court in Maryland v. Buie commented that "there is no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." Id. at 332 (internal quotes and alterations omitted).  It held that such a protective sweep was a minimal -- though not insignificant -- additional intrusion on the Fourth Amendment rights of the criminal defendant.  See 494 U.S. at 333-34.  At the same time, an arrest within a person's home puts the officer at a distinct disadvantage, and places him at an even greater risk of someone laying in wait ambushing or harming him.  See id. at 333.  Thus, balancing the Fourth-Amendment intrusion against the government's heightened interest in protecting police officers arresting suspected criminals, the Supreme Court found that a "protective sweep" was justified on the basis of reasonable suspicion to believe that there might be another individual on the premises that might be a danger to the officers.  See id. at 334.  Probable cause is not required, nor is a warrant.  See id.  The Supreme Court limited, however, the scope of such "protective sweeps:"

> [It] is . . . not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.  The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

Id. at 325-26.  The "intrusion [should] be no more than necessary to protect the officer from harm, and . . . the arresting officers are permitted in such circumstances to take only reasonable steps to ensure their safety after, and while making, the arrest." United States v. Maddox, 388 F.3d at 1362 (quoting Maryland v. Buie, 494 U.S. at 334-36)(internal quotes, citations, and alterations omitted).

### c.    Terry stops give rise to the investigative/protective detention.

In United States v. Maddox, using a theory growing out of Terry v. Ohio, see 388 F.3d at

1361, and <u>Maryland v. Buie</u>, <u>see</u> 388 F.3d at 1361-62, the Tenth Circuit recognized a new basis on which a police officer can detain a citizen on a level of certainty lower than probable cause, <u>see id.</u> at 1369. In <u>United States v. Maddox</u>, the Tenth Circuit was "consider[ing] the reasonableness of a detention taking place outside of a house in which an in-house arrest is occurring."  388 F.3d at 1362.  The Tenth Circuit "h[e]ld that <u>Buie</u> applies to both protective searches and protective detentions because the Court's reasoning in <u>Buie</u> supports treating protective sweeps and protective detentions similarly."  388 F.3d at 1362.

In <u>United States v. Maddox</u>, two federal marshals and a local deputy sheriff Medrano went to serve an arrest warrant on Rachel Page, an individual wanted for narcotics trafficking.  See 388 F.3d at 1358-59.  Page was staying in a mobile home in a dangerous, high-crime area.  <u>See id.</u> at 1359.[10]  After asking the owner of the mobile home if Page was inside, and being answered in the affirmative, the two federal marshals went inside to execute the arrest warrant.  <u>See id.</u>  Medrano remained outside to make sure nobody else entered the building.  Over the fifteen-minute period during which the marshals executed the warrant, a total of eight individuals approached the carport at which Medrano was positioned, and he instructed all to stay where they were and take a seat inside the carport.  <u>See id.</u>[11]  At that point, however, one of the individuals -- Maddox -- was refusing to cooperate and was acting erratically, and Medrano was feeling outnumbered, so he called for backup.  <u>See id.</u> at 1359-60.  Once backup arrived, they patted down each of the individuals in the carport and, at Medrano's request, separated Maddox from the group for individual treatment.  <u>See</u>

_____

[10] The officers involved knew that the location where they sought to make their arrest had been the location of numerous violent crimes, and that several narcotics traffickers and violent fugitives had been arrested there.  See <u>United States v. Maddox</u>, 388 F.3d at 1359.

[11] Notably, during this time, Medrano did not unholster his sidearm nor place any of the individuals in handcuffs.  See <u>United States v. Maddox</u>, 388 F.3d at 1359.

id. at 1360.

Once alone, Deputy McCoy asked Maddox for identification and whether he had any weapons.  See United States v. Maddox, 388 F.3d at 1360.  Maddox responded with his name, but said that he had recently lost his driver's license.  See id.  He also stated that he was carrying a concealed gun.  See id.  At that point, McCoy cuffed and disarmed Maddox, and took from Maddox a scale and some methamphetamine.  See id.  In the trial for charges of drug and firearm possession, Maddox alleged that he was unlawfully seized, and that therefore his answers to McCoy's questions regarding whether he was armed or was carrying any drugs were involuntary.  See id. at 1361.

In United States v. Maddox, the Tenth Circuit recognized that Terry v. Ohio created a "narrowly drawn exception" to the probable-cause requirement for lesser governmental intrusions into a person's liberty.  See id.  It further found that the "protective detention" executed by Medrano should be analyzed under the same standard as the "protective sweep" described in Maryland v. Buie.  See United States v. Maddox, 388 F.3d at 1365.  In other words, the question posed should be: "Did [the] Officer . . . have a reasonable and articulable suspicion that [the person detained] posed a threat to the officers on the scene that justifies the detention of [that person] [at the scene] for the duration of [the] arrest[?]"  Id.  The analysis must be made in light of the totality of the circumstances, and balance the claimant's Fourth-Amendment interests against the governmental interest in officer safety.  See United States v. Maddox, 388 F.3d at 1365.  The reasonableness analysis must be "based on commonsense judgments and inferences about human behavior[;] a mere inchoate and unparticularized suspicion or hunch cannot satisfy this reasonableness requirement."  Id. (internal quotes omitted).  The Tenth Circuit thus held: "[A] protective detention justified on officer safety grounds is decidedly not automatic, but may be conducted only when justified by a reasonable, articulable suspicion that a person poses a danger to those on the arrest scene."  Id.

(quoting <u>Maryland v. Buie</u>, 494 U.S. at 336)(internal quotes and alterations omitted).  The Tenth Circuit further held, "as a part of our reasonableness analysis, that not only must the seizure be justified at its inception, but that the scope of seizure employed must also be reasonable under the circumstances."  <u>United States v. Maddox</u>, 388 F.3d at 1367.

In <u>United States v. Holt</u>, 264 F.3d 1215, the Tenth Circuit again upheld a temporary detention on less than probable cause under <u>Terry v. Ohio</u> principles.  <u>See</u> 264 F.3d at 1220 ("We have consistently applied the principles of <u>Terry v. Ohio</u> . . . to routine traffic stops.").  In <u>United States v. Holt</u>, the Tenth Circuit "assess[ed] the reasonableness of a traffic stop based on an observed [traffic] violation by considering the scope of the officer's actions and balancing the motorist's legitimate expectation of privacy against the government's law-enforcement-related interests."  264 F.3d 1220.  When stopped for a traffic violation, the scope of the detention is generally limited to questions relating to the reasons for the stop or the driver's authority to operate the vehicle.  <u>See id.</u> at 1221-22.  Furthermore, the officer may, in the interest of officer safety, order the driver and passengers out of the vehicle.  <u>See id.</u> at 1222.  "On the other hand, motorists ordinarily expect to be allowed to continue on their way once the purposes of the stop are met."  <u>Id.</u> at 1221.

> **d.     The scope of the officers conduct during the detention determines whether there is a stop or an arrest.**

In <u>United States v. Place</u>, 462 U.S. 696 (1983), the Supreme Court addressed whether a temporary seizure of a person's luggage -- permissible based on reasonable suspicion -- bloomed into a full seizure requiring probable cause based on the extended duration of the police custody.  The Supreme Court held that such action was a seizure, and that, because the police had only reasonable suspicion -- not probable cause -- to justify it, the seizure was unlawful.  <u>See</u> 462 U.S. 696, 710.

In United States v. Place, defendant Place was flying from Miami, Florida to New York, New York.  In the Miami airport, Place's behavior indicated to law enforcement officers that his luggage might contain illegal narcotics.  See id. at 697-98.  They did not search his luggage, however, because his flight was about to depart.  See id. at 698.  Instead, based on some remarks by Place and some discrepancies in the addresses on the pieces of luggage, the officers called ahead to the Drug Enforcement Administration ("DEA") in New York and informed the DEA of Place's impending arrival.  See id. at 698.

Once Place arrived in New York, the DEA agents were watching and also observed Place's suspicious behavior.  See id. at 698-99.  Based on their own observations and the information that they received from the Miami authorities, the New York DEA agents approached Place and asked whether they could search his bags.  See id. at 699. He refused.  See id.  The officers then took the bags, telling Place that they were going to acquire a search warrant, and transported the bags to Kennedy Airport to be sniffed by narcotics-sniffing dogs.  See id.  By the time the dogs sniffed the luggage and gave a "paws-up," alerting to the possible presence of narcotics, the police had retained custody of the bags for ninety minutes.  See id.  When the officers opened the bags, they found approximately 1.125 kilograms of cocaine.  See id.

The Supreme Court affirmed the United States Court of Appeals for the Second Circuit's decision to suppress the evidence, reasoning:

> In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.
>
> * * * *
>
> The exception to the probable-cause requirement for limited seizures of the person recognized in Terry and its progeny rests on a balancing of the competing interests

> to determine the reasonableness of the type of seizure involved within the meaning of the Fourth Amendment's general proscription against unreasonable searches and seizures. We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.

462 U.S. at 701-03. Of course, a general interest in law enforcement is insufficient to justify infringing on a person's Fourth Amendment rights without probable cause. See United States v. Place, 462 U.S. at 703-04. To hold otherwise would render the probable-cause requirement superfluous, because the Fourth Amendment is almost always violated in the context of overzealous law enforcement in the "often competitive enterprise of ferreting out crime." Johnson v. United States, 333 U.S. 10, 14 (1948).

United States v. Place dealt with the permissible scope of a reasonable-suspicion detention of a person's property rather than of the person himself. See id. at 709. The Supreme Court, however, did not find that distinction meaningful: "[W]hen the police seize luggage from the suspect's custody, we think the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause." See 462 U.S. at 708-09. Thus, at least under the facts of United States v. Place, somewhere between zero and ninety minutes, the detention crossed the line from "stop" to "arrest." The Supreme Court was careful to specify, however, that it is the totality of circumstances, not strictly duration, that makes an arrest. See United States v. Sharpe, 470 U.S. 675, 686 (1985) ("We understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct. Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.")(quoting United States v. Place, 462 U.S. at 709). The core inquiry is

whether the scope of the detention -- in terms of both duration and coerciveness -- is commensurate with the circumstances and purpose of the detention.

The Tenth Circuit has also held that a police/citizen encounter that goes beyond the limits of a Terry stop is an arrest which must be supported by probable cause or consent to be valid. See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances." Id.  "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" Id. (quoting Florida v. Royer, 460 U.S. 491 (1983)).

> **e.    The use of guns and handcuffs usually, but not always, turns a stop into an arrest.**

The Court has before engaged in the determination when a detention becomes an arrest.  In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J), aff'd sub nom. United States v. Burciaga-Burciaga, 147 Fed. Appx. 725, 731 (10th Cir. 2005), the Court had to determine whether the police involved transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car.  See United States v. Perea, 374 F. Supp. 2d at 976.  In that case, the officers stopped a vehicle fitting the description of the one used in a drug transaction.  See id. at 975.  The vehicles windows, however, were tinted and the officers did not know who or how many people were inside.  Furthermore, the officers believed that the driver was wanted in connection with a murder investigation, as well as

being involved in a narcotics transaction.  See id. at 975-76.  The Court found that such measures were appropriate and did not elevate the investigative detention to the level of an arrest.  See id. at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974.  See United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'").

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest. 'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, 8 F.3d at 1462).  See also United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990).  Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.  See United States v. Merkley, 988 F.2d 1064; United States v. Miller, 874 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents.").  United States v. Perea was one of those unique cases, because the police had reasonable

-48-

cause to believe that the person that they were detaining was the suspect that they sought to arrest --

a man wanted for murder whom, it was believed, might be armed and dangerous.  See United States

v. Perea, 374 F. Supp. 2d at 976.

In United States v. Melendez-Garcia, 28 F.3d 1046 (10th Cir. 1994), the Tenth Circuit placed

upon the government the "burden of demonstrating that the seizure it seeks to justify on the basis

of reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of

an investigative seizure." Id. at 1052.  While the Tenth Circuit recognized that there is no bright-line

rule to guide whether the scope of police conduct stayed within the bounds of an investigative stop,

see id. at 1052, it held that "the use of force such as handcuffs and firearms is a far greater level of

intrusion [than the ordinary investigative stop], and requires the government to demonstrate that 'the

facts available to the officer would warrant a man of reasonable caution in the belief that the action

taken was appropriate," id.  After reviewing the relevant law, the Tenth Circuit held:

> [T]here was no evidence or testimony from the police that they had reason to believe
> these particular suspects had guns or were violent or that the circumstances of this
> particular encounter warranted the unusual intrusiveness of handcuffing the
> defendants during the Terry stop.  In the absence of such evidence, the naked fact
> that drugs are suspected will not support a *per se* justification for use of guns or
> handcuffs in a Terry stop.

Id. at 1052-53.  The Tenth Circuit therefore held that the detention was an arrest, rather than an

investigative detention, and, because the government made no argument that the officers had

probable cause, it held that the arrest was unlawful.  See id. at 1053.  Thus, it appears that, in the

Tenth Circuit, there must be something more than the fact that the underlying crime was violent to

justify officers' use of handcuffs and/or handguns during an investigative detention.  And that,

without such additional justification, the guns and handcuffs transform that investigative detention

into an arrest.[12]

### 3.   Exigent Circumstances Are an Exception to the Warrant Requirement.

Although "searches and seizures inside a home without a warrant are presumptively unreasonable," Payton v. New York, 445 U.S. 573, 586 (1980), exigent circumstances may, at times, justify a search or seizure without a warrant, see United States v. Najar, 451 F.3d 710, 717-18 (10th Cir. 2006).  In such cases, the question is "whether the officers had both probable cause and exigent circumstances justifying . . . their warrantless entry."  West v. Keef, 479 F.3d 757, 759 (10th Cir. 2007).  See Sanchez v. Ulibarri, 308 Fed. Appx. 280, 284 (10th Cir. 2009)(discussing the "federal mandate that a warrantless entry and arrest be justified by probable cause and exigent circumstances.")(citing United State v. Reeves, 524 F.3d at 1169); United States v. Reeves, 524 F.3d at 1169 ("Officers may enter an individual's home without consent and conduct a warrantless arrest if both probable cause and exigent circumstances exist.")(citing Payton v. New York, 445 U.S. at 590).  The existence of probable cause to make an arrest, however, without more, is not an exigent circumstance warranting warrantless entry.  See United States v. Reeves, 524 F.3d at 1161 ("In Payton v. New York, the Supreme Court held that, absent exigent circumstances, police officers may not enter an individual's home without consent to make a warrantless routine felony arrest even if probable cause to arrest the individual exists.")(citing Payton v. New York, 445 U.S. at 576).  When the exigency is the "immediate need to protect . . . lives or safety," however, probable cause is not

---

[12] The Court realizes that United States v. Melendez-Garcia was decided ten years before United States v. Maddox, and so officers might now be justified in using more force to detain individuals during the course of a protective detention.  The Court notes, however, that the officers in United States v. Maddox did not use handcuffs or draw weapons, and believes that the Tenth Circuit may have come to a different conclusion in that case if the officers had done so. The Court therefore will continue to use United States v. Melendez-Garcia as the standard for determining when use of intrusive techniques changes a protective detention into an arrest.

required.  See West v. Keef, 479 F.3d at 759 ("The Supreme Court has made clear . . . that police may enter a home without a warrant where they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury."); United States v. Najar, 451 F.3d at 718.  In such emergency-aid situations, the Tenth Circuit employs a two-pronged test to determine whether emergency circumstances justify a warrantless entry into a home, which examines: "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable."  United States v. Najar, 451 F.3d at 717-18.  A court must also remember that officers cannot create their own exigent circumstances to justify a warrantless entry. See United States v. Flowers, 336 F.3d 1222, 1230 (10th Cir. 2003).

### 4. Automobile Searches Are an Exception to the Warrant Requirement, But Require Probable Cause.

Generally speaking, an investigatory detention of a person in an automobile may be made based on reasonable suspicion that the driver is involved in criminal conduct.  See United States v. Toro-Pelaez, 107 F.3d 819, 823-24 (10th Cir. 1997)("A traffic stop is a seizure within the meaning of the Fourth Amendment[, but] it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause.").  To search the car, however, the officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality.  See United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008) ("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search.").  And, while the Fourth Amendment generally requires that a search be made pursuant to a warrant to be

considered reasonable, the ongoing exigent circumstance that the car might drive away has led the

Supreme Court to conclude that a warrant is not required to search a vehicle.  See Maryland v.

Dyson, 527 U.S. 465, 466-67 (1999)("[W]here there [is] probable cause to search a vehicle[,] a

search is not unreasonable if based on facts that would justify the issuance of a warrant, even though

a warrant has not been actually obtained.")(citing United States v. Ross, 456 U.S. 798, 809

(1982))(internal quotes omitted); California v. Carney, 471 U.S. 386, 393-94 (1985).  This rule of

law is aptly referred to as the "automobile exception" to the warrant requirement.  See Maryland v.

Dyson, 527 U.S. at 466-67.  Thus, as long as the investigating officer has probable cause to believe

that the vehicle contains contraband or evidence of criminality, he or she may search the vehicle.

## RELEVANT LAW REGARDING EXCESSIVE FORCE

Courts analyze Fourth-Amendment excessive-force claims "under the 'objective

reasonableness' standard that governs other Fourth Amendment inquiries."  Cordova v. Aragon,

2009 WL 1707919, at *3 (10th Cir. 2009).  See Graham v. Connor, 490 U.S. 386, 395 (1989)("[A]ll

claims that law enforcement officers have used excessive force . . . in the course of an arrest,

investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth

Amendment and its 'reasonableness' standard.").  The Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which
> requires that we consider the following factors: [(i)] the severity of the crime at issue,
> [(ii)] whether the suspect poses an immediate threat to the safety of the officers or
> others, and [(iii)] whether he is actively resisting arrest or attempting to evade arrest
> by flight.

Weigel v. Broad, 544 F.3d 1143, 1151-52 (10th Cir. 2008)(internal quotation marks and citations

omitted).  Additionally, a court must judge the reasonableness of a particular use of force from "the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . .

That perspective includes an examination of the information possessed by the [officers]."  Id. at

1152 (citations and internal quotes omitted).

**1.      Excessive Force in Handcuffing.**

Whether an officer acts unconstitutionally in handcuffing an individual depends on the objective reasonableness of the officers' actions. See Silvan W. v. Briggs, 309 Fed. Appx. 216, 224 (10th Cir. 2009). The Tenth Circuit "ha[s] consistently rejected a bright-line rule requiring plaintiffs to demonstrate physical injury when bringing excessive force claims." Vondrak v. City of Las Cruces, 535 F.3d 1198, 1208 (10th Cir. 2008)(emphasis added). "[W]hen an excessive force claim relies upon unduly tight handcuffing, [the Tenth Circuit has] held that the plaintiff must show some actual injury," Id. Thus, the Tenth Circuit has held that officers committed no constitutional violation when they handcuffed and detained, for over an hour, two individuals who were arrested for violating Utah's obstruction-of-justice statute. See Silvan W. v. Briggs, 309 Fed. Appx. at 224. One of the detainees alleged in his affidavit that he suffered chaffing and soreness of his wrists, and extreme emotional trauma, as a result of being publicly displayed in handcuffs. See id. In holding that the arresting officers did not use excessive force, the Tenth Circuit reasoned:

> While Cory and Megan were not arrested for an especially severe crime and were not actively resisting arrest or attempting to flee, the officers could have been reasonably concerned for their safety, given their awareness that Cory was a peace officer and might have been armed. Further, Cory and Megan were released upon A.W.'s arrival at the home, and therefore, were not detained any longer than necessary to resolve the situation which necessitated police involvement. And because there is no evidence that Cory suffered more than a *de minimis* injury or that he notified the officers that his handcuffs were painful, he cannot maintain an excessive force claim based on unduly tight handcuffing . . . . Similarly, there is no evidence that Cory suffered any injury from being denied liquids . . . . Finally, while we do not doubt that being detained in handcuffs in public view would be traumatic, not every indignity -- even if it may later seem unnecessary in the peace of a judge's chambers -- rises to the level of a constitutional violation.

Id. at 224-25 (citations and internal quotes omitted). The Tenth Circuit has recently reiterated this notion in Fisher v. City of Las Cruces, No. 07-2294, 2009 WL 3336075, at *8 (10th Cir. Oct. 19,

2009):

> Our recent cases guide this analysis.  In <u>Cortez</u> we explained that in a handcuffing case "to recover on an excessive force claim, a plaintiff must show: (1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional."

<u>Fisher v. City of Las Cruces</u>, 2009 WL 3336075, at *8 (citing <u>Cortez v. McCauley</u>, 478 F.3d 1108, 1127 (10th Cir. 2007)).  And for "unduly tight handcuffing [to] constitute excessive force . . . a plaintiff [must] allege[] some actual injury from the handcuffing and allege[] that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight." <u>Fisher v. City of Las Cruces</u>, 2009 WL 3336075, at *15 (citing <u>Cortez v. McCauley</u>, 478 F.3d at 1129)).  The injury asserted, however, need not be physical; rather, it must be "non-de minimis [and ] physical, emotional, or dignitary."  <u>Id.</u> at 20.

## 2. <u>Excessive Force During an Unlawful Arrest</u>.

In cases where officers use force in effecting an arrest and the arrest is lawful, there will be no excessive-use-of-force claim if the officers use an amount of force commensurate with the circumstances.  On the other hand, if the officer's use of force was greater than necessary to effect the lawful arrest, an excessive-use-of-force claim will lie.  If, however, the arrest is <u>unlawful</u>, an excessive-use-of-force claim will lie only if the amount of force that the officer used was more than would have been justified if the detention had been lawful.  The Tenth Circuit has explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it.  If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force <u>reasonably</u> employed in effecting the arrest.  If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in

-54-

proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez v. McCauley, 478 F.3d at 1127.  Moreover,

> in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

Id. at 1126.  Thus, if it is clear that the amount of force used would have been reasonable if the detention or arrest had been appropriate, then the plaintiff can recover damages only for the unlawful arrest -- including any damages that flow from the officers' use of force during the arrest -- but there will be no separate excessive-use-of-force claim.

**ANALYSIS**

In these cross-motions for summary judgment, the Smiths seek summary judgment as to liability against most of the Defendants, and the Defendants seek summary judgment largely on grounds of qualified immunity.  Kukowski seeks summary judgment on the excessive-use-of-force claim on the ground that, if there was an unlawful arrest, the damages for excessive force will be subsumed within the unlawful arrest claim, and if there was no unlawful arrest, the Smiths have conceded that the amount of force used was reasonable.  See Thomson v. Salt Lake County, No. 06-4304, 2009 WL 3430758, at *3 (10th Cir. Oct. 27, 2009)("[I]n determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to the plaintiff as the nonmoving party.").  The Court will proceed under the traditional analysis of Saucier v. Katz, analyzing whether the Smiths have met their burden to show some evidence that the Defendants violated their rights, then analyze whether the right at issue was clearly established.  Because the Court is entertaining cross-motions for summary judgment, it will also decide whether any violation has been established as a matter

of law, such that the Smiths are entitled to win on their motion for summary judgment.

As an initial matter, the Court is unaware of any authority for a Fourth Amendment constitutional claim of "unlawful extraction," which the Smiths assert as Count I. The cases cited by the Smiths largely deal with unlawful seizures occurring within the home. The Court will therefore treat Count I to assert a claim of unlawful seizure or unlawful arrest within the home, before M. Smith and L. Smith exited to meet the officers outside. Because of this interpretation, however, the Court is certain that N. Smith, who was seized after voluntarily leaving the home, does not have such a claim. The Court will therefore grant the Defendants' motion for summary judgment as to N. Smith's claims of unlawful extraction (Count I) as to all Defendants.

## I. THE COURT ACCEPTS THE SMITHS' CONCESSIONS AS TO CERTAIN CLAIMS AGAINST CERTAIN DEFENDANTS.

The Smiths have conceded that some of their claims are not viable against some of the Defendants. Specifically, the Smiths have agreed that the Court can properly dismiss N. Smith's constitutional claims -- Counts I (Unlawful Extraction), II (Unlawful Arrest), III (Excessive Use of Force), and IV (Unreasonable Search) -- against Defendants Napoleone and Vocasek as a matter of law because neither Napoleone nor Vocasek played any part in the allegedly unconstitutional seizure of N. Smith. See Defendants' Motion at 13. The Court will therefore grant the Defendants' motion for summary judgment as to N. Smith's constitutional claims against Vocasek and Napoleone.

## II. KUKOWSKI IS ENTITLED TO SUMMARY JUDGMENT ON L. SMITH'S AND M. SMITH'S CLAIMS OF EXCESSIVE USE OF FORCE.

In Kukowski's motion, she asks the Court to grant summary judgment in her favor on L. Smith's and M. Smith's excessive-use-of-force claims. See Kukowski Motion at 8. The Smiths do not respond to Kukowski's legal argument that she did not use excessive force, but rather attack the idea that Kukowski might wish to concede that there was an unlawful arrest for the purposes of her

motion only.  See Plaintiffs' Response to Kukowski's Motion at 3-5.[13]  The Smiths insist that their position has consistently been that the amount of force used by the Defendants was commensurate with an arrest.  Their position, they have repeatedly asserted, is: (i) if the Court finds that the Defendants had probable cause to arrest the Smiths, their claim for excessive use of force will fail because the amount of force used was appropriate; (ii) if the Court finds that the Defendants did not have probable cause or reasonable suspicion to support detaining the Smiths, their excessive use of force claim will be subsumed within their unlawful-arrest claim; but (iii) if the Court finds that the Defendants had reasonable suspicion to execute an investigatory or preventive detention, that the amount of force used to execute such a detention was excessive and that the excessive-use-of-force claim will yield damages.  The Court finds that no evidence supports L. Smith's and M. Smith's claims of excessive use of force against Kukowski, and grants the Kukowski's motion.[14]

Although the Court finds that L. Smith and M. Smith have presented facts to support their unlawful-seizure claim against Kukowski, they have fallen short on their excessive-force claim against her.  "[A]ll claims that law enforcement officers have used excessive force . . . in the course

_____

[13] The Smiths join in Kukowski's motion -- implicitly agreeing that there was no excessive force used -- on the condition that the Court accept Kukowski's concession that the Smiths were unlawfully arrested for all purposes rather than simply for the limited purpose of the motion.  There was no alternative legal argument except that the Court should sanction the Defendants if they should try to withdraw their motion.

[14] The Court will not sanction Kukowski or her counsel for attempting to make a concession for the limited purpose of her motion for summary judgment.  Such limited-purpose concessions are not uncommon.  If the Court determined that the concession was self-serving, as the Smiths assert that it is, the Court would not accept it and would instead rule on the motion as though the concession had not been made.  The Court does not need to make that determination, however, because the Court finds that there is no evidence to support a claim of excessive use of force against Kukowski even in the context of an investigatory/protective detention based on reasonable suspicion.  No damages will arise from the Smiths' excessive-use-of-force claims against Kukowski no matter what the results of their unlawful-arrest claims are.

of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the

Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. at 395.  The

Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which
> requires that we consider the following factors: the severity of the crime at issue,
> whether the suspect poses an immediate threat to the safety of the officers or others,
> and whether he is actively resisting arrest or attempting to evade arrest by flight.

Weigel v. Broad, 544 F.3d at 1151-52 (internal quotation marks and citations omitted).  The Tenth

Circuit has also found that officers did not use excessive force when they handcuffed and detained

for over an hour two individuals who were arrested for violating Utah's obstruction of justice statute.

See Silvan W. v. Briggs, 309 Fed. Appx. at 224.  One of the detainees alleged in his affidavit that

he suffered chaffing and soreness of wrists, and extreme emotional trauma, as a result of being

publicly displayed in handcuffs.  See id.

The evidence that L. Smith and M. Smith have offered establishes that they were seized for

about forty-five minutes.  They were placed in handcuffs and taken to the command station where

someone fitting the description of Kukowski allegedly questioned them.  See Plaintiffs' Motion at

9; M. Smith Depo. at 34:18-25, 35:20-22.  If they had been subject to a lawful arrest, it would

appear, based on the Tenth Circuit's holding in Silvan W. v. Briggs, that being held for forty-five

minutes in handcuffs would not support an excessive-force claim, considering that the plaintiff in

Silvan W. v. Briggs was held, in handcuffs, in a similar fashion for about the same amount of time.

Moreover, considering the totality of the circumstances, Kukowski and her colleagues were pursuing

a lead on a homicide suspect, whereas, the officers in Silvan W. v. Briggs were executing a warrant

for obstruction of justice.  If the officers were concerned that the Smiths might be cooperating with

a homicide suspect, they would have more reason to place them in handcuffs for a period of time.

The primary wrinkle in the analysis is that L. Smith and M. Smith have presented facts to show that they were not subject to a lawful arrest.  More precisely, there is evidence that L. Smith and M. Smith were arrested, and that the arrest was not based on probable cause.  The Tenth Circuit has explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it.  If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest.  If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez v. McCauley, 478 F.3d at 1127.  Moreover,

> in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

Id. at 1126.  Thus, to determine whether L. Smith's and M. Smith's evidence supports a viable excessive-force claim, the Court must determine whether the force used against them was more than would have been necessary to effectuate a lawful arrest.[15]  The Court does not believe that the Smiths' evidence shows that what the officers did, and what Kukowski allegedly failed to stop, amounted to a clearly established use of excessive force.  The Court's analogy to the facts in Silvan

---

[15] To the extent that L. Smith and M. Smith contend that Kukowski used excessive force when extracting them from their home, the Court notes that, in merely talking on the telephone, Kukowski used no physical force in effecting the extraction.  And, because no other officer will be held liable on the unlawful extraction claim except perhaps Kenny -- who likewise exerted no physical force against the Smiths -- Kukowski cannot be vicariously liable for using excessive force in seizing the Smiths inside their home.  The Court therefore holds that L. Smith and M. Smith's claims of excessive force against her must fail insofar as they are based on Count I.

W. v. Briggs therefore holds, even though, according to L. Smith's and M. Smith's evidence, they were arrested without probable cause.

Moreover, other Tenth Circuit case law supports the Court's conclusion that L. Smith and M. Smith have not established excessive force. In Cortez v. McCauley, a plaintiff was arrested at midnight, grabbed and pulled out of his house, handcuffed, and placed in the back of a patrol car. See 478 F.3d at 1128. Furthermore, he complained that the handcuffs were too tight and that they were hurting him. See id. There were no contentions that the plaintiff resisted arrest or attempted to evade capture, and there was nothing to suggest that the plaintiff was an immediate threat to anyone's safety. See id. Nevertheless, the Tenth Circuit held that the officers did not use excessive force. See id. The Tenth Circuit explained: "[W]e have little difficulty concluding that a small amount of force, like grabbing Rick Cortez and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment." Id. Furthermore, the Tenth Circuit did not find the failure to loosen the handcuffs to be excessive force because there was no evidence of actual injury. See id. at 1129.

Although the Court does not yet comment regarding whether Vocasek, Napoleone, and the other officers used excessive force in effectuating L. Smith's and M. Smith's arrest, the Court believes that the record lacks evidence that Kukowski participated in or failed to intervene in any acts that would constitute excessive force. By the time Kukowski allegedly made in-person contact with L. Smith and M. Smith, they were already in handcuffs, and the handcuffs were not excessively tight.[16] There is no evidence of physical force being applied to L. Smith or M. Smith in Kukowski's

---

[16] There still seems to be some dispute whether the sergeant who talked with L. Smith and M. Smith was Kukowski. M. Smith's deposition refers only to a "blonde, female officer." Kukowski maintains that she did not encounter the Smiths at the command post.

presence, or at her direction, aside from the handcuffs, and no evidence that L. Smith or M. Smith suffered any physical harm aside from some temporary redness or tenderness.  The Court finds that the temporary redness and tenderness experienced by L. Smith and M. Smith is the kind of de minimis physical injury that does not support an excessive use of force claim based on the use of handcuffs.  See Fisher v. City of Las Cruces, 2009 WL 3336075, at *20 ("[O]ur precedent requires a showing in a handcuffing case of an actual, non-de minimis physical, emotional, or dignitary injury to succeed on a claim.").

The Smiths' response to the Defendants' motion for summary judgment alleges also that L. Smith suffered "significant emotional and psychological harms," see Plaintiff's Response at 22, but the Smiths present no evidence of those harms.  After scouring all of the attached deposition transcript excerpts, the most persuasive testimony that L. Smith gave during her deposition was that she felt the situation was "highly intimidating" and that she only signed the permission-to-search form because "she felt very threatened" during the encounter.  L. Smith Depo. at 58:1-2, 60:3-4. Those statements establish, at most, de minimis psychological harm; but, even if they were sufficient, they did not relate to the encounter with the woman that L. Smith and M. Smith imply was Kukowski.  In sum, the Smiths do not allege non-de minimis physical or emotional injury. There also is no testimony that anyone familiar with the Smiths saw them arrested nor that any rumors started that might have caused dignitary injury.  The handcuffs in this situation are not, on their own, enough to support an excessive-force claim, particularly against Kukowski, who did not apply the handcuffs and was never told that they were overly tight.  The Court will therefore grant summary judgment to Kukowski on the excessive-force claims.

**III.   KENNY IS LIABLE FOR ANY CONDUCT THAT HE DIRECTLY ORDERED OR
IN WHICH HE PARTICIPATED.**

As the Smiths accurately point out, a municipality cannot be liable under 42 U.S.C. § 1983
as a matter of vicarious liability.  See Ashcroft v. Iqbal, 129 S. Ct. 1837, 1949 (2009) ("In a § 1983
suit or a Bivens action -- where masters do not answer for the torts of their servants -- the term
"supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or
her title notwithstanding, is only liable for his or her own misconduct."); Monell v. Dep't of Soc.
Servs., 436 U.S. 658, 691 (1978).  "The doctrine of *respondeat superior* cannot be employed to hold
governmental entities liable under § 1983 for the constitutional torts of their employees."
Christensen v. Park City Mun. Corp., 554 F.3d 1271, 1279 (10th Cir. 2009) (citing Monell v. Dep't
of Soc. Servs., 436 U.S. at 691).  Similarly, a plaintiff cannot bring a § 1983 claim against a
supervisor only on a theory of supervisor liability.  See Fogarty v. Gallegos, 425 F.3d at 1162.  That
primarily is the rule because "[i]ndividual liability under § 1983 must be based on *personal
involvement* in the alleged constitutional violation." Fogarty v. Gallegos, 523 F.3d at 1162 (quoting
Foote v. Spiegel, 118 F.3d at 1423)(emphasis added).  "Personal involvement," however, "is not
limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands
on him." Fogarty v. Gallegos, 523 F.3d at 1162.  A supervisor "may be liable for a subordinate's
constitutional deprivations [if] an affirmative link exists between the constitutional deprivation and
either the supervisor's personal participation, his exercise of control or direction, or his failure to
supervise." Id. (internal quotes and citations omitted).

If Kenny was the supervisor of all other APD officers involved in the events of October 23,
2007, he will be liable for any constitutional violations that his subordinates committed if there was
an affirmative link between (i) the constitutional violation and Kenny's personal participation; (ii)

the constitutional violation and Kenny's exercise of control or direction; or (iii) the constitutional violation and Kenny's failure to adequately supervise.  The undisputed evidence establishes that Kenny was in charge of all other officers involved in the alleged searches and seizures of October 23, 2007.  See Kenny Aff. ¶ 11, at 3 ("I was the incident commander so I was giving officers directives as to what to do.").  The Court will therefore determine, for each violation, whether an affirmative link exists between the violation and Kenny's personal participation, exercise of control or direction, or failure to supervise.  As the Court assesses the remainder of the claims, the Court will also assess if such an affirmative link exists.  If it does, the Court will find that Kenny is personally liable for that violation to the same extent as the subordinate.  See Fogarty v. Gallegos, 523 F.3d at 1162.

## IV.    L. SMITH AND M. SMITH ARE ENTITLED TO SUMMARY JUDGMENT ON SOME OF THEIR CLAIMS FOR "UNLAWFUL EXTRACTION," WHICH THE COURT INTERPRETS AS A CLAIM OF UNLAWFUL ARREST.

Count I of the Smiths' Complaint asserts, essentially, that some of the Defendants seized L. Smith and M. Smith inside their home and forced them to leave their home.  First, they argue that a telephone call from Kukowski to M. Smith, during which Kukowski stated that she was with the APD and instructed M. Smith to exit the residence, constituted a seizure under the Fourth Amendment, and that, because it was done without probable cause, it was an unlawful arrest.  They further argue that, once L. Smith and M. Smith had exited their residence, other APD officers -- including Vocasek and Napoleone – seized them, and that this seizure was also made without probable cause.  The Defendants argue first that Kukowski's telephone call could not possibly constitute a seizure for the purposes of the Fourth Amendment.  As indicated in its prior opinion, the Court believes that Kukowski's telephone call could constitute a Fourth Amendment seizure:

The facts that Matthew Smith has alleged amount to a seizure under the Fourth

-63-

Amendment.  When an officer issues a command to someone to leave his or her home and to surrender himself to officers waiting outside, the individual receiving the command is not likely to feel free to decline to comply.  Moreover, according to Matthew Smith's version of events, Kukowski made him aware of the presence of other officers and ordered him to surrender to those officers with his hands in the air. Such a scenario suggests to a person that he is the target of an arrest on the premises of his home.

Amended Memorandum Opinion and Order at 35-36 (emphasis added).

As an initial matter, the parties agree that each of the Smiths was seized in the early-morning hours of October 23, 2007, during the APD's attempt to apprehend Lollis.  Furthermore, the parties agree that no police officer involved in the October 22-23, 2007 incident had probable cause to arrest any of the Smiths.  Instead, the officers had, at most, knowledge of articulable facts that would give rise to a reasonable suspicion that Lollis was somehow connected with the residents of 1704 Cardenas and/or might be inside the house.  It will therefore become important to determine whether the Defendants affected an investigatory or protective detention of the Smiths, or whether the detention of the Smiths blossomed into a full-fledged arrest.  If the seizure constituted an arrest, such arrest would be unlawful, because any given arrest requires that the arresting officer have probable cause to believe that the arrestee was involved in some form of criminality.  If the seizure was no more than a protective or investigative detention, on the other hand, the officers' reasonable suspicion might have justified it.

### A.    THE DEFENDANTS, INCLUDING VOCASEK AND NAPOLEONE, UNLAWFULLY ARRESTED L. SMITH AND M. SMITH WHEN THEY EXITED THE HOUSE.

The most cut-and-dry issue in this case is probably whether the officers standing outside of 1704 Cardenas seized L. Smith and M. Smith as they exited their home on October 23, 2007.  The Court has difficulty believing that any reasonable person would feel at liberty to deny the requests of a half-dozen armed police officers instructing him or her to turn around, kneel down, and be

placed in handcuffs.  The Court therefore concludes that the officers outside of the Smiths'

residence, including Vocasek and Napoleone, seized L. Smith and M. Smith for the purposes of the

Fourth Amendment.

The next issue is whether the seizure was "reasonable" under the Fourth Amendment.  This

inquiry is similar to asking whether the Defendants executed an "arrest" of the Smiths, because,

under established Tenth Circuit law, an arrest is a seizure that requires probable cause.  See United

States v. Perdue, 8 F.3d at 1461.  Seizures that are similar to arrests also require probable cause.  See

id. ("In order to protect that right, formal arrests or seizures that resemble formal arrests must be

supported by probable cause.")(citing Michigan v. Summers, 452 U.S. 692, 700 (1981)).  On the

other hand, "Terry stops are seizures under the Fourth Amendment, [but] they constitute such

limited intrusions on the personal security of those detained and are justified by such substantial law

enforcement interests that they may be made on less than probable cause . . . ."  United States v.

Perdue, 8 F.3d at 1461 (citing Michigan v. Summers, 452 U.S. at 700).

### 1.    The Seizure Executed by the Defendants Exceeded the Permissible Scope of a Terry-Stop.

Under the circumstances, the Court is not convinced that the detention of L. Smith and M.

Smith can be placed into the category of detentions that can be supported by reasonable suspicion.

The undisputed facts show that a group of at least eight APD officers apprehended L. Smith and M.

Smith.  See L. Smith Depo. at 47:19-48:21; M. Smith Depo. at 30:2-8, 30:21-31:15.  As L. Smith

and M. Smith exited the house, the officers instructed them to turn around, place their hands behind

their back, and submit to being handcuffed.  See M. Smith Depo. at 31:23-32:13; L. Smith Depo.

at 48:22-49:14, 50:21-25.  The officers then placed the Smiths in Vocasek's police car, and Vocasek

transported them to another location -- the command post -- which is similarly under the APD's

control.  See Vocasek Aff. ¶ 5, at 2; Kenny Aff. ¶ 24, at 5; M. Smith Depo. at 34:18-25, 35:20-22.

The Smiths remained in handcuffs during their time in the police car, though there is some

disagreement whether the handcuffs were removed during the Smiths' time at the command post.

The Smiths were detained at the command post for at least eighteen minutes (from 2:19 a.m. to

2:37 a.m.), though they allege that the detention lasted between thirty and forty-five minutes.  Before

the time at the command post, L. Smith and M. Smith had been under the custody and control of the

APD officers for at least six minutes -- exiting the residence at approximately 2:13 a.m. and then

transported to the command post at approximately 2:19 a.m.  See Napoleone Aff. ¶ 13, at 3; Vocasek

Aff. ¶ 6, at 2.  The Smiths were not free to return to their home until no earlier than 2:43 a.m., see

Kenny Aff. ¶ 30, at 6; Napoleone Aff. ¶ 22, at 5, meaning that they were in custody -- during which

they were greeted at gun-point, ordered to turn around and put their hands above their head,

handcuffed, and transported to a remote location -- over a span of approximately forty-five minutes.

        The Court concludes that this conduct constitutes a formal arrest or at least a seizure that

sufficiently "resemble[s a] formal arrest[]" to necessitate probable cause.  United States v. Perdue,

8 F.3d at 1461.  When an officer has reasonable suspicion to believe that an individual may be

involved in criminality, the officer may temporarily stop the individual and attempt to use relatively

non-invasive tactics to confirm or dispel that suspicion.  In United States v. Sharpe, the Supreme

court stated:

>        In assessing whether a detention is too long in duration to be justified as an
> investigative stop, we consider it appropriate to examine whether the police
> diligently pursued a means of investigation that was likely to confirm or dispel their
> suspicions quickly, during which time it was necessary to detain the defendant.

470 U.S. at 686-87.  See Terry v. Ohio, 392 U.S. at 21-22, 28.  The methods that the officers took

in this case, however, go beyond the scope of a reasonable Terry-stop, as does the detention's

duration.  Methods for confirming or dispelling suspicion often involve briefly -- over the course

of a few minutes -- questioning the individual and/or observing his or her behavior.   The

circumstances in this case, particularly being at gun-point, being handcuffed, being placed in the

back of a squad-car, and being transported to a "command center," are indicative of an arrest.

Moreover, L. Smith was read her <u>Miranda</u> rights before being asked to consent to a search of her

home, yet another traditional ingredient of an arrest.  <u>See</u> L. Smith Depo. at 55:22-25, 56:10-12,

57:25-58:2; Vocasek Depo. at 10:22-11:1.  The Court finds that, as a matter of law, Vocasek's and

Napoleone's conduct constituted a seizure under the Fourth Amendment and, furthermore,

constituted an unlawful arrest without probable cause.

### 2.    The Court Is Not Convinced that the Seizure Was Permissible as a Protective Detention.

The Court also does not find that the Vocasek's and Napoleone's conduct can accurately be

categorized as a protective or investigatory detention.  The Defendants have cited the Court to a

number of cases in which the police detained a citizen based on "officer safety concerns," and have

made the argument that similar concerns justified L. Smith's and M. Smith's detention in this case.

They assert "it was reasonable for officers to detain Linda and Matthew Smith for officer safety

reasons given that they were there to serve a high[-]risk warrant upon Raymond Lollis."  <u>See</u>

Defendants' Motion at 20.  The Smiths dispute this argument, asserting that the concept of a

"protective detention" has no place in this case, as the situation was never so volatile as to justify

such a detention.  <u>See</u> Plaintiffs' Response at 15-21.  The Court agrees with the Smiths on this point.

The concept of a protective detention in the Tenth Circuit arises from the case of  <u>United</u>

<u>States v. Maddox</u> -- and, indeed, this is the primary case upon which the Defendants rely in support

of their protective detention theory.  In <u>United States v. Maddox</u>, one policeman temporarily

detained eight individuals in a carport for a period of approximately one-half hour while federal marshals executed an arrest warrant on an individual who was inside of a mobile home nearby. See 388 F.3d 1359-60. The Tenth Circuit held that the thirty-minute detention of Maddox, one of the individuals detained in the carport, for the purpose of officer safety, was reasonable based on the totality of the circumstances, even though the officers initially lacked probable cause to believe that Maddox had committed any crime. See id. at 1367-68. The circumstances in this case, however, do not warrant the same treatment.

The Tenth Circuit in United States v. Maddox pointed to particular circumstances that, taken together, justified the detention of Maddox, without probable cause, for the safety of the officers: (i) the arrest was of a narcotics trafficker, and such arrests are known to be highly dangerous; (ii) the home in question was known to be a dangerous location, as officers had previously investigated a murder at that address and a number of violent fugitives had been arrested there; (iii) it was getting dark; (iv) the officer was outnumbered five-to-one, and one of the individuals was a known murder suspect; and (v) the officer had observed Maddox reach under the seat of his car when he arrived, possibly retrieving a weapon. See id. at 1366. Similar to the circumstances in United States v. Maddox, in this case, the potential arrest was of a murder suspect, and therefore was likely dangerous, and it was dark. On the other hand, many circumstances are distinguishable: (i) there is no evidence that 1704 Cardenas is in a particularly bad section of town or was particularly dangerous; (ii) the officers had the advantage, outnumbering L. Smith and M. Smith approximately five-to-one; and (iii) the officers had no basis to believe that L. Smith or M. Smith were armed.

Further factors materially distinguish this case from United States v. Maddox. First, in United States v. Maddox, the officers were serving a warrant on an individual that the officers had probable cause to believe was in the residence. See id. at 1359. The federal marshals had asked the

homeowner whether the arrestee was inside and was told that she was.  See id.  Here, the officers

had a tip, six hours before the seizure of the Smiths, from someone at a Twisters restaurant.  That

tip was that Lollis had been riding in a particular vehicle -- the same vehicle that was now parked

in front of the Smiths' residence.  That does not rise to the level of probable cause to believe that

Lollis was inside the Smiths' home, nor do the Defendants argue that it does.

Next, the officer in United States v. Maddox did not draw his weapon, did not treat Maddox

with indignity, and did not, until Maddox told the officer that he had a gun, handcuff Maddox.  See

id. at 1367.  The Tenth Circuit interpreted this action as the officer "employ[ing] no more force than

was necessary for officer protection in temporarily detaining Mr. Maddox."  Id.  In contrast, the

Smiths opened their door to over a half-dozen officers, many of whom had weapons drawn.  The

Defendants ordered the Smiths out of their home, to turn around, place their hands on their heads,

and walk backwards toward the officers.  The officers then told L. Smith and M. Smith to get on

their knees and submit to being handcuffed.  The officers placed L. Smith and M. Smith in

Vocasek's car, and transported them to a command center to be questioned away from their home.

At no time did the Defendants have probable cause to suspect that L. Smith or M. Smith were

involved in criminal activity.  This conduct shows that many of the factors supporting the officers'

reasonableness in United States v. Maddox are missing from this case.

Finally, Maddox refused to cooperate with the officers' instructions before being directly

questioned and, ultimately, arrested.  See id. at 1359.  Instead, Maddox was behaving erratically,

ignoring the officer's instructions, and pacing in circles farther and farther away from the carport.

See id.  In this case, both L. Smith and M. Smith complied with each and every instruction given,

demonstrating to the officers that they were intending to cooperate and posed no threat.  The

Defendants enjoyed control of the situation.

In total, the situation in this case is different from that in <u>United States v. Maddox</u>.  In <u>United States v. Maddox</u>, the officers were placed in a dangerous situation with dangerous people in a dangerous place.  The danger in this case arose from the idea that the officers would arrest Lollis, a wanted murder suspect, if they found him inside the Smiths' house -- a plan that was problematic from its inception because it required entry into the Smiths' home as a necessary premise.  Because they had insufficient cause to reasonably believe that they would find Lollis in the Smiths' house, or that they would be able to lawfully enter the Smiths' house at all, their concern for officer safety was not reasonable.

Even if the officers' concern had been reasonable, the officers -- by brandishing their weapons, handcuffing the Smiths, putting the Smiths in police cars, transporting them to a remote location, and questioning them over the course of approximately forty-five minutes -- exceeded the permissible bounds of a protective detention.  <u>See</u> <u>United States v. Gama-Bastidas</u>, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'"); <u>United States v. Melendez-Garcia</u>, 28 F.3d at 1052-53 (holding that detention turned into an arrest when handcuffs and guns were used in the absence of evidence that the officers had reason to believe the individuals detained were particularly dangerous); <u>United States v. Perea</u>, 374 F. Supp. 2d at 974-76 (holding seizure of man thought to be armed-and-dangerous murder suspect, by use of handcuffs and drawn guns, did not rise to the level of an arrest).  This case is distinguishable from the only case in which this Court has held that handcuffs did not transform the detention into an arrest.  In <u>United States v. Perea</u>, the officers involved could not see who was inside the suspect vehicle until he exited because of heavy window tinting.  <u>See</u> 374 F. Supp. 2d at 977.  Furthermore, even after he exited, the officers believed that the individual was the one wanted in connection with both a murder and an illegal narcotics

transaction, creating a reasonable belief that the suspect exiting the vehicle might be armed and dangerous.  See id.  Under those circumstances, the Court held that the officers were reasonable in handcuffing Perea while they conducted a brief investigative questioning of him to establish his identity.  See id.

The Defendants in this case might have truly believed that the Smiths were somehow linked to Lollis.  The Defendants do not dispute, however, that they knew that none of the persons that exited the Smith residence was Lollis.  The Defendants also do not dispute that the Smiths had been compliant up to the point that they exited their home, that they made no threatening movements, and that they complied with the officers' instructions after they exited the house.  The Court finds that the Defendants have provided "no evidence or testimony . . . that they had reason to believe that these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing . . . during the Terry stop."  United States v. Melendez-Garcia, 28 F.3d at 1052-53.  At best, the officers reasonably believed that the persons exiting the house were somehow linked to Lollis.  United States v. Melendez-Garcia, however, appears to foreclose the notion that it is inherently reasonable to use handcuffs and draw guns in a protective/investigative detention based on the inference that, because the person might be linked to something that frequently involves guns or violence, the suspect might be dangerous.  See United States v. Melendez-Garcia, 28 F.3d at 1053 ("In the absence of [evidence that the particular suspects are armed or violent, or that the situation in particularly dangerous], the naked fact that drugs are suspected will not support a *per se* justification for use of guns or handcuffs in a Terry stop.").  The Court will not hold that it is permissible, in the absence of probable cause, to handcuff anyone who is suspected of being somehow connected to a murder suspect.  More is required.  The Court therefore finds that the use of these intrusive techniques during the Smiths'

detention transformed that detention into an arrest, and, because the officers had no probable cause to make an arrest, that arrest was unlawful.

The other cases cited by the Defendants do not support their position any better than United States v. Maddox.  For example, in Mazzoni v. Morales, No. CIV 07-0432 LH-ACT, Memorandum Opinion and Order, filed June 9, 2009 (Doc. 54), the Honorable C. LeRoy Hansen, Senior United States District Judge, refused to find, as a matter of law, that the protective detention was beyond the permissible scope given the circumstances.  The circumstances in Mazzoni v. Morales, however, were different from those in this case.  The shooting in Mazzoni v. Morales had occurred only three to four hours before the police action in which the plaintiffs were extracted from their home; the trail had not yet cooled, and the officers had even greater reason to believe that the shooter was on the premises.  See id. at 2-3.  In this case, the arrest warrant for Lollis had issued October 19, 2007, based on events that allegedly occurred on October 18, 2007.  By October 23, 2007, the trail was cold, and the officers were acting on only a tip.  The Court believes that Mazzoni v. Morales was decided more on the basis of the exigency of the situation -- that the police were hot on the trail of the alleged criminal, almost immediately after the crime had occurred, and did not want to lose the scent.  In this case, the exigency had ceased.  Lollis committed his crime four days earlier, the trail was cold, and the police had only a tip and a possibility that he was inside the Smiths' home.  Given that the officers had no reasonable basis to conclude that a protective detention was necessary, and further because the amount of force used in this detention exceeded the bounds of a reasonable protective detention under the circumstances, the Court holds that Vocasek and Napoleone unlawfully arrested L. Smith and M. Smith.

3.    **The Right to be Free From Arrest in the Absence of Probable Cause is Clearly Established.**

The Court has concluded that Vocasek and Napoleone participated in a seizure of L. Smith and M. Smith, without probable cause, and that such seizure constituted an unlawful arrest.  For the Smiths to avoid Vocasek's and Napoleone's defense of sovereign immunity, the Court must also find that the right to be free from arrest in the absence of probable cause was clearly established on October 23, 2007, such that a reasonable officer would have known of it.  See Overdorff v. Harrington, 268 F.3d at 1186; Gross v. Pirtle, 245 F.3d at 1156; Albright v. Rodriguez, 51 F.3d at 1534.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as plaintiff maintains."  Strepka v. Miller, 28 Fed. Appx. 823, 830 (10th Cir. 2001)(quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  The Court so finds that the right to be free from unreasonable seizures -- such as an arrest without probable cause -- is clearly established.  See Dunaway v. New York, 442 U.S. 200, 207-10 (1979).  Because the right was clearly established at the time of the violation, and the Court has found that a violation has occurred, Defendants Vocasek and Napoleone are not entitled to qualified immunity as to these claims.  Further, because the merits of the L. Smith's and M. Smith's claim for unlawful arrest are established as a matter of law, the Court grants L. Smith's and M. Smith's motion for summary judgment on liability as to Count II against Vocasek and Napoleone.  And because the evidence establishes that the extraction was pursuant to Kenny's plan, under his supervision, and at his direction, Kenny will also be liable as a supervisor.

**B.    THE COURT HELD THAT KUKOWSKI'S TELEPHONE CALL TO M. SMITH COULD CONSTITUTE A SEIZURE, BUT WILL NOT HOLD, AS A MATTER OF LAW, THAT IT DID.**

A Fourth Amendment seizure occurs when an officer attempts to assert his or her official authority over a citizen and the citizen does not feel that he or she is at liberty to disregard that authority.  See Florida v. Bostick, 501 U.S. at 436; United States v. Mendenhall, 446 U.S. at 554. It does not require that the officer physically restrain the citizen, or even make physical contact with him or her.  See Florida v. Bostick, 501 U.S. at 436; United States v. Mendenhall, 446 U.S. at 554. In fact, the citizen need not even see the officer for the seizure to occur.  See United States v. Maez, 872 F.2d at 1446; United States v. Reeves, 524 F.3d 1168-69.  See also United States v. Al-Azzawy, 784 F.2d at 893; United States v. Morgan, 743 F.2d 1163-64.

In a Memorandum Opinion and Order entered July 21, 2009, the Court found that Kukowski's telephone call to M. Smith could constitute a seizure for the purposes of the Fourth Amendment.  See Memorandum Opinion and Order, filed July 21, 2009 (Doc. 52).  The Court held:

> As Matthew Smith relates the events that occurred at the Smiths' residence, which are at issue on this motion, he received a call at approximately 2:00 a.m. from Kukowski, who identified herself as a police officer and ordered him and all other occupants of the house to exit and surrender themselves to other officers waiting outside.  See Matthew Aff. ¶¶ 4-8, at 1.  Matthew Smith also alleges in his affidavit that Kukowski ordered that he and his mother exit with their hands in the air.  See id. ¶ 9, at 1-2.
>
> * * * *
>
> *The facts that Matthew Smith has alleged* amount to a seizure under the Fourth Amendment.  When an officer issues a command to someone to leave his or her home and to surrender himself to officers waiting outside, the individual receiving the command is not likely to feel free to decline to comply.  Moreover, according to Matthew Smith's version of events, Kukowski made him aware of the presence of other officers and ordered him to surrender to those officers with his hands in the air.  Such a scenario suggests to a person that he is the target of an arrest on the premises of his home.

In this case, *if Matthew Smith's evidence is to be believed*, Kukowski directly ordered him to leave the house and to surrender himself into custody. Furthermore, similar to United States v. Reeves, the police initiated contact with Matthew Smith at an odd hour – something that the Tenth Circuit found important to its analysis of coercion in United States v. Reeves. The Court believes that, in light of the case law, a direct order to exit a home and surrender into police custody is a seizure because a reasonable person would not feel free to ignore the order.

\* \* \* \*

The Court believes that, though mechanically different from a bullhorn, yelling into a home, or a land-line phone call, a cellular telephone is a tool to aide communication, as Kukowski has conceded. The means of communication was not the focus of the analysis in United States v. Al-Azzawy or in United States v. Morgan. Rather, the Sixth Circuit in United States v. Morgan outlined the principle of the Fourth Amendment's protection:

> In these circumstances, it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home. Otherwise, arresting officers could avoid illegal "entry" into a home simply by remaining outside the doorway and controlling the movements of suspects within through the use of weapons that greatly extend the "reach" of the arresting officer.

United States v. Morgan, 743 F.2d at 1166 (quoting United States v. Johnson, 626 F.2d 753, 757 (9th Cir. 1980)). Applying the principle idea taken from United States v. Johnson, the Sixth Circuit in United States v. Morgan determined that warrantless control of a suspect inside his own home constitutes a seizure. See id.

The Tenth Circuit has similarly accepted the notion that "[o]pening the door to one's home is not voluntary if ordered to do so under color of authority." United States v. Reeves, 524 F.3d at 1167. See United States v. Flowers, 336 F.3d at 1226 (holding that, if a resident's decision to open his door to police is made involuntarily, a seizure within his home has occurred). *In his affidavit, Matthew Smith presents a scenario* in which a reasonable person would not have felt free to leave. The late hour, the phone call, the order to exit with hands up, and the additional police presence are all factors that create a sense of coercive police authority which a reasonable person would not feel free to disregard. Thus, *Matthew Smith's facts, if taken as true, would constitute a seizure.*

Id. at 35-37 (emphasis added). The Court therefore denied Kukowski's motion for summary judgment with regard to M. Smith's unlawful seizure claim. See id.

On this motion, the evidence has come out slightly differently from the allegations in the

Complaint, and the context in which the Court analyzes this issue -- cross-motions for summary judgment -- requires the Court to view the evidence in a different light.  Both parties concede that Kukowski placed a telephone call to M. Smith's cellular telephone at approximately 2:00 a.m. on a Monday night/Tuesday morning.  <u>See</u> Kukowski Aff. ¶ 18, at 3; M. Smith Depo. at 25:11-14. Once they were speaking, she instructed him to go outside and bring with him anyone who was inside the house, and to surrender to the other officers that were located outside.  <u>See</u> Kukowski Aff. ¶ 18, at 3; M. Smith Aff. ¶¶ 7-9, at 1.

### 1.    <u>Kukowski's and M. Smith's Stories Are Materially Different</u>.

There are some differences between Kukowski's recount of events and M. Smith's, two of which are particularly significant.  First, M. Smith asserts that Kukowski told him to come out with his hands up, <u>see</u> M. Smith Aff. ¶ 9, at 2,  whereas Kukowski contends that she instructed him to come outside and attempted to advise him to dress warmly because it was cold outside, <u>see</u> Kukowski Depo. at 13:11-17.  Second, Kukowski asserts that she told M. Smith that she worked for the City of Albuquerque, <u>see</u> Kukowski Depo. at 13:2-14:6, whereas M. Smith insists that she told him that she was a police officer, <u>see</u> M. Smith Depo. at 25:20-21; M. Smith Aff, ¶¶ 5-6, at 1.  These circumstances change the analysis.

The relevant, undisputed facts establish the following:  (i) Kukowski instructed M. Smith that he was to exit his home and surrender to the officers waiting outside -- implying to M. Smith that she was an officer or associated with "officers;" (ii) she instructed that he collect everyone else in the residence and bring them outside with him; and (iii) the call was received at 2:00 a.m., rousing M. Smith from his slumber.  Interpreting the disputed facts in the light most favorable to the Defendants -- as the Court must when analyzing the Smiths' motion -- Kukowski was very cordial, referred to herself only as a city employee, and said politely that she needed M. Smith to exit his

home and contact the officers outside.  Interpreting those facts in the light most favorable to the

Smiths -- as the Court must when analyzing the Defendants' motion -- Kukowski announced herself

as a police officer, and ordered that M. Smith and anyone else inside the house come out with their

hands up, and surrender to the police officers waiting outside.  The Court believes that the disputed

facts are material and, construed in favor of the Defendants, might foreclose a finding that Kukowski

seized L. Smith and M. Smith.  The Court will therefore deny both the Smiths' and the Defendants'

motions for summary judgment regarding the Smiths' claim of "unlawful extraction," finding that

material factual issues exist whether Kukowski seized the Smiths while they were inside their home.

There are other factors, however, which the Court finds conclusively establish that Vocasek and

Napoleone seized L. Smith and M. Smith once they exited their home, and that such seizure violated

the Fourth Amendment.  On the other hand, the participation of Vocasek and Napoleone occurred

as L. Smith and M. Smith were exiting their home and after.  Thus, for the purposes of Napoleone

and Vocasek, the unlawful extraction is indistinguishable from the unlawful arrest.  The Court will

therefore grant the Defendants summary judgment on Count I, unlawful extraction, as to Napoleone

and Vocasek.

### 2. In Conjunction with the Conduct of the Other Officers, Kukowski Might Have Unlawfully Arrested L. Smith and M. Smith.

Kukowski did not work in isolation.  The undisputed facts disclose that Kukowski offered

to "assist" in the extraction of the Smiths from their 1704 Cardenas residence.  See Kukowski Aff.

¶ 17, at 3.  She played a particular role in the extraction: to get L. Smith and M. Smith to leave the

house and contact the officers waiting outside.  See Kenny Depo. at 17:14-18.  Her conduct was an

essential piece of the unlawful seizures that Vocasek and Napoleone committed.  The three officers

-- Kukowski, Vocasek, and Napoleone[17] – executed a plan to extract L. Smith and M. Smith from their home, and Kukowski actively participated in that plan.  This could constitute, for the purposes of Kukowski, "personal involvement in the alleged constitutional violation," which can give rise to liability.  See Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008)("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.  Personal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him. We have recognized at least two other ways . . . ."); Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997); Grimsley v. MacKay, 93 F.3d 676, 679 (10th Cir. 1996).  This does not, however, end the inquiry.

When cast in the light of direct participation in the alleged constitutional violation, there exist factual issues regarding what exactly Kukowski thought that the plan would entail.  The Court is convinced that the officers had reasonable suspicion that the Smiths might be related -- either as victims or associates -- to Lollis.  It therefore appears that a limited investigation for the purpose of ensuring the safety of the Smiths was appropriate.  The facts are in conflict as to some facts that the Court considers material.  If a fact-finder determines that Kukowski believed that the plan was to draw the Smiths into the front yard so that the other officers could quickly question them and then permit them to return to their slumber, such a brief investigation and detention was reasonable under the circumstances.  On the other hand, if the fact-finder finds that Kukowski knew or believed that the ultimate goal of the extraction was to detain the Smiths, put them in a police car, and transport them to the command center, then Kukowski clearly participated in Vocasek's and Napoleone's

---

[17] Other officers likely participated in this conduct, given that M. Smith alleges that he saw as many as eight officers when he exited his home on October 23, 2007.  See M. Smith Depo. at 30:2-8, 30:21-31:15.  The three named officers plus Kenny, however, are the only ones against whom he currently has claims regarding this incident.

unlawful arrest.

If Kukowski is found to have been ignorant that Kenny and the other officers intended to apprehend the Smiths, there exists a factual issue whether she failed to intervene in that unlawful detention. Kukowski has maintained that she had no exposure to the Smiths once they were brought to the command center, and that her participation in the October 23, 2007 incident was limited to telephone call to the Smiths. On the other hand, the Smiths have all insisted that they spoke with a blonde, female sergeant at the command center and that Kukowski was both (i) a sergeant and (ii) the only female at the command post. This, of course, implies that the Smiths spoke with Kukowski. If Kukowski was the officer at the command center that questioned each of the Smiths, the lack of probable cause and the arrest-like nature of the detention might have been sufficiently clear that Kukowski should have realized that the detention was unlawful.[18] In that case, the Court would find that Kukowski either actively participated in the unlawful arrest or failed to fulfill her duty to intervene once she learned about it. See Hall v. Burke, 12 Fed. Appx. at 861. On the other hand, a reasonable fact-finder might credit Kukowski's testimony and find that some other female officer questioned the Smiths at the command center. In that case, if Kukowski both was ignorant that officers intended to apprehend and transport the Smiths, and did not later encounter the Smiths at the command center, the Court would be unable to find that Kukowski meaningfully participated in that unlawful arrest.

Of course, Kukowski's absence from the scene of L. Smith's and M. Smith's initial detention

---

[18] Another disputed fact further clouds this analysis. The parties dispute whether the Smiths remained in handcuffs while they were at the command post. If they did, the detention would clearly appear to be an arrest. If the handcuffs had been removed, and Kukowski did not see the Smiths detained in the police cars, it might have appeared as though the Smiths were voluntarily assisting the police. These factual issues will also have to be resolved by a jury.

does not, in itself, absolve her of liability.  She used a telephone to instruct the Smiths when and how to exit the house.  One cannot use technology to accomplish, without liability, what would otherwise violate the Constitution.  The situation is not significantly different than if Kukowski had been standing outside with the other officers, shouting her instructions through a bullhorn, and merely watched as another officer placed handcuffs on the Smiths and placed them in squad cars for transport to the command post.  Accord United States v. Al-Azzawy, 784 F.2d at 893.  She may assert that she did not know that the Smiths were going to be transported, in handcuffs, to the command post; but, if she did not know that initially, she may have learned it when they were delivered to the command post for questioning.  The Court has found that Napoleone and Vocasek unlawfully arrested the Smiths when they exited their home on Tuesday morning, and that such seizure constituted an unlawful arrest under the Fourth Amendment.  Because factual issues exist whether Kukowski knew that the officers intended to apprehend the Smiths and whether she later learned of the arrest when she allegedly questioned the Smiths at the command post, the Court cannot properly grant either party's motions for summary judgment.

The Defendants argue that the evidence shows that M. Smith initially did not believe that Kukowski was a police officer, but rather thought that she was "some cute girl," and that this impression should militate in favor of finding that she did not "seize" the Smiths.  In other words, because M. Smith did not initially believe he was speaking to a police officer, Kukowski's assertion of authority could not possibly have compelled him.  The Court is not convinced.  First of all, the question whether a Fourth Amendment seizure has occurred is not subjective, but rather is whether a reasonable person would feel as though he or she was at liberty to resist the officer's requests.  See United States v. Mendenhall, 446 U.S. at 554; United States v. Bostick, 501 U.S. at 436.  Second, even if M. Smith thought that he was speaking merely to "some cute girl" when he first answered

-80-

the telephone, the facts establish that at some point M. Smith did rouse his mother and exit the house.  This fact at least shows a factual issue whether, at some point, M. Smith was convinced that he was speaking to a police officer and no longer felt that he was at liberty to disregard Kukowski's instructions.  Thus, denial of both motions for summary judgment is appropriate.

### C.   KENNY ORDERED THE EXTRACTION OF L. SMITH AND M. SMITH, AND THEREBY "EXERCISED CONTROL OR DIRECTION."

Kenny will be liable for the conduct of his subordinates if he personally participated in, exercised control or direction over, or failed adequately to supervise, any acts that amount to a constitutional violation.  See Fogarty v. Gallegos, 523 F.3d at 1162.  The undisputed evidence establishes that Kenny had an extraction plan involving Kukowski calling the occupants of 1704 Cardenas, and that Kenny ordered Vocasek to transport L. Smith and M. Smith from their home to the command post.  See Kenny Depo. at 17:14-18.  In the Court's view, although the liability of Kukowski for this plan is not firmly established, because Kenny orchestrated the conduct of Napoleone and Vocasek, as well as that of Kukowski, his conduct is sufficient to constitute personal participation and establish Kenny's liability for the unlawful arrest of L. Smith and M. Smith.  See Kenny Aff. ¶ 11, at 3; id. ¶ 18, at 4; id. ¶ 24, at 5. The Court will therefore grant L. Smith's and M. Smith's motion for summary judgment as to Count II against Defendant Kenny.  Kenny's liability for the unlawful extraction (Count I), however, will depend on Kukowski's liability.  Thus, there exists a factual issue regarding L. Smith's and M. Smith's claims of unlawful extraction against Kenny.

### D.   SOME EVIDENCE LINKS McDONNELL TO THE UNLAWFUL ARREST OF L. SMITH OR M. SMITH, BUT NOT TO THE UNLAWFUL EXTRACTION.

L. Smith and M. Smith appear to assert their unlawful-arrest and unlawful-extraction claims

against McDonnell as well as against Kukowski, Vocasek, Kenny, and Napoleone.  Although the

Court has found liability established as a matter of law as to Vocasek, Kenny, and Napoleone, the

evidence is not as clear with respect to McDonnell.  The Court has found evidence in the record that

McDonnell supervised the Smiths while other Defendants executed the search of the Smiths' home.

See McDonnell Depo. at 12:20-13:4.  The Court is not sure, however, what McDonnell knew about

L. Smith's and M. Smith's detention.  The record does not clearly disclose whether McDonnell was

at or near the Smiths' house at the time of the unlawful arrest, nor whether McDonnell encountered

L. Smith or M. Smith at the command post and failed to intervene in the ongoing constitutional

violation.  For this reason, the Court will not grant the Smiths' motion for summary judgment on

Count II against McDonnell at this time.  Because there is some evidence that McDonnell

participated in the unconstitutional seizure, however, and because it is clearly established that one

has the right not to be arrested in the absence of probable cause, the Court will also deny the

Defendants' motion for summary judgment as to L. Smith's and M. Smith's claims of unlawful

arrest (Count II) against McDonnell.  No evidence, however, links McDonnell to the initial

seizure/extraction of the L. Smith and M. Smith from the Smith residence.  The Court will therefore

grant the Defendants' motion for summary judgment with respect to Count I against McDonnell.

**E.   BECAUSE L. SMITH AND M. SMITH SUCCEED ON THEIR UNLAWFUL ARREST CLAIM, THEIR EXCESSIVE-USE-OF-FORCE CLAIM IS SUBSUMED WITHIN IT.**

As the Smiths willingly admit, an excessive-use-of-force claim will be subsumed within a

successful claim of unlawful arrest, because, when a seizure is unlawful, any use of force is

excessive.  See Cortez v. McCauley, 478 F.3d at 1126.  Thus, all damages caused by an excessive

use of force will mirror those caused by an unlawful arrest.  The Court will therefore grant the

Defendants' motion as to L. Smith's and M. Smith's excessive-use-of-force claims (Count III)

against Defendants Vocasek, Napoleone, Kukowski, and Kenny.  On the other hand, the Court has denied both parties' motions with respect to L. Smith's and M. Smith's unlawful-seizure claim (Count II) against McDonnell.  Nevertheless, there is no evidence that McDonnell applied any force to the Smiths.  If he applied no force, the Court cannot see how the force he used -- i.e. none -- can possibly be excessive.  The Court will therefore grant the Defendants' motion for summary judgment as to L. Smith's and M. Smith's excessive-use-of-force claim against McDonnell.

## V.   N. SMITH IS ENTITLED TO SUMMARY JUDGMENT AS TO HIS CLAIM OF UNLAWFUL ARREST.

The next seizure that the Court must analyze is that of N. Smith.  Again, N. Smith left the Smith residence in a white car at approximately 1:30 a.m. on October 23, 2007.  That was roughly eight minutes after the white car had shown up -- likely carrying N. Smith.  The Defendants were then in the midst of setting up a perimeter around the neighborhood in which 1704 Cardenas was located.  Furthermore, the officers were working from a tip that put Lollis in the Jeep Cherokee registered to the Smiths earlier in the evening, so they had reason to believe that the white car might also be linked with Lollis.

As N. Smith left the house, McDonnell, acting on Kenny's direct orders, pulled over N. Smith's vehicle.  See Kenny Aff. ¶¶ 13-14, at 3.  Once the vehicle was pulled over, McDonnell was able to identify N. Smith and, importantly, identify that N. Smith was not Lollis.  See N. Smith Depo. at 17:2-24.  Someone placed N. Smith's keys and cellular telephone on the roof of the car. See id. at 18:12; McDonnell Depo. at 7:10-19.  At that point, N. Smith could no longer warn Lollis, if he had any interest in doing so.  Also, at that point, McDonnell had been given no additional reason to believe that there was any link between N. Smith and Lollis.

### A.   McDONNELL'S STOP OF N. SMITH WAS PERMISSIBLE, BUT EXCEEDED THE PERMISSIBLE SCOPE OF SUCH A STOP.

"A traffic stop is a seizure within the meaning of the Fourth Amendment.  For purposes of constitutional analysis, it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause."  United States v. Toro-Pelaez, 107 F.3d 823-24.  The law permits an officer to make a short Terry-stop or investigative detention on the basis of reasonable suspicion for the sole purpose of confirming or dispelling that suspicion, but the officer's conduct during that stop must be "reasonably related in scope to the circumstances which justified the interference."  Id. at 824.  The Court finds that the combination of the detailed tip of Lollis being seen inside the vehicle that was later found parked at 1704 Cardenas, and N. Smith's very brief 1:22 a.m. visit to the house, created reasonable suspicion for McDonnell to believe that N. Smith might either (i) be Lollis or (ii) be connected to Lollis.  The stop was, therefore, justified at its inception.  The issue remains, however, whether McDonnell exceeded the permissible scope of this sort of investigative detention.

McDonnell pulled over N. Smith, asked him some questions, had the opportunity to do a background check and check the vehicle registration, and had the opportunity to do a number of other routine tasks that could legitimately confirm or dispel McDonnell's concern and/or prolong the seizure.  The Defendants contend that they were concerned that whoever was in the white vehicle might spot the police cars creating the perimeter and warn Lollis, allowing him to escape or to prepare for the officers' arrival, increasing the danger.  The problem is that the seizure did not end after that brief encounter.  Instead, McDonnell placed N. Smith in handcuffs, placed him in a squad car, and transported him to the command post where a blonde officer, alleged to be Kukowski, questioned him.  He was detained from approximately 1:30 a.m. until 2:32 a.m., and was in

handcuffs throughout that time.  The Court finds that this hour-long detention, in handcuffs, exceeds the scope of a permissible investigatory detention.  See United States v. Place, 462 U.S. at 699 (finding a 90-minute detention of a persons luggage exceeded permissible length of investigatory detention); United States v. Maddox, 388 F.3d at 1367-68 (finding that investigative seizure for 30 minutes, without handcuffing, under circumstances dangerous to the officers did not rise to the level of an arrest); United States v. Gama-Bastidas, 142 F.3d at 1240 ("the use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'"); United States v. Melendez-Garcia, 28 F.3d at 1052-53 (holding that detention turned into an arrest when handcuffs and guns were used in the absence of evidence that the officers had reason to believe the individuals detained were particularly dangerous); United States v. Perea, 374 F. Supp. 2d at 974-76 (holding seizure of man thought to be armed-and-dangerous murder suspect, by use of handcuffs and drawn guns, did not rise to the level of an arrest). The Court also finds that this detention, occurring over a block from where the Defendants suspected that Lollis was hiding, could not reasonably be called a protective detention.  For McDonnell to validly detain N. Smith in the manner that he did, he would need probable cause to believe that N. Smith was engaged in some criminal conduct.  Because he had no such probable cause, this detention constituted an unlawful arrest as a matter of law.  Furthermore, because the parties agree that McDonnell was acting on Kenny's direct orders in apprehending N. Smith, detaining him, and searching his vehicle, the Court finds that Kenny is also liable for N. Smith's unlawful arrest.

The Court believes that this encounter and the Defendants' arguments in support of it shed light on what went wrong on the morning of October 23, 2007.  The officers concluded that they had found where a wanted murder suspect was possibly located, and they were convinced that they would apprehend him.  None of the Defendants ever sought a search warrant, even though one

would be necessary to enter the Smith's residence to apprehend Lollis inside.  See United States v. Cavely, 318 F.3d 987, 993 (10th Cir. 2003)(holding that, absent exigent circumstances, officers have no authority to search a third-party's home, even if they have reason to suspect that the subject of an arrest warrant is inside)(citing Steagald v. United States, 451 U.S. 204, 205-06 (1981)).  The officers behaved, from the very beginning, as though there were exigent circumstances.  The Defendants justify the detention of N. Smith on the grounds that they did not want Lollis to be notified that the police were planning to apprehend him, because he might then escape or plan an ambush.  Such an ambush, however, would occur only if the APD officers entered the Smith residence.  Removal of the Smiths from their home appears to be on the ground that the Defendants feared that Lollis would use them as hostages, that they would assist Lollis in fending off the Defendants, or the Defendants thought that Lollis would cause harm to the Smiths.  These hopes and fears, however, assume that the Defendants would be able to enter the Smiths' home that evening, or have Lollis come out to effect his arrest.  In fact, all of the Defendants' officer safety concerns were premised on the idea that they would enter the Smiths' home to meet Lollis face-to-face.

### B.    THE DEFENDANTS DID NOT HAVE PROBABLE CAUSE TO SEARCH N. SMITH'S VEHICLE.

Once the officers had detained N. Smith, also under Kenny's direct orders, they searched N. Smith's vehicle, including the trunk.  See Kenny Depo. at 9:9-22, 10:18-23.  This search was ostensibly to determine whether Lollis was inside.  See Kenny Depo. at 10:21-23.  First, the Court is surprised that the Defendants were concerned that Lollis might be in the trunk of the vehicle, given that they were surveilling 1704 Cardenas, saw the vehicle arrive, saw the vehicle leave eight minutes later, and did not see anybody stow a person in the trunk.  Unless Lollis was already in the trunk of the vehicle when it arrived, the Court is not sure when he might have snuck in.

-86-

Nevertheless, the Defendants have not shown the Court any authority for the proposition that reasonable suspicion that a criminal may be stowed away inside a vehicle is a sufficient basis to execute a full automobile search.  A search of a vehicle requires either consent or probable cause to believe that the officers will find evidence of criminality within, neither of which the Defendant had.  See United States v. Forbes, 528 F.3d at 1277-78 ("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search.").  A search of the accessible areas of the car would be permissible as a search incident to a lawful arrest, but the Defendants' whole argument is that no arrest occurred.  Even then, a search incident to an arrest would not allow the officers to search the car's trunk.  See Arizona v. Gant, 129 S. Ct. 1710, 1723-24 (2009).  The Court finds that McDonnell -- and Kenny as his supervisor -- executed an unconstitutional search of N. Smith's vehicle, and will therefore grant N. Smith's motion for summary judgment on his Count IV (unlawful search) against McDonnell and Kenny.

### C.   A FACTUAL ISSUE EXISTS WHETHER KUKOWSKI FAILED TO INTERVENE IN THE UNCONSTITUTIONAL SEIZURE OF N. SMITH, BUT SHE PLAYED NO PART IN THE SEARCH OF HIS CAR.

The Smiths seem to insist that Kukowski questioned N. Smith when he was brought to the command post after being seized by McDonnell.  The Defendants contest this assertion and have provided testimony by Kukowski that she did not encounter N. Smith when he was at the command post.  On the other hand, the Defendants concede that a blonde, female sergeant questioned N. Smith, that Kukowski was a sergeant on October 23, 2007, and that Kukowski was the only female officer at the command post that evening.  See Plaintiffs' Motion at 4-5; Defendants' Response at 5 (disputing Plaintiffs' facts Nos. 22, 24, 25 "[t]o the extent, if any, Plaintiffs are trying to infer that the blonde female sergeant is Sergeant Kukowski," though admitting fact No. 26, that "Defendant

Cassandra Kukowski was the only female officer at the mobile command center, [and that s]he was a sergeant at the time."). The Defendants' concessions run contrary to Kukowski's insistence that she did not encounter N. Smith at the command post, but the Court finds that the issue is a factual one that a jury must resolve. The Court believes a reasonably jury could find that Kukowski questioned the Smiths or that someone other than Kukowski questioned them. The Court will therefore deny both the Smiths' and the Defendants' motions for summary judgment as to liability on N. Smith's claim of unlawful arrest against Kukowski.

On the other hand, the Court finds that no factual issue exists whether Kukowski is liable for the unlawful search of N. Smith's vehicle. There exist no facts to indicate that Kukowski ordered N. Smith's seizure or the search of his vehicle, no facts to indicate that she participated in the search, and no facts to indicate that she knew that the search occurred. The Court will therefore grant the Defendants' motion for summary judgment as to N. Smith's claim of unlawful search (Count IV) of his vehicle against Kukowski.

## VI.    L. SMITH AND M. SMITH ARE ENTITLED TO SUMMARY JUDGMENT ON SOME OF THEIR UNREASONABLE SEARCH CLAIMS.

It is undisputed that at least three of the Defendants -- Vocasek, Napoleone, and Kenny -- entered the Smiths' residence in the early morning of October 23, 2007, to conduct a search for Lollis. The Smiths challenge this search as violative of their Fourth Amendment right because it was not based upon probable cause, because it was not made pursuant to a warrant or a valid exception to the warrant requirement, and because they did not consent. The Defendants make two arguments in response: (i) that the search was valid because exigent circumstances justified searching the premises without a warrant; and (ii) because L. Smith signed a permission-to-search form that allegedly gave the police authority to search the house. The Smiths contest both

justifications.  First they argue that there were no exigent circumstances other than those the Defendants created, which cannot justify a warrantless entry.  Next, they assert that, even if there was an exigency, there was still no probable cause, which is a requirement of any constitutional search of a person's home.  Finally, they contend that the permission-to-search form that L. Smith signed was invalid because it was coerced.  In their reply brief, the Smiths also argue that, even if the consent to search was not coerced, Vocasek knew at the time that he read the terms of the permission-to-search form to L. Smith that he would not honor those, and that therefore the consent was based on false promises and cannot constitute actual, voluntary, informed consent.  See Plaintiff's Reply at 10.

As an initial matter, the Court finds that the right to be free from a warrantless search of his or her home is clearly established, as is the right to be free from coercion in giving police permission to search one's home.  See Doe v. United States, 487 U.S. 201, 214 n.13 (1988)(noting that "the Fourth Amendment generally prevents the government from compelling a suspect to consent to a search of his home."); Schneckloth v. Bustamonte, 412 U.S. 218, 233-34 (1973)(stating that, in the context of an automobile search, "if under all circumstances it has appeared that the consent was not given voluntarily -- that it was coerced by threats or force, or granted only in submission to a claim of lawful authority -- then we have found the consent invalid and the search unreasonable."); Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968)("When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.").  Thus, if the Court finds that there is evidence that an unconstitutional search occurred, it must deny the Defendants' motion for summary judgment on qualified immunity grounds.  See Gross v. Pirtle, 245 F.3d at 1155; Currier v. Doran, 242 F.3d at 917; Scull v. New Mexico, 236 F.3d at 595.

-89-

**A.   NO EXIGENCY WARRANTED THE WARRANTLESS SEARCH OF THE SMITHS' HOME, AND THE DEFENDANTS DID NOT HAVE PROBABLE CAUSE TO BELIEVE THERE WAS EVIDENCE INSIDE THE HOUSE.**

The Court is unconvinced by the Defendants' argument that officer safety issues arose from N. Smith's coming and going from the Smiths' residence, and that those issues created an exigent circumstance justifying a warrantless entry into the house.  See Defendants' Motion at 24-25.  The argument runs in circles.  The officers were setting up a perimeter around the neighborhood in hopes of apprehending Lollis.  They then saw a vehicle come and go from a house in which they believed Lollis was hiding.  The Court accepts that these circumstances may have piqued the officers' interests about who was driving the white car, and whether he or she had any connection with Lollis. Assuming, *arguendo*, that Lollis was inside the house at that time, the person inside that car as it left the house was either (i) Lollis, (ii) a friend or associate of Lollis, or (iii) a person unconnected with Lollis, and Lollis simply did not force him or her to remain at the house.

Giving the officers the benefit of every doubt, the only danger to the police officers at this time was in being seen by the person in the white car, who might be Lollis or someone else who might wish to do them harm.  That concern was quelled when McDonnell pulled over N. Smith and took his cellular telephone.[19]  To say that officer safety was a concern justifying entry into 1704 Cardenas is nonsensical unless one already assumes that the officers are going to enter the residence, without a search warrant, to apprehend someone that they are not certain is inside.  In other words, officer safety is a concern only <u>if</u> the officers enter, so officer safety cannot possibly be the exigency that <u>allows</u> the officers to enter in the first place.  A contrary rule would allow officers that think,

---

[19] The Court is not indicating that the seizure of N. Smith was lawful merely because it would quell concern that the driver might harm the officers.  Police officers do not have a right to seize a citizen solely to make their job safer.

however vaguely, that a fugitive is inside a dwelling to enter the dwelling without a warrant, because there are always concerns about officer safety when attempting to arrest a known felony suspect. The Supreme Court has held that the presence of a fugitive inside a home is not an exigency warranting intrusion into that home without a warrant:

> A contrary conclusion -- that the police, acting alone and in the absence of exigent circumstances, may decide when there is sufficient justification for searching the home of a third party for the subject of an arrest warrant -- would create a significant potential for abuse. Armed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances. Moreover, an arrest warrant may serve as the pretext for entering a home in which the police have a suspicion, but not probable cause to believe, that illegal activity is taking place.

Steagald v. United States, 451 U.S. at 215. The Defendants seem to ask this Court to adopt a contrary rule; the Court declines the invitation. The Court will therefore find that exigent circumstances did not justify a warrantless entry into the Smiths' residence.

Even if the Court found that N. Smith's swift sojourn at the Smiths' house created some exigent circumstance, the Defendants are missing another component of a search of a citizen's home: probable cause. The Supreme Court and Tenth Circuit have repeatedly emphasized that, to execute a reasonable search of a person's home, the police must have (i) probable cause and (ii) either a warrant or some valid exception to the warrant requirement, such as exigent circumstances. See Maryland v. Buie, 494 U.S. at 339; Sanchez v. Ulibarri, 308 Fed. Appx. 284; United States v. Reeves, 524 F.3d at 1169; West v. Keef, 479 F.3d at 759. Only in the limited situation where risk of danger to the officers or others gives rise to the exigent circumstance does the exigency obviate the need for probable cause. See West v. Keef, 479 F.3d at 759; United States v. Najar, 451 F.3d at 718 (stating, while discussing the standard for assessing "whether the risk of personal danger created exigent circumstances," that "[n]either did the [Supreme] Court require probable cause in

this type of exigent circumstances.")(discussing <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398 (1943)) (emphasis added).

The Court finds that the 7:00 p.m. tip linking Lollis to the vehicle registered to the Smiths, without more, does not provide probable cause to believe that Lollis was inside the Smiths' home. Thus, even if there were exigent circumstances, which the Court does not find, the exigency alone does not justify entry into the Smiths' home to apprehend Lollis.  That all three of the Smiths -- N. Smith, M. Smith, and L. Smith, none of whom were Lollis -- had been apprehended, and that each stated that Lollis was not inside the house, did not aid the Defendants in establishing probable cause. And while the arrival and departure of a mysterious white car at 1:22 a.m. on a Tuesday morning might have heightened suspicion and leaned in favor of establishing probable cause, once McDonnell identified the driver as one of the occupants of the house, any additional "cause" created by the visit was nullified.  Also, once the officers had extricated the Smiths from their home and confirmed -- by way of questioning each of the Smiths -- that Lollis was not in the house, any danger to the Smiths that might justify entry under the emergency-aid exception of <u>United States v. Najar</u> was eliminated.  Finally, the Court declines to extend the <u>Maryland v. Buie</u> notion of a "protective sweep," done in conjunction with a successful arrest inside the home and limited to person-sized places wherein other persons might be, to allow officers to enter a house which they otherwise have no right to enter for the purpose of searching for the person named in an arrest warrant.  Because the Court finds neither probable cause nor exigent circumstances justified a search of the Smiths' residence, and the parties agree that the Defendants had no search warrant, the Court would find the Defendants' search of the Smiths' residence violated the Fourth Amendment.  Because the Court finds that factual issues exist whether L. Smith voluntarily consented to the search, however, the Court cannot grant summary judgment to either party.

**B.     A FACTUAL ISSUE EXISTS WHETHER L. SMITH GAVE VALID PERMISSION TO SEARCH.**

Because the Defendants have failed to show that they had exigent circumstances justifying a search of the Smith residence on October 23, 2007, L. Smith's and M. Smith's unlawful-search claims turn on whether L. Smith validly gave the Defendants permission to search the home. The Defendants argue that L. Smith was properly informed of her rights, was not handcuffed or otherwise physically restrained during the encounter, and freely gave the Defendants permission to search the house. The Smiths, however, argue that L. Smith and M. Smith were both handcuffed when L. Smith was presented with the permission-to-search form, and that the circumstances rendered the permission that she gave involuntary and invalid.

Permission to search must be given voluntarily to be valid. And the Court has already found that L. Smith was unlawfully arrested and detained when she signed the permission-to-search. The disputed factual issues in the case, however, preclude the Court from deciding, as a matter of law, that L. Smith's permission was obtained under circumstances that render it involuntary.

Viewing the facts in the light most favorable to the Defendants, the situation might have been as follows: After being instructed to exit their home, being placed in handcuffs, and being transported to the command post, L. Smith's and M. Smith's handcuffs were removed. At that point, Vocasek calmly explained to L. Smith that the Smiths were asked to leave their home because the officers believed that a man named Lollis was inside their home, and that they would like L. Smith's permission to enter the home and conduct a protective search. Vocasek made clear that the choice was entirely L. Smith's and that there would be no negative repercussions for refusing the search. L. Smith, being completely put at ease by Vocasek's explanation, voluntarily and rationally concluded that it would be in her best interest to ensure that Lollis was not inside her home, and

-93-

agreed that the officers should search the house.

If a fact-finder determined that the events occurred in this way on October 23, 2007, the fact-finder might rightfully conclude that L. Smith's permission to search was given voluntarily.  On the other hand, the facts could be construed differently: After L. Smith and M. Smith were forced out of their house at gun-point, handcuffed, put in the back of a police car, and transported to the command post, Kukowski questioned them.  The officers kept them in handcuffs.  After being told that the officers suspected that they were involved with a wanted murder suspect, Vocasek presented L. Smith with a form that would allow the Defendants to search their home for Lollis.  Fearing that they would be thrown in jail or otherwise found to be in cahoots with Lollis, L. Smith reluctantly signed the permission-to-search form and was abruptly placed back in the police car while the officers prepared to enter 1704 Cardenas.  If the foregoing is what the fact-finder concludes occurred on October 23, 2007, they might not find that she signed the permission-to-search form voluntarily. The Court believes that a reasonable jury could validly reach either conclusion.

Furthermore, it is undisputed that the permission-to-search form states that the homeowner will have the right to accompany the officers on the search and, at any time, rescind permission to search.  See Permission to Search at 1 ("I understand that I may accompany the officers during this search, and that I may rescind the Permission to Search at any time.").  It is also undisputed that the Smiths did not enter their home during the officers' search.  The Defendants insist that the Smiths were excluded from the home because it would be dangerous for them to accompany the officers into the home in search of a wanted murder suspect.  It is unclear, however, (i) whether Vocasek knew that the officers would exclude the Smiths from the search when he spoke with L. Smith; (ii) whether Vocasek and L. Smith had discussed the fact that the Smiths would be kept outside during the search; (iii) whether that fact was included as part of her permission to search; and (iv) whether

the Smiths ever desired to enter the home or to rescind their permission to search.  See United States

v. Romero, 247 Fed. Appx. 955, 964 (10th Cir. 2007)(holding that "the use of deception or trickery

is one factor to be considered in the totality of circumstances."); United States v. Pena-Sarabia, 297

F.3d 983, 986 (10th Cir. 2002)("[A] court should consider, inter alia, . . . deception or trickery . . .

within the totality of the circumstances."); United States v. Cavely, 318 F.3d 987, 992 (10th Cir.

2003)(implying that, if officers deceived the homeowner into signing the permission to search, the

search would be invalid); United States v. Dozal, 173 F.3d 787, 796 (10th Cir. 1999)(stating that the

proper inquiry regarding whether a permission-to-search is valid "centers on whether the defendant

suffered, inter alia, '. . . deception or trickery.'")(quoting United States v. Glover, 104 F.3d 1570,

1584 (10th Cir. 1997); United States v. Jacquez, 409 F. Supp. 2d 1286, 1300 (D.N.M. 2005)

(Browning, J.)(discussing whether the police attempted to coerce the defendant into granting

consent).  There exists, therefore, multiple factual issues whether the permission-to-search form that

L. Smith signed was valid.  The Court will therefore deny both parties' motions for summary

judgment as to the unlawful search claims by L. Smith and M. Smith against Vocasek, Napoleone,

and Kenny, who ordered the search and ordered Vocasek to get permission from L. Smith.  There

is no evidence, however, that Kukowski played any role in the search, ordered the search, supervised

the search, or had any responsibility for supervising the search.  See Fogarty v. Gallegos, 523 F.3d

at 1162.  There is also no evidence that Kukowski, from her position at the command post, knew

about or was in any position to stop the search.  See Mick v. Brewer, 76 F.3d at 1136.  For those

reasons, the Court will grant the motion as to L. Smith's and M. Smith's claims of unreasonable

search against Kukowski.  Because there is also no evidence that McDonnell participated in the

search or had any supervisory responsibility for it, the Court will also grant the Defendants' motion

as to L. Smith's and M. Smith's claims of unlawful search against McDonnell.

**VII.    THE SMITHS' STATE-LAW TORT CLAIMS SURVIVE SUMMARY JUDGMENT BECAUSE SOME CONSTITUTIONAL CLAIMS SURVIVE.**

Count V of the Smiths' Complaint asserts that the Defendants are liable for various state-law torts against the Smiths under the New Mexico Tort Claims Act.  The Defendants' only argument in support of summary judgment on Count V is that they should be granted summary judgment on all of the federal constitutional claims and therefore that there is no basis for state-tort liability under NMSA 1987, § 41-4-21.  See Defendants' Motion at 25-26.  As the Defendants' state, the statute "waives immunity for various torts, generally intentional torts, caused by law enforcement officers while acting within the scope of their duties."  Id. at 26 (internal quotes omitted).  First of all, the Court did not grant summary judgment in the Defendants' favor on all of the federal constitutional claims; therefore, the Defendants' only argument in favor of summary judgment fails.  Furthermore, the Court agrees with the Smiths that, because "neither party has fully briefed this court on the numerous factual and legal issues surrounding state tort liability, including the issue of supervisory liability, these claims are not yet ripe for decision."  Plaintiffs' Response at 25.  The Defendants have not met their burden of proving that, on the record before the Court, no genuine issue of material fact precludes summary judgment or that they are otherwise entitled to judgment as a matter of law.  The Court will therefore decline to grant either party's motion for summary judgment as to Count V.

**IT IS ORDERED** that the Plaintiffs' Motion for Summary Judgment is granted as to the following claims: (i) Plaintiff Nathan Smith's claims of unlawful arrest and unlawful search (Counts II and IV) against Defendants Casey McDonnell and Sean Kenny; and (ii) Plaintiffs Linda Smith's and Matthew Smith's claims of unlawful arrest (Count II) against Defendants Andrew Vocasek, Kevin Napoleone, and Kenny.  It is further ordered that the Defendants' Motion for Summary

Judgment Requesting Dismissal of Plaintiffs' Complaint is granted as to the following claims: (i) all of the Smiths' claims for excessive use of force (Count III); (ii) N. Smith's claim of unlawful extraction (Count I) against all Defendants; (iii) L. Smith and M. Smith's claim of unlawful extraction (Count I) against Napoleone, McDonnell, and Vocasek; (iv) N. Smith's claim of unlawful arrest and unlawful search (Counts II and IV) against Vocasek and Napoleone; (v) L. Smith's and M. Smith's claims for unlawful search (Count IV) against McDonnell; and (vi) L. Smith's, M. Smith's, and N. Smith's claims for unlawful search (Count IV) against Kukowski.  Finally, it is ordered that Defendant Cassandra Kukowski's Motion for Summary Judgment to Dismiss Plaintiffs Linda and Matthew Smith's Excessive Use of Force Claims is granted.  The remainder of the Plaintiffs' and Defendants' motions are denied.


_____
UNITED STATES DISTRICT JUDGE


*Counsel*:

Grieta A. Gilchrist
Attorney at Law
Albuquerque, New Mexico

-- and --

Paul J. Kennedy
Mary Y.C. Han
Darin M. Foster
Minal P. Unruh
Kennedy & Han, P.C.
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*

Robert M. White
Stephanie M. Griffin
Albuquerque City Attorney's Office
Albuquerque, New Mexico

 *Attorneys for Defendants Sean Kenny, Casey McDonnell, Kevin Napoleone,*
  *and Andrew Vocasek*

Phillip W. Cheves
Minerva C. Camp
Butt Thornton & Baehr, P.C.
Albuquerque, New Mexico

 *Attorneys for Defendant Cassandra Kukowski*